IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
BENTON DIVISION

| | | |
|---|---|---|
| MARY E. SHEPARD and the<br>ILLINOIS STATE RIFLE ASSOCIATION, | ) ) ) | |
| Plaintiffs, | ) ) | No. 3:11-cv-00405-WDS-PMF |
| v. | ) ) ) | Honorable Judge William D. Stiehl |
| LISA M. MADIGAN, solely in her official capacity<br>as ATTORNEY GENERAL OF ILLINOIS,<br>GOVERNOR PATRICK J. QUINN, solely in his<br>official capacity as Governor of the State<br>of Illinois | ) ) ) ) ) ) | Magistrate Judge Philip M. Frazier |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY AND/OR PERMANENT INJUNCTION**

William N. Howard
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Tel.: 312/360-6000
Fax: 312/360-6596

*Attorneys for Plaintiffs,*
  *Mary E. Shepard and*
  *The Illinois State Rifle Association*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ ii

BACKGROUND ......................................................................................... 1

ARGUMENT ............................................................................................. 2

I.   BECAUSE ILLINOIS' LAW INFRINGES PLAINTIFFS' RIGHT TO BEAR ARMS, PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ............................................ 2

    A.   The Right to Carry Firearms is not Limited to Narrowly Circumscribed Locations. ................................................................................... 3

    B.   Illinois' Prohibition Cannot be Squared with Limitations Historically Understood as Consistent with the Second Amendment. ....................... 9

    C.   Illinois' Ban is Unconstitutional. .................................................. 13

II.   THE PLAINTIFFS WILL BE IRREPARABLY HARMED UNLESS AN INJUNCTION ISSUES. ......... 14

III.   THE DEPRIVATION OF PLAINTIFFS' SECOND AMENDMENT RIGHTS OUTWEIGHS ANY HARM TO THE PUBLIC OR THE STATE OF ILLINOIS. ........................................... 15

IV.   THIS COURT SHOULD RULE ON THE MERITS. ................................................ 19

CONCLUSION ........................................................................................... 19

## TABLE OF AUTHORITIES

**Cases**                                                                **Page**

*Andrews v. State*, 50 Tenn. 165 (1871)..................................................................13

*Bliss v. Commonwealth*, 12 Ky. 90 (1822) ..........................................................12

*Curtis 1000, Inc. v. Suess*, 24 F.3d 941 (7th Cir. 1994).................................16, 19

*District of Columbia v. Heller*, 554 U.S. 570 (2008)........................................ *passim*

*Elrod v. Burns*, 427 U.S. 347 (1976) ...................................................................14

*Ezell v. City of Chicago*, No. 10-3525, 2011 WL 2623511 (7th Cir. July 6, 2011) ............. *passim*

*KH Outdoor LLC v. Trussville*, 458 F.3d 1261 (11th Cir. 2006)..................................16

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010)...........................................3, 7

*Nunn v. State*, 1 Ga. 243 (1846)..................................................................8, 12, 13

*Rex v. Knight*, 90 Eng. Rep. 330 (1686) ...............................................................5

*Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380 (7th Cir. 1984) ...............15

*Simpson v. State*, 13 Tenn. 356 (1833) ...............................................................11

*State v. Chandler*, 5 La. Ann. 489 (1850)............................................................13

*State v. Huntly*, 25 N.C. (3 Ired.) 418 (1843).......................................................11

*State v. Reid*, 1 Ala. 612 (1840)..................................................................9, 12

*State v. Wash Lowe*, *reprinted in* New York Times, Oct. 26, 1866................................7

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010), *cert. denied*, 131 S. Ct. 1674 (2011).......13

*Wright v. United States*, 302 U.S. 583 (1938) ......................................................4

**Statutes and Legislative Materials**

720 ILCS 5/24-1 ...............................................................................................1

720 ILCS 5/24-1.6 ...........................................................................................1

720 ILCS § 5/24-1(a)(4) ..................................................................................13

720 ILCS § 5/24-1(a)(10) ................................................................................13

Statute of Northampton, 2 Edw. 3., c. 3 (1328)................................................10

FED. R. CIV. P. 65(a)(2) ...................................................................................19

**Other**

An Act Forbidding and Punishing Affrays (Va. 1786) *in* A COLLECTION OF ALL SUCH ACTS
    OF THE GENERAL ASSEMBLY OF VIRGINIA (Augustine Davis ed., 1794) ................................11

An Act for the Better Ordering and Governing Negroes and Other Slaves in this Province,
and to Prevent the Inveigling or Carrying Away Slaves from Their Masters or Employers
(Ga. 1765) *in* ACTS PASSED BY THE GENERAL ASSEMBLY OF GEORGIA (1765)......................11

An Act for the Better Security of the Inhabitants, By Obliging the Male White Persons
to Carry Fire Arms To Places of Public Worship (Ga. 1770) *in* A DIGEST OF THE LAWS
OF THE STATE OF GEORGIA (1800) ..........................................................................................7

An Act for the Protection and Security of the Sheep and Other Stock on Tarpaulin-Cove-Island,
Otherwise Called Naushon-Islands, and on Nennemesset-Island; and Several Small Islands
Contiguous, Situated in the County of Dukes'-County *in* LAWS OF THE COMMONWEALTH
OF MASSACHUSETTS (Mass. 1790) .......................................................................................11

1 BLACKSTONE COMMENTARIES ............................................................................................5

2 BLACKSTONE COMMENTARIES (Christian ed., 1794) ...............................................................5

4 BLACKSTONE COMMENTARIES ...........................................................................................10

5 BLACKSTONE COMMENTARIES (St. George Tucker ed., 1803) ....................................................6

BENJAMIN OGLE TAYLOE, IN MEMORIAM: ANECDOTES AND REMINISCENCES
(Washington, D.C., 1872), *available at* http://www.archive.org/details/
inmemoriambenjam00wats (last accessed May 10, 2011) .......................................................6

C. Kevin  Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J. L. & PUB. POL'Y
695 (2009)......................................................................................................................10

CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY (1822)..10

Charles F. Wellford *et al.* (eds.), *Firearms and Violence: A Critical Review* (2005) .............17, 18

DAVID MCCULLOUGH, JOHN ADAMS (2001).............................................................................6

1 *Documentary History of Reconstruction* ...................................................................................7

*First Reports Evaluating the Effectiveness of Strategies for Preventing Violence: Firearms
Laws*, 52 MORBIDITY & MORTALITY WEEKLY REPORT (CDC Oct. 3, 2003)
(No. RR-14), *available at* http://www.cdc.gov/mmwr/PDF/rr/rr5214.pdf............................ 17

Gary Kleck, TARGETING GUNS: FIREARMS AND THEIR CONTROL (1997) ......................................18

JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS (1994) ............................................................7

N. WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (reprinted 1989) ........4

Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 U.C.L.A. L.
REV. 1343 (2009).............................................................................................................12

Philip J. Cook, Jens Ludwig, & Adam M. Samaha, *Gun Control after* Heller*: Threats
and Sideshows from a Social Welfare Perspective*, 56 U.C.L.A. L. REV. 1041 (2009)...........14

RICHARD FROTHINGHAM, LIFE AND TIMES OF JOSEPH WARREN 452
(Boston: Little, Brown, & Co., 1865) ...................................................................................7

Right-To-Carry 2010 http://www.nraila.org/Issues/factsheets/read.aspx?ID=18 ........................17

Robert A. Hahn, *et al.*, *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREV. MED. 40 (2005)..............................................................................................17

SAMUEL JOHNSON, 1 DICTIONARY OF THE ENGLISH LANGUAGE (4th ed.) (reprinted 1978) ...................................................................................................................4

T. SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (1796)...............................4

THOMAS JEFFERSON, WRITINGS (letter of August 19, 1785) (Merrill D. Peterson ed., 1984) .........7

WILLIAM W. HENING, THE NEW VIRGINIA JUSTICE, COMPRISING THE OFFICE AND AUTHORITY OF A JUSTICE OF THE PEACE, IN THE COMMONWEALTH OF VIRGINIA (2d ed. 1810) .................10

# BACKGROUND

Illinois's 720 ILCS 5/24-1 (the "Unlawful Use of Weapons" law) and 720 ILCS 5/24-1.6 (the "Aggravated Unlawful Use of a Weapon" law) constitute a complete ban on the public carrying of firearms by law abiding citizens otherwise qualified to possess them in Illinois.

The effect of the Unlawful and Aggravated Unlawful Use of a Weapon law (the "Weapons Laws") is, at a bare minimum, a plain violation of Plaintiffs' Second Amendment rights. The harmful effects of this ban are severe, and its immediate forestallment imperative.

As a result of the Weapons Laws, 69-year-old Mary Shepard was unarmed when working at the First Baptist Church in Anna, Illinois on September 28, 2009. Ex. A, Declaration of Mary Shepard ("Shepard Decl.") ¶ 12. At 3:00 p.m., an attacker broke in to the church, beat Mrs. Shepard and another elderly woman nearly to death, and left them bleeding. *Id.* ¶¶ 8-10. Mrs. Shepard sustained four skull fractures, fractures of both cheeks, shattered teeth, a concussion, crushed vertebrae, two torn rotator cuffs, and a mangled arm. *Id.* ¶ 8. She has lost the hearing in her left ear, and now suffers blinding recurrent headaches. *Id.* ¶ 9.

Mrs. Shepard has a valid Illinois Firearms Owner Identification Card and has no criminal record. *Id.* ¶ 3. She has completed five safety and self-defense training courses. *Id.* ¶ 4. Although Mrs. Shepard is licensed in two other states to do so, she was not carrying a handgun on her person on the afternoon of the attack. *Id.* Forty-nine states recognize some form of self-defense carriage; Illinois alone recognizes no form of self-defense carriage. *Id.* ¶ 5.

If allowed to exercise her Second Amendment rights, Mrs. Shepard would have had her handgun with her for self defense. *Id.* ¶ 13. But Illinois's Weapons Laws commanded her to lay down her constitutional rights and suffer the devastating consequences. In the absence of the Weapons Laws, Mrs. Shepard would immediately carry her small handgun for self-defense. *Id.*

1

Mrs. Shepard cannot predict when she will next need to defend herself from violent attack, but she knows that every day that passes she is at risk of being defenseless against predatory criminals. *Id.* ¶ 15.

This Court should preliminarily and permanently enjoin Illinois's Weapons Laws because they are flatly unconstitutional. They target activity—firearm carriage for self-defense—at the very core of the Second Amendment, and then outlaw that activity entirely. Simply put, they prevent Illinois citizens like Mary Shepard from defending themselves almost everywhere they might need to do so. The harm caused to Mrs. Shepard and other Illinois citizens is neither temporary nor abstract—it is instead immediate, permanent, and irreparable.

## ARGUMENT

"To win a preliminary injunction, a party must show that it has (1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits." *Ezell v. City of Chicago*, No. 10-3525, 2011 WL 2623511, at *5 (7th Cir. July 6, 2011). Once these threshold requirements are met, "the district court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Id.*

## I. BECAUSE ILLINOIS' LAW INFRINGES PLAINTIFFS' RIGHT TO BEAR ARMS, PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

In *District of Columbia v. Heller*, the Supreme Court struck down the District of Columbia's handgun ban on the basis of a textual and historical analysis demonstrating that the ban reached the core of activity protected by the Second Amendment. *See* 554 U.S. 570, 628-29 (2008) (holding that D.C. handgun ban would "fail constitutional muster" under "any of the standards of scrutiny we have applied to enumerated constitutional rights"). In *McDonald*, the

2

Supreme Court held that the Second Amendment is "fully applicable to the States" through the Fourteenth Amendment, *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3026 (2010); *see also id.* at 3058 (Thomas, J., concurring in part and concurring in the judgment), and thus struck down Chicago's handgun ban. *Heller* and *McDonald* thus establish that "broadly prohibitory laws restricting the core Second Amendment right … are *categorically* unconstitutional." *Ezell*, *supra*, at *13 (emphasis added).

When confronted with other laws that restrict activity protected by the Second Amendment, the Seventh Circuit has made clear that a Court is "left to choose an appropriate standard of review from among the heightened standards of scrutiny the Court applies to governmental actions alleged to infringe enumerated constitutional rights." *Id.* Laws that impose "a severe burden on the core Second Amendment right of armed self-defense … require an extremely strong public-interest justification and a close fit between the government's means and its end." *Id.* at *17. "[L]aws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right." *Id.*

## A.     The Right to Carry Firearms is not Limited to Narrowly Circumscribed Locations.

The Second Amendment provides that "the right of the people to keep *and bear* Arms shall not be infringed." (Emphasis added.) The Supreme Court in *Heller* made clear that "[a]t the time of the Founding, as now, to 'bear' *meant* to 'carry.' " *Id.* at 584 (emphasis added). Consequently, *Heller* ruled that the phrase to "bear arms" "meant (as it continues to mean today)," to "wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another per-

son." *Id.* at 584, 586 (quotation marks omitted).[1]  Specifically, the Second Amendment "guarantee[s] the individual right to … carry weapons in case of confrontation."  *Id*. at 592.

The Second Amendment's text negates the proposition that the right to carry firearms is limited to the home.  Such a limitation on the right would read the term "bear" out of the Constitution, for the Second Amendment also protects the right to "keep" arms – that is, to "have weapons."  *Heller*, 554 U.S. at 582.  The explicit textual guarantee of the right to "bear" arms would mean nothing if it did not protect the right to "bear" arms outside of the home where they are "kept."  The most fundamental canons of construction forbid any interpretation that would relegate this language to the status of meaningless surplusage.  *See, e.g., Wright v. United States*, 302 U.S. 583, 588 (1938).

Indeed, even putting the text of the Second Amendment to one side, it would be more than a little strange to interpret "the individual right to possess and carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, as applying only in the privacy of the home, and not out in public where one is more likely to experience "confrontation."  This common sense animates the Supreme Court's ruling that the Second Amendment was originally understood to guarantee the right to "wear, bear, or carry [weapons] upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person," *Heller*, 554 U.S. at 584.

---

[1] For the proposition that "bear" meant "to carry," *Heller* cited, *inter alia,* the 1773 edition of Samuel Johnson's dictionary, 1 DICTIONARY OF THE ENGLISH LANGUAGE 161 (4th ed.) (reprinted 1978); N. WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (reprinted 1989);  T. SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (1796).  *See Heller,* 554 U.S. at 583-84. Cunningham's important 1771 legal dictionary, repeatedly cited in *Heller*, indicated that "bearing arms" encompassed carrying weapons outside the home; it gave as an example a law limiting the rights of " 'Servants and labourers' " to use of " 'bows and arrows on Sundays*,* & c. and not bear other arms.' " *Heller*, 554 U.S. at 588-89 (italics omitted).  It is inconceivable that the Framers envisioned using a bow and arrow inside one's home.

It is essential to keep in mind that the Second Amendment did not create a new right – it "codified a *pre-existing*" one.  *Id.* at 592 (emphasis in original).  The "right … long … understood to be the predecessor to our Second Amendment" was the provision in the English Bill of Rights  stating that individuals " 'may have arms for their defense suitable to their conditions and as allowed by law.' "  *Id.* at 593 (quoting 1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689)).  This right extended to carrying arms for protection against violence *in public*.

This is apparent from Blackstone's discussion of the right to arms.  Blackstone classified the right of British subjects "of having arms for their defence" as among "auxiliary" rights "which serve principally as barriers to protect and maintain inviolate the three great and primary rights, of personal security, personal liberty, and private property."  1 BLACKSTONE COMMENTARIES *136, *139.  The right to arms, Blackstone explained, "is indeed a public allowance … of the natural right of resistance and self-preservation; when the sanctions of society and laws are found insufficient to restrain the violence of oppression."  1 BLACKSTONE COMMENTARIES *139; *id.* at *140 ("the subjects of England are entitled … to the right of having and using arms for self-preservation and defence").  Inasmuch as threats to liberty, security, and property know no bounds, a right to arms limited to the home plainly would have been insufficient to meet its high purposes.[2]

The right to bear arms was understood by the Framers of our Constitution to have similar scope.  In *Heller*, the Court noted a wealth of support for this interpretation of the public scope of

---

[2] Other British sources confirm that the right to arms was understood to extend to carrying arms in public.  By the late 17th century, the English courts recognized that it was the practice and privilege of "gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330 (1686).  And in the early 1790's, Edward Christian, a lawyer and professor of the laws of England at the University of Cambridge, published an edition of Blackstone's Commentaries in which he noted that "every one is at liberty to keep or carry a gun, if he does not use it for the destruction of game," 2 BLACKSTONE COMMENTARIES *411-12 n.2 (Christian ed., 1794).

the right to bear arms.  "The most prominent examples are those most relevant to the Second Amendment: Nine state constitutional provisions written in the 18th century or the first two decades of the 19th, which enshrined a right of citizens to 'bear arms in defense of themselves and the state' or 'bear arms in defense of himself and the state.' "  *Heller*, 554 U.S. at 584-85 & n.8. Just as "it is clear from those formulations that 'bear arms' did not refer only to carrying a weapon in an organized military unit," *id*. at 585, it is likewise clear that "bear arms" did not refer only to toting a weapon from room to room in one's house.  Citizens could not effectively bear arms either in defense of themselves or in defense of the state if they were not free to carry their weapons where they were needed for both purposes.  As *Heller* recognized, "Justice James Wilson interpreted the Pennsylvania Constitution's arms-bearing right … as a recognition of the natural right of defense 'of one's person *or* house,' " demonstrating that the right of "bearing arms" in defense of the person was understood to extend beyond the home.  554 U.S. at 585 (quoting 2 COLLECTED WORKS OF JAMES WILSON 1142, at n.x (K. Hall & M. Hall eds., 2007)) (emphasis added).

The practices of the Founding generation confirm that the right to carry a firearm was well-established.  Judge St. George Tucker observed, "In many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 BLACKSTONE COMMENTARIES App. n.B, at 19 (St. George Tucker ed., 1803).[3]  As the Court noted in *Heller,*

---

[3] And the Founders regularly exercised their right. For example, George Washington carried a pistol for self-defense and is said to have drawn one to fend off a "desperado" who threatened to shoot him on his ride from Mt. Vernon to Alexandria shortly after the Revolutionary War. *See* BENJAMIN OGLE TAYLOE, IN MEMORIAM: ANECDOTES AND REMINISCENCES 95 (Washington, D.C., 1872), *available at* http://www.archive .org/details/inmemoriambenjam00wats (last accessed May 10, 2011).  John Adams brought a pistol with him when he sailed to France in 1778. *See* DAVID MCCULLOUGH, JOHN ADAMS 177

"[m]any colonial statutes *required* individual arms-bearing for public-safety reasons."  554 U.S. at 601 (emphasis added).[4]

Those who wrote and ratified the 14th Amendment in 1868 understood the right to bear arms in precisely the same way.  *Cf. Ezell*, *supra*, at *12.  An 1866 report to Congress from the Freedmen's Bureau stated: "There must be 'no distinction of color' in the right to carry arms, any more than in any other right." Ex. Doc. No. 70, House of Representatives, 39th Cong., 1st Sess., at 297 (1866). A Mississippi court recognized this in 1866 when it struck down a state ban on carrying a firearm without a license: "While, therefore, the citizens of the State and other white persons are allowed to carry arms, the freedmen can have no adequate protection against acts of violence unless they are allowed the same privilege." *State v. Wash Lowe*, *reprinted in* New York Times, Oct. 26, 1866, at 2 (*quoted in* Stephen P. Halbrook, Freedmen, the Fourteenth Amendment, and the Right to Bear Arms, 1866-1876, 57-58 (1998)).  Thus bearing arms included carrying them for personal self-defense.  The Supreme Court embraced this understanding in *McDonald* when it cited, as examples of laws that would be nullified by the 14th Amendment, a statute providing that "no freedman, free negro or mulatto, not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind."  130 S. Ct. at 3038.  *McDonald* also referred to "Regulations for Freedman in Louisiana" which stated that no freedman "shall be al-

---

(2001).  Thomas Jefferson wrote his nephew, "Let your gun therefore be the constant companion of your walks."  *See* Thomas Jefferson, Writings 816–17 (letter of August 19, 1785) (Merrill D. Peterson ed., 1984).  And Dr. Joseph Warren, a prominent Boston patriot, carried pistols when making his rounds. Richard Frothingham, Life and Times of Joseph Warren 452 (Boston: Little, Brown, & Co., 1865).

[4] *See, e.g.,* An Act for the Better Security of the Inhabitants, By Obliging the Male White Persons to Carry Fire Arms To Places of Public Worship (Ga. 1770) *in* A Digest of the Laws of the State of Georgia 157-58 (1800); *see also* Joyce Lee Malcolm, To Keep and Bear Arms 139 (1994) (citing several examples of laws that "required colonists to carry weapons").

lowed to carry firearms, or any kind of weapons, within the parish, without the written special permission of his employers, approved and indorsed by the nearest and most convenient chief of patrol." 1 DOCUMENTARY OF HISTORY OF RECONSTRUCTION at 279-80.

The Second Amendment's "prefatory" clause cements the interpretation of the right to carry protected by the operative clause.  The prefatory clause "announces the purpose for which the right was codified: to prevent elimination of the militia."  *Heller*, 554 U.S. at 599.  Indeed, "it was understood across the political spectrum that the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down."  *Id*.  In *Nunn v. State*, the Georgia Supreme Court "perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause," *Heller*, 554 U.S. at 612-13:

> [T]he right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree; and all this for the important end to be attained:  the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State.

*Nunn v. State*, 1 Ga. 243, 251 (1846) (emphasis omitted).  A right to bear arms limited to the home plainly would be ill-suited to the purpose of "the rearing up and qualifying a well-regulated militia," for if citizens could be prohibited from carrying arms in public they simply could not act as the militia at all.

Of course, "the militia was not the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting." *Heller*, 554 U.S. at 599.  Hunting, like self-defense from assailants at large, cannot be conducted by those bearing arms only within their homes.  Thus *Heller* concluded that, although "self-defense had little to do

8

with the right's *codification*; it was the *central component* of the right itself." *Id.* (emphasis in original).

**B.   Illinois' Prohibition Cannot be Squared with Limitations Historically Understood as Consistent with the Second Amendment.**

Like other constitutional rights, the right to bear arms is "not unlimited," and Plaintiffs do not claim a right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.  The potential limits on firearms carriage mentioned by *Heller*, however, *underscore* the impermissible infringement wrought by Illinois on Plaintiffs' Second Amendment rights.

First, the Court cautioned that its decision should not "be taken to cast doubt on longstanding prohibitions on … laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 626.  But it would make no sense for the Court to carve out this narrow limitation if the Second Amendment allowed states to ban the carrying of firearms in *all* public spaces, not just particularly sensitive ones.

Second, the Court distinguished between laws regulating the *manner* in which firearms may be borne for self-defense purposes and those *prohibiting* carriage, implying that the latter are plainly illegitimate.[5]  Indeed, the Court characterized laws broadly prohibiting handgun carriage as among the "few" that "come close to the severe restriction of the District's handgun ban" the Court struck down.  *Id.*  Plaintiffs assert no constitutional right to carry concealed weapons; although we contend that bearing firearms outside the home for purposes of self-defense is

---

[5] *Compare id.* at 626 ("the majority of the 19th-century courts to consider the question held that prohibitions on carrying *concealed* weapons were lawful under the Second Amendment or state analogues") (emphasis added), *with id.* at 629 (" 'A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.' ") (quoting *State v. Reid*, 1 Ala. 612, 616-17 (1840)).

at the core of the Second Amendment right identified in *Heller*, the choice of concealed or open carry is left to Illinois because either facilitates the right of armed self-defense.

Because *Heller* did not purport to map "the full scope of the Second Amendment," these potential limits on the scope of the Second Amendment for the most part are only that: potential limits, subject to revision following the necessary "historical analysis." *Id.* at 626. Unlike the laws at issue here, however, as an historical matter these limits arguably find support in the traditional ban on going armed to terrify the populace, a prohibition which was understood in 18th century England to be based in the common law and codified in the Statute of Northampton, 2 Edw. 3., c. 3 (1328).[6]

This understanding of the scope of the right to carry was echoed in early America. But no person fell within this narrow exception to the right to bear arms "unless such wearing [of a firearm] be accompanied with such circumstances as are apt to terrify the people; consequently the wearing of common weapons, or having the usual number of attendants, merely for ornament or defence, where it is customary to make use of them, will not subject a person to the penalties of this act." WILLIAM W. HENING, THE NEW VIRGINIA JUSTICE, COMPRISING THE OFFICE AND AUTHORITY OF A JUSTICE OF THE PEACE, IN THE COMMONWEALTH OF VIRGINIA 49-50 (2d ed. 1810) (citing Hawkins). Thus, although "going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land … it should be remembered, that in this country the constitution guaranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily."

---

[6] *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J. L. & PUB. POL'Y 695, 716 (2009) ("English law in the 1700s depended on just one common-law rule for the regulation of arms: a prohibition against going armed so as to terrify the people."); 4 BLACKSTONE COMMENTARIES *148-49 ("The offense of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land, and is particularly prohibited by the statute of Northampton, 2 Edw. III. c. 3.").

CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822).

"[I]t is to be remembered that the carrying of a gun *per se* constitutes no offence.  For any lawful purpose … the citizen is at perfect liberty to carry his gun.  It is the wicked purpose – and the mischievous result – which essentially constitute the crime." *State v. Huntly*, 25 N.C. (3 Ired.) 418, 422-23 (1843).  Indeed, the Tennessee Supreme Court went so far as to hold that this common-law offense could not be carried over from England due to the State's guarantee of the right to bear arms:  "after so solemn an instrument hath said the people may carry arms," the Court explained, it could not "be permitted to impute to the acts thus licensed such a necessarily consequent operation as terror to the people to be incurred thereby."  *Simpson v. State*, 13 Tenn. 356, 360 (1833).

Nor do statutes in effect during the founding era support Illinois' restrictive laws.  To the contrary, typical regulations of arms-bearing at that time were narrowly framed for specific purposes, such as laws codifying the common-law offense of carrying unusual arms to the terror of the people,[7] regulating the carrying of guns in certain locations to protect wildlife,[8] and prohibiting slaves from bearing arms.[9]  In fact, as *Heller* explained, many jurisdictions went the other

---

[7] *See* An Act Forbidding and Punishing Affrays (Va. 1786) *in* A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA 33 (Augustine Davis ed.,1794).

[8] *See, e.g.*, An Act for the Protection and Security of the Sheep and Other Stock on Tarpaulin-Cove-Island, Otherwise Called Naushon-Islands, and on Nennemesset-Island; and Several Small Islands Contiguous, Situated in the County of Dukes'-County *in* LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 34 (Mass. 1790) (restricting gun carriage on parts of named islands absent a "special licence" or "sufficient reason" for such carriage).

[9] *See, e.g.*, An Act for the Better Ordering and Governing Negroes and Other Slaves in this Province, and to Prevent the Inveigling or Carrying Away Slaves from Their Masters or Employers (Ga. 1765) *in* ACTS PASSED BY THE GENERAL ASSEMBLY OF GEORGIA 256 (1765) (making it unlawful for "any slave, unless in the presence of some white person, to carry and make use of fire-arms," subject to limited exceptions).

way and "*required* individual arms-bearing for public-safety reasons." 554 U.S. at 601 (emphasis added).  *See supra* at 7 & n.4.

Finally, although such laws were not in place when the Second Amendment was ratified, later in the 19th century some state legislatures started to ban the carrying of concealed firearms. The first state high court to consider such a ban struck it down under the state constitution's right-to-arms provision, *see Bliss v. Commonwealth*, 12 Ky. 90 (1822), but by the end of the 19th century, a "majority of the … courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues."  *Heller*, 554 U.S. at 626.  Although it is uncertain whether banning concealed firearms could be reconciled with the Second Amendment, that question is not before this Court.  To decide this case the Court need only determine whether banning *all* carriage, concealed *and* open, violates the Constitution.  Plaintiffs do not seek recognition here of a constitutional right to bear concealed firearms.

Nineteenth century cases upholding bans on concealed weapons "reflected a belief that there would seldom be reason to conceal a weapon on one's person unless one had a criminal intent.  The presumption of criminal intent may well have been sensible in a world where the open carry of weapons was common and socially accepted, as it may have been in Georgia in 1846 and Louisiana in 1850.  But the world of 1791 may have been different, and America today is certainly very different." Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 U.C.L.A. L. REV. 1343, 1361 (2009).  Thus in upholding bans on concealed arms, the courts emphasized that laws seeking only "to suppress the practice of carrying certain weapons *secretly* … do[] not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms," *Nunn v. State*, 1 Ga. 243, 251 (1846), because such laws

merely regulate "the manner in which arms shall be borne," *State v. Reid*, 1 Ala. 612, 616 (1840). *See also State v. Chandler*, 5 La. Ann. 489 (1850). The same is not true, of course, of laws that prohibit any carrying of firearms, whether concealed or not, and 19th century courts were accordingly much less receptive to such laws. *See Nunn*, 1 Ga. at 251 (striking down ban on carrying pistols openly while upholding ban on carrying concealed weapons); *Andrews v. State*, 50 Tenn. 165, 187 (1871) (striking down law prohibiting carrying a pistol in any manner); *State v. Reid*, 1 Ala. 612, 616-17 (1840) ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.").

### C.   Illinois' Ban is Unconstitutional.

The foregoing textual and historical analysis demonstrates that Illinois' carriage ban is a "broadly prohibitory law[] restricting the core Second Amendment right" and is thus "categorically unconstitutional." *Ezell*, *supra*, at *13. No trip into the " 'levels of scrutiny' quagmire" is necessary. *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (*en banc*), *cert. denied*, 131 S. Ct. 1674 (2011). Indeed, Illinois' ban is in one respect more sweeping than was the ban struck down in *Heller*, for while the District of Columbia prohibited keeping *one* "class of 'arms,' " *Heller*, 544 U.S. at 628, Illinois prohibits bearing publicly "*any* … firearm," 720 ILCS §§ 5/24-1(a)(4) & (10) (emphasis added); *see also Heller*, 554 U.S. at 629 (classifying law banning carrying pistols while *not* "restrict[ing] the carrying of long guns" as among the "[f]ew laws in the history of our Nation [that] have come close to the severe restriction of the District's handgun ban").

The end result is the same under a level of scrutiny analysis. Because Illinois' carriage ban imposes "a severe burden on the core Second Amendment right of armed self-defense," it

"require[s] an extremely strong public interest justification and a close fit between the govern-ment's means and its end." *Ezell*, *supra*, at *17. "Stated differently, [Illinois] must demonstrate that [publicly carrying firearms] creates such genuine and serious risks to public safety that pro-hibiting [the activity] is justified," and to meet this burden it must "supply actual, reliable evi-dence to justify" the restriction. *Id.* at *17-18.

Illinois cannot "come close to satisfying this standard." *Id.* at *17. As an initial matter, because the Second Amendment "elevates above all other interests the right of law-abiding, re-sponsible citizens to" bear arms, *Heller*, 554 U.S. at 635, there is no public interest sufficiently strong to support banning the practice. Furthermore, even public health experts who zealously advocate handgun controls have concluded—in the wake of *Heller*—that, "based on available empirical data," there would be "relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home." Philip J. Cook, Jens Ludwig, & Adam M. Samaha, *Gun Control after* Heller*: Threats and Sideshows from a Social Welfare Perspective*, 56 U.C.L.A. L. REV. 1041, 1082 (2009). Illinois thus cannot show that any interest in public safety justifies its carriage ban. *See also* Part III, *infra*.

## II.    THE PLAINTIFFS WILL BE IRREPARABLY HARMED UNLESS AN INJUNCTION ISSUES.

No legal remedy after the fact can be adequate here because monetary damages cannot compensate for the deprivation of the right to engage in conduct that is protected by the Constitu-tion. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). The Seventh Circuit held just two days ago that with the Second Amendment, as with the First, "*irreparable harm is pre-sumed.*" *Ezell*, *supra*, at *10 (emphasis added). In *Heller* the Supreme Court said that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." 554 U.S. at 592. "Confrontation" is a rather sterile term for describing the hor-

rors inflicted on Mrs. Shepard when she was mugged in her own church.  She suffered four skull fractures, a mangled arm and a crushed spine because Illinois criminalizes her right to armed self-defense.  She lives day to day in mortal fear that she will once again be the victim of a savage beating from which she will once again, due to the challenged statute, be entirely defenseless. This constitutional injury is not an abstract legal proposition for Mrs. Shepard: she wants, needs, and is entitled to exercise her Second Amendment right to armed self-protection right now.

Although Mrs. Shepard's after-the-fact tort remedy against her assailant might be damages for battery, only injunctive relief can provide redress for the State of Illinois' deprivation of her constitutional right to armed self-defense. "Infringements of this right cannot be compensated by money damages," the Seventh Circuit held, because the "Second Amendment protects … intangible and unquantifiable interests." *Ezell*, *supra*, at *10 (citing *Heller*, 554 U.S. at 592-95).  Mrs. Shepard and the members of Plaintiff Illinois State Rifle Association are entitled to preliminary injunctive relief now.  *See id.* at *9 ("If they're right, then the range ban was unconstitutional when enacted and violates their Second Amendment rights every day it remains on the books.").

III.   **THE DEPRIVATION OF PLAINTIFFS' SECOND AMENDMENT RIGHTS OUTWEIGHS ANY HARM TO THE PUBLIC OR THE STATE OF ILLINOIS.**

Once the threshold factors discussed above have been met, "the court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Ezell*, *supra*, at *5.  "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor."  *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 387 (7th Cir. 1984).

Here, as in *Ezell*, "the plaintiffs *are* the 'law-abiding, responsible citizens' whose Second Amendment rights are entitled to full solicitude under *Heller*," *Ezell*, *supra*, at *17 (original emphasis), and it is axiomatic that a State has "no legitimate interest in enforcing an unconstitutional ordinance." *KH Outdoor LLC v. Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).  No uncertainty as to the outcome here can arise from "facts presented at trial," because whether Illinois's total ban on carrying a firearm for self-defense is constitutional is purely a question of law; therefore no risk of error in the ruling on preliminary relief arises from issues of fact, and further judicial balancing of harms is unnecessary. *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994) ("Only if the final outcome will depend on facts presented at trial, so that there is genuine uncertainty at the preliminary-injunction stage concerning what that outcome will be, should the judge go through the balancing process that we have described.").

Should Illinois assert possible harm to public safety if the State's licensed and law-abiding citizens are allowed to exercise their right to bear arms for self-defense, the answer is provided by *Heller*:  "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." 554 U.S. at 636.  The public policy choice of denying Mrs. Shepard and others the right of armed self-defense is simply no longer available to Illinois, and any such policy arguments will thus be irrelevant in deciding whether to enjoin Illinois's laws permanently.

In any event, Illinois could not muster the necessary evidence to support its policy choice if it tried, and this weighs in favor of granting Plaintiffs preliminary relief.  *Every other state in the Union allows some form of carrying of firearms for self-defense*.  That inconvenient truth renders futile any effort by Illinois to demonstrate that its circumstances are exceptional, and that firearms in the hands of trained and licensed individuals are uniquely a threat to public safety in this State, even if nowhere else in America.

16

In *Ezell* the Court of Appeals flatly rejected Chicago's lack of "empirical evidence" of dangers associated with firearms ranges and its "entirely speculative" public-safety harms. *Ezell*, *supra*, at *18, *19.  Illinois is likewise destined to fail to prove its case here—as demonstrated by the only two comprehensive studies of the gun-control literature that have been conducted.  The public-health advocates of gun control at the federal Centers for Disease Control ("CDC") convened an independent Task Force to conduct "a systematic review of scientific evidence regarding the effectiveness of firearms laws in preventing violence, including violent crimes, suicide and unintentional injury." *First Reports Evaluating the Effectiveness of Strategies for Preventing Violence: Firearms Laws*, 52 MORBIDITY & MORTALITY WEEKLY REPORT 11 (CDC Oct. 3, 2003) (No. RR-14), available at http://www.cdc.gov/mmwr/PDF/rr/rr5214.pdf.  ("MMWR").  The Task Force exhaustively examined firearms studies conducted over a 20-year period in eleven different databases of law, public health and public policy research.  *See* Robert A. Hahn, *et al.*, *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREV. MED. 40, 44 (2005).  The Task Force examined laws licensing and restricting the carriage of firearms in public (including "shall—issue" laws that exist in 31 states) and concluded that the evidence "was insufficient to determine the effectiveness" of such laws in "reducing violence." *Id.* at 7.[10] Likewise, the National Research Council of the National Academies of Science conducted its own survey of the scientific literature and reached the same conclusion.  *See* (Charles F. Wellford *et al.* (eds.), *Firearms and Violence: A Critical Review* 2005). ("NRC").  "[A]nswers to some of the most pressing questions cannot be addressed with existing data and research methods, however well designed.  For example, despite a large body of research, the committee

_____

[10] As of 2010, 37 states had "Shall-Issue" laws.  Right-To-Carry 2010 <http://www.nraila.org/Issues/factsheets/read.aspx?ID=18>.

found no credible evidence that the passage of right-to-carry laws decreases or increases violent crime."  NRC at 2.  *See also id.* at 49 & n.12.

On the other side of the ledger, the evidence supports the proposition that *denying* law-abiding citizens the right to keep and bear arms would increase violence by preventing citizens from defending themselves against criminal assault.  Such defensive gun use ("DGU") occurs approximately two-and-a-half million times a year in the United States, which means that crime victims use firearms to thwart crime three to four times more often criminals use guns to commit crimes.  *See* Gary Kleck, Targeting Guns: Firearms and their Control 151-52, 184-88 (1997).  The NRC acknowledged that there was some uncertainty in the debate about DGU, NRC at 6-7, 102, 110, but noted that Dr. Kleck's figures have been confirmed by others:  "At least 19 other surveys have resulted in estimated numbers of defensive gun use that are similar (*i.e.*, statistically indistinguishable) to the results found[ ] by Kleck and Gertz. . . .  No other surveys have found numbers consistent with" the lower figures reported by other researchers.  *Id*. at 103.

Thus here, as in *Ezell*, "the harms invoked by the [government] are entirely speculative and in any event may be addressed by more closely tailored regulatory measures," *Ezell*, *supra*, at *19, such as denying gun-carry permits to felons, drug addicts, and the mentally ill, rather than to all law-abiding adult citizens.  On the other side of the scale, the "plaintiffs have established a strong likelihood that they are suffering violations of their Second Amendment rights every day" that the carry ban is in effect. *Id.*  A preliminary, and permanent, injunction should therefore issue.

18

IV.     THIS COURT SHOULD RULE ON THE MERITS.

Under the Federal Rules, this Court is permitted to "advance the trial on the merits and consolidate it with the hearing" for a preliminary injunction. FED. R. CIV. P. 65(a)(2). Indeed, "when the eventual outcome on the merits is plain at the preliminary injunction stage, the judge should, after due notice to the parties, merge the stages and enter a final judgment." *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994).

A permanent injunction is appropriate now. The final outcome of this case will not depend on any facts presented at trial, nor is there any "genuine uncertainty at the preliminary-injunction stage concerning what that outcome will be." *Curtis 1000, Inc.*, 24 F.3d at 945. At this stage, the Court has all the facts that it needs—only questions of law remain. Mrs. Shepard is a law-abiding citizen who wishes to carry a handgun for her own protection; the members of the Illinois State Rifle Association are in a similar position. Under Illinois law, they are plainly prohibited from doing so, and Defendants have every intention of enforcing the statutes at issue.

## CONCLUSION

For these reasons, plaintiffs' motion for a preliminary and/or permanent injunction should be granted.

Respectfully Submitted,

**MARY E. SHEPARD and THE ILLINOIS STATE RIFLE ASSOCIATION**,
Plaintiffs

By: ___ s/ William N. Howard ___
        One of their attorneys

William N. Howard
FREEBORN & PETERS LLP
311 S. Wacker Dr., Suite 3000
Chicago, Illinois   60606
Tel: (312) 360-6415
Fax: (312) 360-6996
Email: whoward@freebornpeters.com

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned attorney states that he caused a true and correct copy of **Plaintiffs'**

**Memorandum in Support of Their Motion For Preliminary And/Or Permanent Injunction,**

to be served upon the parties of record, as shown below, via the Court's CM/ECF system on the

**8th** day of  **July, 2011**.


By:    s/ William N. Howard

<u>**SERVICE LIST**</u>

Terence J. Corrigan
Illinois Attorney General's Office
500 S. Second St.
Springfield, IL  62706
Tel:  (217) 782-5819
Fax:  (217) 524-5091
tcorrigan@atg.state.il.us
***Atty. for Lisa Madigan, Pat Quinn***
***and Tyler Edmonds***

Joseph A. Bleyer
Bleyer & Bleyer
601 West Jackson
P.O. Box 487
Marion, IL 62959-0487
Tel: (618) 997-1331
jableyer@bleyerlaw.com
***Atty. for David Livesay***