IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARY E. SHEPARD and the ILLINOIS )
STATE RIFLE ASSOCIATION, )
                                )
         Plaintiffs,            )
                                )
         -vs-                   )         No. 11-405
                                )
LISA M. MADIGAN, solely in her official )
capacity as ATTORNEY GENERAL OF )
ILLINOIS, et.al.                )
                                )
         Defendants.            )

**RESPONSE TO PLAINTIFFS' MOTION**
**FOR A PRELIMINARY INJUNCTION**

Now come defendants, Lisa Madigan, Attorney General of the State of Illinois;

Patrick J. Quinn, Governor of the State of Illinois; and Tyler R. Edmonds, State's Attorney

of Union County, Illinois, by their attorney, Lisa Madigan, Attorney General of the State of

Illinois, and hereby respond to plaintiffs' motion for a preliminary injunction, stating:

**I. Background**

Plaintiffs, Mary Shepard and the Illinois State Rifle Association, have brought this

action claiming that §§24-1(a)(4) and (a)(10) and §24-1.6 of the Criminal Code (720 ILCS

5/24-1(a)(4), 5/24-1(a)(10), and 5/24-1.6) are facially unconstitutional. The first two

provisions challenged by plaintiffs, subsection (a)(4) and (a)(10) of Section 24-1 of the

Criminal Code, generally provide that, subject to an extensive list of exemptions in Section

24-2, a person cannot carry a weapon concealed on his person, in a city, or in a vehicle,

except when on that person's property or fixed place of business or on the property of

another with that person's permission.  The third challenged provision creates the offense

of aggravated unlawful use of a weapon and, subject to exceptions in section 24-2, applies

1

when aggravating factors are present such as the weapon is uncased, loaded and immediately accessible; the offender is committing certain drug crimes; the offender is threatening violence against another; the offender has had an order of protection taken out against him or her; and the offender is under 21 and the weapon is a handgun.

In the opening paragraph, plaintiffs ask the Court to enjoin all enforcement of these sections against persons qualified to possess firearms. In their prayer for relief, plaintiffs ask the Court to prohibit enforcement, "to the extent they prohibit Ms. Shepard and other persons qualified to possess firearms in Illinois from carrying functional firearms in public." The scope of the injunction sought is unclear. While acknowledging that the Supreme Court has recognized that a prohibition on carrying concealed weapons is constitutional, plaintiffs ask the Court to enjoin enforcement of the prohibition on concealed weapons.

## II.    Plaintiffs Are Not Entitled To a Preliminary Injunction

A party seeking a preliminary injunction must demonstrate that 1) it has a reasonable likelihood of success on the merits; 2) no adequate remedy at law exists; 3) it will suffer irreparable harm if [a preliminary injunction] is denied; 4) the irreparable harm the party will suffer without injunctive relief is greater than the harm the opposing party will suffer if the preliminary injunction is granted; and 5) the preliminary injunction will not harm the public interest. *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007). If a plaintiff meets the threshold requirements for an injunction, the court must weigh the various factors "to determine whether the balance of harms weighs in favor of the moving party or whether the nonmoving party or public interest will be harmed sufficiently that the injunction should be denied." *Coronado v. Valleyview Public School District*, 537 F.3d 791, 795 (7th Cir. 2008).

A.     **Plaintiffs have not demonstrated a likelihood of success on the merits**[1]

Judicial review under the Second Amendment proceeds in two steps.  First, the court must determine whether the activity at issue falls within the Second Amendment's "scope."  *Ezell v. City of Chicago*, No. 10-3525, 2011 WL 2623511, *12 (7th Cir. July 6, 2011).  This requires "a textual and historical inquiry into original meaning" to determine whether the restricted activity is "protected by the Second Amendment in the first place." *Id.*  "[I]f the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment — 1791 [for federal regulations] or 1868 [for State regulations] — then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review."  *Id.*  "If the government cannot establish this" because "the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected," then the court moves to the second step in the analysis: applying means-ends scrutiny.  *Id.* at *13.

Here, historical evidence shows there is no "core" Second Amendment right to carry weapons in public for personal self-defense.  Thus, the challenged statutes should receive, at most, intermediate scrutiny.[2]   Because the statutes are substantially related to the

---

[1]The requirement that plaintiff show a likelihood of success on the merits means that plaintiffs must show that they are likely to prevail on the underlying request for relief in their complaint.  *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 500 (7th Cir. 2008); *Platinum Home Mortgage Corporation v. Platinum Financial Group*, 149 F.3d 722, 726 (7th Cir. 1998).  That means that plaintiffs must have a reasonable likelihood of winning on their facial challenge to the statutes.  As argued in defendants' motion to dismiss, plaintiffs have no likelihood of prevailing on a facial challenge, because the statutes have, at a minimum, some constitutional applications.

[2] As explained in defendants' Motion to Dismiss, defendants also preserve for later review the argument that the challenged statutes are constitutional because they regulate conduct wholly outside the Second Amendment's scope.

critical governmental interest of preventing armed violence, they are constitutional.

> **1.    Intermediate Scrutiny Applies Because the "Core" Of the Second Amendment Right Does Not Extend Outside Of The Home**

*Ezell* holds that the level of scrutiny a firearms law receives depends "on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right."  2011 WL 2623511, at *13.  Under *Heller*, "the core component" of the Second Amendment is "the right to possess operable firearms — handguns included — for self-defense, most notably in the home."  *Id.* at *1.  "What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open [in *Heller*]."  *Skoien*, 614 F.3d at 640.  *Ezell does not* indicate what tests should be used to determine whether an activity is "core."  Indeed, the court in *Ezell* had no need to do so, for the plaintiffs there asserted only their "core Second Amendment right to possess firearms at home for protection."[3]  2011 WL 2623511, at *9.

The choice of test does not matter here.  Under any test, the right to carry firearms for personal self-defense outside the home — openly or concealed — is not "core."  In *Heller*, the Supreme Court held that the Second Amendment protects the right to possess a handgun for self-defense in the home.  554 U.S. at 635.  The Court limited this holding, cautioning that the Second Amendment does not "protect the right of citizens to carry arms for *any sort* of confrontation," *Heller*, 554 U.S. at 595*, and the Supreme Court has never held that the Second Amendment guarantees a right to carry weapons for self-defense outside the home.  Even if the Second Amendment does apply to places outside the home,

---

[3] The *Ezell* court made passing reference to "the core right to possess firearms for self-defense."  2011 WL 2623511, at *17.  But this appears to be shorthand for the right to possess firearms for self-defense *in the home* — the right at issue in that case and the one discussed throughout the rest of the opinion.  *See, e.g.*, *id.* at *1, 7, 9, 11, 13-14.

courts "have no idea what those places are, what the criteria for selecting them should be, what sliding scales of scrutiny might apply to them, or any one of a number of other questions." *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011).

Without support from *Heller*, this Court should not expand the right recognized there beyond the home. When courts stretch *Heller* beyond its holding, they "circumscribe the scope of popular governance, move the action into court, and encourage litigation in contexts we cannot forsee." *Masciandaro*, 638 F.3d at 475. Removing a vital issue of public safety from the democratic process "is serious business," *id.*, and should not be done lightly. The costs of miscalculation are high. "[N]o one doubts that the goal" of gun control laws, i.e., "preventing armed mayhem, is an important governmental objective." *Skoien*, 614 F.3d at 642; *see also United States. v. Salerno*, 481 U.S. 739, 748 (1987) ("We have repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest."). "If ever there was an occasion for restraint, this would seem to be it." *Masciandaro*, 638 F.3d at 476.

In light of these concerns, courts nationwide have declined to extend the Second Amendment's protections beyond the home. *See, e.g.*, *id.* at 475 ("On the question of *Heller*'s applicability outside the home environment, we think it prudent to await direction from the Court itself."); *Williams v. State*, 10 A.3d 1167, 1177 (Md. 2011) ("If the Supreme Court . . . meant its holding to extend beyond home possession, it will need to say so more plainly."); *People v. Dawson*, 934 N.E.2d 598, 605-07 (Ill. App. Ct. 2010) (declining to extend Second Amendment outside of home because Supreme Court "deliberately and expressly maintained a controlled pace of essentially beginning to define this constitutional right"); *cf. People v. Yarbrough*, 169 Cal.App.4th 303, 312-14 (2008) (upholding California's concealed weapons law because it did not implicate *Heller*'s core holding

5

regarding weapons in the home); *Sims v. United States*, 963 A.2d 147, 150 (D.C. 2008) (rejecting Second Amendment claim, under plain error review, because Supreme Court has not held that Second Amendment extends outside the home).  One court concluded, "We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights."  *Masciandaro*, 638 F.3d at 475.  For these reasons alone, this Court should not announce a new "core" right to possess firearms for self-defense outside the home.

These are not the only reasons.  History also indicates that there is no "core" Second Amendment right to carry firearms for personal defense in public places.  *Heller* grounded its holding, in part, on the fact that "[f]ew laws in the history of our Nation have come close to the severe restriction" that the District of Columbia placed on guns in the home.  554 U.S. at 629.  Such is not the case here.  State and local governments frequently restricted citizens from carrying firearms in public when the Fourteenth Amendment was ratified.  *See, e.g.*, Act of Nov. 18, 1858, Corp. Laws of the City of Washington D.C., at 114 ("it shall not hereafter be lawful for any person or persons, to carry or have concealed about their persons any deadly or dangerous weapons, such as a dagger, pistol, bowie-knife, dirk-knife or dirk, colt, slung-shot, or brass or other metal knuckles, within the city of Washington") (Robert A. Waters 1853 & 1860); 1876 Wyo. Comp. Laws ch. 52, § 1 (forbidding "ope[n]" bearing of "any fire arm or other deadly weapon, within the limits of any city, town or village"); Tex. Act of Apr. 12, 1871, ch. 34 (prohibiting carrying of pistols without "immediate and pressing" reasonable grounds to fear "immediate and pressing" attack or for militia service); *accord Aymette v. State*, 1840 WL 1554, *4 (Tenn. 1840) ("The Legislature, therefore, have a right to prohibit the wearing

or keeping weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defence."); *State v. Buzzard*, 1842 WL 331, *5 (Ark. 1842).  Such laws would have been unthinkable if there were a broadly recognized, inalienable right to carry firearms in public at the time.

The history at the time of the *Second Amendment's* ratification is even clearer on the point.  "[T]he Second Amendment was not intended to lay down a novel principle, but rather codified a right inherited from our English ancestors," *Heller*, 554 U.S. at 599 (internal quotations omitted), and "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right" at English law, *id.* at 592 (emphasis in original).  Thus, if history indicates that English law did not consider an activity to be a "core" right, then that activity cannot be within the Second Amendment's core protections.

History demonstrates that neither English statutory nor common law provided any right to carry weapons in public.  For nearly seven hundred years, England criminalized the practice.  The Statute of Northampton, one of the earliest laws regulating weapons possession, provided that, unless he was on the King's business, no man was permitted to "go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure."  Statute of Northampton, 2 Edw. 3, c. 3 (1328) (Eng.).  English courts upheld the continuing vitality of this law, even hundreds of years later.  In *Sir John Knight's Case*, 87 Eng. Rep. 75 (1686), for example, the Chief Justice noted that carrying arms in public was not merely banned by the Statute of Northampton, but was "likewise a great offence at the common law."  *Id.*  The reason was not just that carrying arms in public was dangerous, but also that it was an insult to

7

the sovereign and the social compact: "as if the King were not able or willing to protect his subjects." *Id.* In this way, the Statue of Northampton was "but an affirmance" of the longstanding common law rule that there is no right to carry weapons in public. *Id.* The Statute remained the law of Massachusetts, North Carolina, and Virginia, nearly verbatim, even after the ratification of the Constitution, *see* Patrick J. Charles, *Scribble Scrabble, The Second Amendment, & Historical Guideposts: A Short Reply to Lawrence Rosenthal & Joyce Lee Malcolm*, 105 Nw. U. L. Rev. Colloquy 227, 237 (2011), laws that could not exist if there were a widely understood right carry to arms for self-defense in public at the time.

The most prominent common law scholars agreed that there was no right to carry arms outside the home. Lord Edward Coke, who was "widely recognized by the American colonists as the greatest authority of his time on the laws of England," *Payton v. New York*, 445 U.S. 573, 593-94 (1980) (internal markings omitted), confirmed — in a chapter entitled "Against going or riding armed," *see* 3 Coke, Institutes of the Laws of England 160 (1797 ed.) — that English law forbade carrying weapons in public. Under the Statute of Northampton, Coke explained, one could possess weapons in the home "to keep his house against those that come to rob, or kill him, or to offer him violence in it." *Id.* "But he cannot assemble force, though he be extreamly threatned, to goe with him to church, or market, or any other place." *Id.* at 162. That the weapons were carried for self-defense was no excuse under the Statute. *Id.* Indeed, even an immediate threat of harm did not permit one to go armed in public spaces. *Id.*

William Blackstone, whose works "constituted the preeminent authority on English law for the founding generation," *Heller*, 554 U.S. at 593-94 (internal quotations omitted), confirmed there was no right to carry weapons in public for personal defense. "The

offence of riding or going armed with dangerous or unusual weapons," he wrote, "is a crime against the public peace, by terrifying the good people of the land, and is particularly prohibited by the [Statute of Northampton], upon pain of forfeiture of the arms and imprisonment during the king's pleasure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armour."  Commentaries *149.

In short, English law acknowledged a right to use arms to defend one's home — the "core" right recognized in *Heller*. *See* 3 Coke, Institutes at 160.  It did not recognize any right to carry weapons in public for personal self-defense.  On the contrary, English statutes and common law forbade the practice.  Accordingly, carrying a weapon in public for personal self-defense cannot be a "core" Second Amendment right.  Thus, to the extent that carrying firearms outside the home for personal self-defense implicates the Second Amendment at all (and history proves that it does not), it certainly lies "closer to the margins of the Second Amendment right," and therefore "may be more easily justified" under means-ends analysis. *Ezell*, 2011 WL 2623511, at *17.  As a result, the proper standard for evaluating plaintiffs' constitutional claim is intermediate scrutiny.

## 2. Plaintiffs' Arguments That The "Core" Of The Second Amendment Extends To Personal Self-Defense Outside The Home Are Unavailing

### a. Plaintiffs Misread English History

Plaintiffs' assertion that there is a core Second Amendment right to carry firearms for self-defense outside the home does not withstand scrutiny.  Plaintiffs begin their brief discussion of English history by citing Blackstone for the proposition that Englishmen had a right to arms for their defense. *See* Doc. 21 at 5.  But plaintiffs relegate Blackstone's explicit limitation of that right to a footnote ten pages later.   Doc. 21 at 15 n.6.  They cannot have it both ways.  If plaintiffs wish to invoke Blackstone in support of a right to

possess weapons, they must acknowledge that Blackstone thought that right was severely limited with regard to public carry.

Plaintiffs also contend that English law tolerated "'gentlemen to ride armed for their security.'" Doc. 21 at 10 (quoting *Rex v. Knight*, 90 Eng. Rep. 330 (1686)). True, but plaintiffs misunderstand the nature of this exception. English law enforcement overlooked the wearing of "weapons of fashion, as swords, &c. or privy coats of mail." 2 William Hawkins, *Treatise on the Pleas of the Crown* 601 (Thomas Leach, ed.) (7th ed. 1795). This was only the case where the swords were worn by "persons of quality" with "their usual number of attendants with them for their ornament and defense, in such places and upon such occasions, in which it is the common fashion to make use of them, without causing the least suspicion of an intention to commit any act of violence or disturbance of the peace." *Id.* at 21-22. The law tolerated noblemen and their attendants wearing swords as a means of displaying their rank, but only in a ceremonial context. Plaintiffs offer no indication that this small allowance for aristocratic fashions ever extended to public displays of *firearms*, which were considered particularly dangerous weapons at the time. *See, e.g.*, *King v. Hutchinson*, 168 Eng. Rep. 273, 276 (1784) ("guns, pistols, daggers, and instruments of war" are "dangerous," and "offensive" weapons, unlike mere "club sticks,"); *King v. Oneby*, 92 Eng. Rep. 465, 468 (1727) (a pistol is a "dangerous weapon").

Plaintiffs' citation of Edward Christian for the proposition that "every one is at liberty to keep or carry a gun, if he does not use it for the destruction of game," *see* Doc. 21 at 10 n.2 (citing 2 Blackstone Commentaries *411-12 n.2 (Christian ed., 1794)), likewise distorts the historical context. Christian was not addressing the Statute of Northampton — a provision on which Christian had no comment. *See* Blackstone, 4 Commentaries *149 (Christian ed., 1794). Rather, Christian was discussing the nature of England's *game*

10

*laws.* Blackstone speculated that the real reason for the English game laws was to disarm the people, while Christian disagreed, arguing that this could not be the game laws' purpose because Englishmen were allowed to keep guns and use them for hunting. *See* 2 Blackstone Commentaries *411-12 & n.2 (Christian ed., 1794). Christian's scholarly speculations on the purposes behind the English hunting regulations say nothing about whether Englishmen could carry dangerous weapons in public places for self-defense.

Finally, plaintiffs cite a law review article for the theory that the Statute of Northampton applied only where the carrying of arms was particularly "terrifying." Doc. 21 at 15. Once again, this misunderstands history. The Statute did not require a specific intent to terrify. The Statute's text contains no such a requirement, *see* 2 Edw. 3, c. 3 (1328) (Eng.), nor did Lord Coke allude to one, *see* 3 Coke, Institutes at 160-62. This is unsurprising, for carrying weapons with the *intent* to harm or threaten others was a separate felony under English law, *see* 25 Edw. 3, st. 5, c. 2, § 13 (1351) (Eng.); *see also State v. Workman*, 35 W.Va. 367 (1891), a fact plaintiffs fail to acknowledge. Moreover, plaintiffs' reading misunderstands Blackstone himself. "The offence of riding or going armed with dangerous or unusual weapons," Blackstone wrote, "is a crime against the public peace, by terrifying the good people of the land[.]" Blackstone, 4 Commentaries *149. In other words, under English law, carrying dangerous weapons was *always* a crime against public peace because it was considered *inherently* terrifying. *Accord Chune v. Piott*, 80 Eng. Rep. 1161 (1614) (Croke, J.) ("Without all question, the sheriffe hath power to commit . . . if contrary to the Statute of Northampton, he sees any one to carry weapons in the high-way, in terrorem populi Regis; he ought to take him, and arrest him, *notwithstanding he doth not break the peace in his presence*.") (emphasis added). Plaintiffs also ignore Blackstone's observation that the Statute operated "in like manner

11

as . . . the laws of Solon," which provided that "every Athenian was finable who walked about the city in armour," Blackstone, 4 Commentaries *149, not merely those who wore "terrifying" or "unusual" armor.  Finally, even if plaintiffs' strained reading were correct, and the Statute of Northampton applied only to terrifying or unusual weapons, it would not help them here, for, as discussed, *all* firearms were considered unusually dangerous weapons at the time.  *See Hutchinson*, 168 Eng. Rep. at 276; *Oneby*, 92 Eng. Rep. at 468.

### b.    A Proper Historical Approach Does Not Read The Word "Bear" Out Of The Second Amendment

Plaintiffs next observe that the Second Amendment contains a right to "bear" arms, and that "bear" meant "carry" at the time of the founding.  Doc. 21 at 8-9.  Thus, plaintiffs reason, they must have a right to "carry" firearms in public whenever they like.  A contrary reading, they fear, would "read the term 'bear'" out of the Second Amendment.  *Id.* at 9.

Plaintiffs' fears are misplaced.  *Heller* is clear that the Second Amendment confers a right to "carry" arms, 554 U.S. at 584, but it is equally clear that this right is limited.  The Second Amendment does not protect "the right of citizens to carry arms for *any sort* of confrontation."  *Id.* at 595.  Thus, plaintiffs' contention that they should be able to carry arms in public for personal self-defense because they have a right to "carry" arms merely begs the question.  The issue here is not whether plaintiffs have a right to "carry" arms; it is whether plaintiffs have a "core" right to "carry" arms in the manner, times, and places that they would prefer .  As shown above, the Second Amendment's original understanding was that they do not have such a core right, and that settles the constitutional question.

In any event, Illinois does not stop plaintiffs from bearing arms now.  Nothing in Illinois law prevents people from "carrying" arms in their home; on their own land; in their fixed place of business; in someone else's home (with their permission); on someone

else's land (with their permission); in any land outside "the corporate limits of a city, village or incorporated town"; in designated hunting areas; and during militia service.  *See* 720 ILCS 5/24-1, *et seq.* (West 2011); 520 ILCS 5/1.1, *et seq.* (West 2011) (Illinois Wildlife Code); 17 Ill. Adm. Code 510, *et seq.* (West 2011).  Thus, Illinois' current statutory scheme is constitutional, for it aligns with both the text and history of the Second Amendment.

### c.    Plaintiffs' Remaining Analysis Is Irrelevant or Incomplete

Plaintiffs acknowledge, as they must, that *Heller* did not create a new right, but instead merely codified a preexisting English right.  *See* Doc. 21 at 10.  But, after devoting two paragraphs to English history, plaintiffs spend most of their brief discussing the history of *later* interpretations of the right to bear arms.  Much of this history is irrelevant, and none of it establishes a "core" right to carry arms in public for self-defense.

Most of plaintiffs' historical discussion boils down to the following: that in some areas it was common for men to carry guns, Doc. 21 at 11; that some local governments required the possession of arms for self defense, *id.* at 12; that carrying a gun in public was not considered a crime in some States, *id.* at 16;[4] and that Thomas Jefferson thought carrying a gun was a good idea, *id.* at 12 n.3.

Even if true, none of this is relevant to the constitutional analysis.  Reasonable people differ on how guns should be regulated, and democratically elected legislatures have always had the power to expand gun rights, by statute, beyond the constitutional

---

[4] Plaintiffs cite *State v. Huntly* for the proposition that "the carrying of a gun *per se*" was not criminal under North Carolina criminal law.  1843 WL 891, *3 (N.C. 1843). They omit the previous two sentences: "A gun is an 'unusual weapon,' wherewith to be armed and clad.  No man amongst us carries it about with him, as one of his every day accouterments — as part of his dress — and never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State, as an appendage of manly equipment."  *Id.*

minimum.  The fact that some Americans held a particular policy view does not mean they thought the contrary view was *unconstitutional*.  It is one thing to oppose the regulation of firearms as a matter of policy, and it is quite another to conclude that such regulation would be unconstitutional.  Thomas Jefferson, in other words, may well have thought it was a good idea for his nephew to carry a gun, Doc. 21 at 12 n.3, just as he thought his nephew should avoid "[g]ames played with the ball," which are "too violent for the body, and stamp no character on the mind."  1 The Writings of Thomas Jefferson 397-99 (H. A. Washington, ed.) (1853).  Neither statement speaks to what government can or cannot do constitutionally.  In short, most of plaintiffs' history is simply irrelevant.  It shows only that some States may choose to allow the open carry of firearms, not that all States must.

Finally, plaintiffs cite several state cases from the middle of the Nineteenth Century that concluded, without examining its original history, that the Second Amendment protects a right to carry weapons in public, so long as they are carried in plain view.  Doc. 21 at 17-18; *see, e.g.*, *State v. Chandler*, 1850 WL 3838, *2 (1850) (dicta); *Nunn v. State*, 1 Ga. 243, 251 (1846).  At the outset, this later trend was nowhere near as universal as plaintiffs make it out to be; other Nineteenth Century jurisdictions maintained the Framing-era approach and restricted or banned weapons in public.  *See* Part II.A. 1, *supra* (collecting statutes and cases).  But more fundamentally, this later trend is simply irrelevant.  The Second Amendment did not create a new right, but rather "codified a right inherited from our English ancestors."  *Heller*, 554 U.S. at 599 (internal quotations omitted).   And, because constitutional rights are "enshrined with the scope they were understood to have when the people adopted them," *id.* at 634-35, any later, state-court misunderstandings of the Second Amendment are immaterial, *see id.* at 624 n.24 (lower courts' "erroneous reliance upon an uncontested and virtually unreasoned case cannot nullify the reliance of

14

millions of Americans (as our historical analysis has shown) upon the true meaning of the right to keep and bear arms"). Nothing in the Nineteenth Century could change the scope of the preexisting English right that the Framers adopted in the Second Amendment.

In sum, the Second Amendment codified a preexisting English right to possess weapons, and that English right did not include a privilege to carry firearms in public for self-defense. Plaintiffs' arguments to the contrary are unavailing, for they rely on misunderstandings of English history and later, irrelevant American history that tells us nothing about the preexisting English right. Accordingly, there is no "core" right to carry firearms for personal self-defense in public, and the proper standard for evaluating plaintiffs' constitutional claim is intermediate scrutiny.

### 3.   The Challenged Statutes Satisfy Intermediate Scrutiny

To satisfy intermediate scrutiny, a law must be "substantially related to an important government objective." *See, e.g.*, *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Illinois's prohibition against the carrying of loaded — and readily loadable — firearms in public places readily satisfies this standard. The State's interest in protecting the public health and safety has long been recognized as a compelling objective for purposes of constitutional scrutiny, *see Salerno*, 481 U.S. at 750, 754-55, and "no one doubts" that "preventing armed mayhem . . . is an important governmental objective," *Skoien*, 614 F.3d at 642.

The challenged provisions are substantially related to this compelling interest in public safety. The "benefits" of a firearm regulation need not be "established with admissible evidence," for a court may also look to "logic" in deciding whether a "substantial relation" exists between the regulation and its objective. *Skoien*, 614 F.3d at 641-42; *see also Florida Bar v. Went for It, Inc.*, 515 U.S. 618, 628 (1995) (speech regulations may be

15

upheld against First Amendment challenges "based solely on history, consensus, and "simply common sense'").  Logic supports the notion that the provisions that plaintiffs challenge will make it more difficult to discharge firearms in public, thereby reducing the risk that guns will fire to deadly effect, purposefully, or accidently.  Even if empirical evidence were necessary (which it is not), it, too, supports the statutes' common-sense goals: Preliminary studies indicate that the passage of so-called "right to carry" laws in other States corresponds with a measurable increase in crime.  *See* John J. Donohue, *Guns, Crime, and the Impact of State Right-to-Carry Laws*, 73 Fordham L. Rev. 623, 630-39 (2004).  Evidence from other States also suggests that permitting systems consistently fail to keep guns out of the hands of dangerous people.  *See, e.g.*, Violence Policy Center, *Concealed Carry Killers* (2009), *available at* http://www.vpc.org/ccwkillers.htm (concealed carry permit-holders have killed 309 people, including 11 police officers, since May 2007).

In sum, the challenged statutes serve a legitimate government interest in ensuring public safety, and they further that interest by reasonable means supported by common sense and empirical evidence.  Accordingly, the open and concealed-carry bans satisfy intermediate scrutiny.

### 4.      Plaintiffs are not entitled to the injunction sought

Plaintiffs seek an injunction prohibiting enforcement of provisions of the Criminal Code as to Mary Shepard and other persons qualified to possess firearms.  The "other persons mentioned in the motion are not parties to this case.  "[D]istrict courts lack the authority to enjoin the 'enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs.'" *Wisconsin Right to Life, Incorporated v. Schober*, 366 F.3d 485,490 (7th Cir 2004) quoting, *McKenzie v. City of Chicago*, 118 F.3d 552 (7th Cir 1997).  The Court, therefore, cannot grant the relief sought.

### C.    Plaintiffs have not demonstrated they would suffer irreparable harm

Plaintiffs claim that they do not need to prove irreparable harm, because such harm is presumed, citing *Ezell*, 2011 WL 2623511 at 10.   In *Ezell*, however, the court was dealing with an ordinance that impinged upon the right to possess firearms in defense of the home, a constitutional right recognized in *Heller*.   *Ezell*, 2011 WL 2623511 at 14. Thus, while a question might remain as to whether the right at issue there had been imfringed, the right itself had been recognized.   In contrast, here, plaintiffs are claiming irreparable harm should be presumed from the "violation" of a constitutional right which has never been recognized.

Furthermore, in *Ezell*, the court was faced with a facial challenge to the statute and individual harm was, therefore, irrelevant.   *Id.* at 9-10.   Here, while plaintiffs have made a facial challenge in their complaint, they have sought injunctive relief based upon an "as applied" challenge.   Individual harm is not, therefore, irrelevant.

The only individual harm asserted is that plaintiff Shepard was assaulted in a church where she worked, which she blames on the prohibition of firearms (even though the church was on private property and, therefore, Shepard could have carried a firearm there with the church's permission).   This harm is irrelevant to the issue.   First, for a preliminary injunction, plaintiffs must show that they would suffer irreparable harm in the future. *St. John's United Church of Christ*, 502 F.3d at 625.   A party cannot seek injunctive relief based upon past harm.   *Schirmer v. Nagode*, 621 F.3d 581, 584-582 (7th Cir. 2010). To the extent plaintiffs imply the possibility exists that she could be attacked in the future and successfully defend herself with a firearm, if legally permitted, the claimed harm is speculative and cannot, therefore, form the basis of a claim for irreparable harm.   *East St. Louis Laborers Local 100 v. Bellon Wrecking and Salvage Company*, 414 F.3d 700, 705-06

(7th Cir. 2005).

The Court should find, accordingly, that plaintiffs have failed to prove that they will suffer irreparable harm if injunctive relief is denied.

**D.    The injunctive relief sought will harm the public interest[5]**

Plaintiffs ask that this Court to enjoin enforcement of public safety measures determined by the legislature of the State of Illinois to be in the public interest as a means of protecting the safety and welfare of the people of the State of Illinois.  Indeed, plaintiffs propose a vague injunction that allows all persons "qualified to possess firearms in Illinois" to carry firearms in public.  Assuming that "qualified to possess" means possessing a FOID card (and plaintiffs do not otherwise define the term) plaintiffs' requested injunction would permit the carrying of any firearm by any person who possessed a FOID card without regard to their training or intent to use the weapon for crimes of violence, without regard to whether the person was intoxicated, and without limitation as to the nature of the public place. Thus, the State would be compelled to allow weapons to be carried into courthouses; government offices; churches; schools; and public businesses, including bars and banks. In short, the requested injunctive relief would extend into areas the *Heller* court acknowledged are constitutionally subject to state regulation.

Plaintiffs contend that there are only two studies on gun control legislation and that there is no evidence that gun legislation reduces violent crime. (Mem. at 17-18).  But there have been numerous attempts to quantify the impacts of gun legislation, and any lack of consensus demonstrates why gun control is best left to the legislature.  The empirical

---

[5]While weighing the harm that defendants will suffer is a separate element, in the context of this case the harm that the State as an entity will suffer and the public interest largely merge.

studies are numerous.  One camp of researchers has argued that arming citizens will reduce crime, *see, e.g.*, John R. Lott Jr*., More Guns, Less Crime: Understanding Crime and Gun Control Laws* (Univ. Chicago Pr. 2000), while another camp suggests that Lott's research was flawed and that concealed carry laws either have no impact or make violence more likely, *see, e.g.*, Robert Ehrlich, *Nine Crazy Ideas in Science (A Few May Even Be True*) (Princeton Univ. Pr. 2001).  Ehrlich and Lott debated their competing research and conclusions in *The Great Gun Fight*, Reason 53 (Aug. 2001).

In response to plaintiffs cited research from the National Research Council, a study at the American Journal of Public Health more recently concluded that "guns did not protect those who possessed them from being shot in an assault."  Branas, et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 Am. J. Pub. Health 2034.  The research demonstrated that "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault."  *Id.* at 2037.  In a more holistic approach, another group of researchers identified a significant decrease in the number of gun-related deaths in jurisdictions that have comprehensive gun control legislation.  Ik-Whan Kwon & Daniel Baack, *The Effectiveness of Legislation Controlling Gun Usage*, 64 Am. J. Econ. & Soc. 533.

The competing nature of these studies demonstrates that plaintiffs have not, and cannot, meet their burden of showing that a preliminary injunction will not harm the public interest.  Plaintiffs insist that they are seeking relief on behalf of "law abiding citizens."  Any workable definition of that term includes all who have not yet been convicted of a crime.  Every murderer, robber, and rapist fell within that definition at some point in their lives.  It is because dangerous weapons are at issue and the public interest is at risk that the Fourth Circuit noted it did not want to be responsible "for some unspeakably tragic act

of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." *Masciandaro,* 638 F.3d at 475 (noting that the "danger would rise exponentially" if the right to carry weapons moved from the home to the public square). The Seventh Circuit has also noted the danger to the public interest in the type of relief sought in this case: "Erroneous grants of injunctive relief that hamper enforcement of the criminal law have the potential to cause havoc." *Campbell v. Miller*, 373 F.3d 834, 835 (7th Cir 2004).

### III.    Conclusion

Plaintiffs seek injunctive relief would apply to nonparties and is beyond the authority of the Court.  In urging this Court to find a core right to carry weapons in public, plaintiffs have misread the historical record.  Plaintiffs have not shown that the statutes fail intermediate scrutiny.  Plaintiffs have also not demonstrated irreparable harm.  Because of this and because the requested injunction will harm the public interest, the motion should be denied.

WHEREFORE, defendants respectfully request that this honorable Court deny plaintiffs' request for an order entering a summary ruling on the merits.

Respectfully submitted,

LISA MADIGAN, et al.,

Defendants,

Terence J. Corrigan, #6191237            LISA MADIGAN, Attorney General
David A. Simpson, #6300876               State of Illinois,
Assistant Attorneys General
500 South Second Street                      Attorney for Defendants.
Springfield, IL  62706
Telephone:  (217) 782-5819               By: /s/Terence J. Corrigan
Facsimile:  (217) 524-5091                     Terence J. Corrigan
tcorrigan@atg.state.il.us                        Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2011, I electronically filed Objection to Plaintiffs' Request that the Court enter a Summary Ruling on the Merits with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

whoward@freebornpeters.com

jableyer@bleyerlaw.com

and I hereby certify that on July 22, 2011, I mailed by United States Postal Service, the document to the following nonregistered participant:

None

Respectfully submitted,

By: /s/Terence J. Corrigan
      Terence J. Corrigan
      Assistant Attorney General
      Attorney for Defendant(s)
      500 South Second Street
      Springfield, IL  62706
      Telephone:  (217) 782-5819
      Facsimile:  (217) 524-5091
      tcorrigan@atg.state.il.us