IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
BENTON DIVISION

| | | |
|---|---|---|
| MARY E. SHEPARD and the ILLINOIS STATE RIFLE ASSOCIATION, | ) ) ) | |
| Plaintiffs, | ) ) | No. 3:11-cv-00405-WDS-PMF |
| v. | ) ) ) | Honorable Judge William D. Stiehl |
| LISA M. MADIGAN, solely in her official capacity as ATTORNEY GENERAL OF ILLINOIS, GOVERNOR PATRICK J. QUINN, solely in his official capacity as Governor of the State of Illinois, TYLER R. EDMONDS, solely in his official capacity as the State's Attorney of Union County, Illinois, and SHERIFF DAVID LIVESAY, solely in his official capacity as Sheriff of Union County, | ) ) ) ) ) ) ) ) ) ) ) ) ) | Magistrate Judge Philip M. Frazier |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

William N. Howard
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Tel.: 312/360-6000
Fax: 312/360-6596

*Attorney for Plaintiffs,*
*Mary E. Shepard and The Illinois State Rifle Association*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 1

I.      STATUTORY FRAMEWORK ................................................................................ 1

II.     THE PLAINTIFFS ............................................................................................... 3

III.    THIS ACTION ...................................................................................................... 4

ARGUMENT ...................................................................................................................... 5

I.      FRAMEWORK FOR REVIEW .............................................................................. 5

II.     THE CORE SECOND AMENDMENT RIGHT TO CARRY FIREARMS FOR SELF-DEFENSE
        IS NOT LIMITED TO THE HOME ........................................................................ 7

III.    ILLINOIS' PROHIBITION IS NOT SUPPORTED BY LIMITATIONS THAT HAVE
        HISTORICALLY BEEN UNDERSTOOD AS CONSISTENT WITH THE SECOND AMENDMENT ..... 14

IV.     ILLINOIS'S BAN IS UNCONSTITUTIONAL ........................................................ 18

CONCLUSION ................................................................................................................ 20

i

## TABLE OF AUTHORITIES

**Cases**                                                                                   **Page**

*Andrews v. State*, 50 Tenn. 165 (1871)................................................................ 17

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001)............................................. 15

*Bliss v. Commonwealth*, 12 Ky. 90 (1822) ......................................................... 17

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..........................................*passim*

*Ezell v. City of Chicago*, No. 10-3525, 2011 WL 2623511 (7th Cir. July 6, 2011)..............*passim*

*King v. Dewhurst*, 1 St. Tr. 529 (Lancaster Assize 1820) ................................... 10

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) ......................................5, 7, 12

*Nunn v. State*, 1 Ga. 243 (1846).........................................................................13, 17

*Rex v. Knight*, 90 Eng. Rep. 330 (1686) ............................................................ 10

*Simpson v. State*, 13 Tenn. 356 (1833)............................................................... 16

*State v. Chandler*, 5 La. Ann. 489 (1850)........................................................... 17

*State v. Huntly*, 25 N.C. (3 Ired.) 418 (1843)..................................................... 16

*State v. Reid*, 1 Ala. 612 (1840) ......................................................................... 17

*Wright v. United States*, 302 U.S. 583 (1938)...................................................... 9

**Statutes and Legislative Materials**

U.S. Const. amend. III.......................................................................................... 9

Ala. Code § 13A-11-75......................................................................................... 1

Alaska Stat. § 11.61.220(a).................................................................................. 1

Alaska Stat. § 18.65.700(a).................................................................................. 1

Ariz. Rev. Stat. Ann. § 13-3102(A) ..................................................................... 1

Ariz. Rev. Stat. Ann. § 13-3112(A) ..................................................................... 1

Ark. Code § 5-73-309(a)....................................................................................... 1

Cal. Penal Code § 12050....................................................................................... 1

Colo. Rev. Stat. § 18-12-203(1) ........................................................................... 1

Conn. Gen. Stat. § 29-28(b) ................................................................................. 1

Conn. Gen. Stat. § 29-35(a) ................................................................................. 1

Del. Code tit. 11 § 1441......................................................................................... 1

Fla. Stat. § 790.06(2) ............................................................................................ 1

Ga. Code § 16-11-129 .................................................................................... 1

Haw. Rev. Stat. § 134-9 ................................................................................ 1

Idaho Code § 18-3302(1) ............................................................................. 1

430 ILCS 65/2 ............................................................................................... 4

430 ILCS 65/4 ............................................................................................... 18

720 ILCS 5/24-1 .......................................................................................... 1, 2

720 ILCS 5/24-1(10) ..................................................................................... 2

720 ILCS 5/24-1(a)(4) ................................................................................... 2

720 ILCS 5/24-1(a)(10) ................................................................................. 2

720 ILCS 5/24-1.6 ......................................................................................... 1

720 ILCS 5/24-1.6(a)(1) ................................................................................ 2

720 ILCS 5/24-1.6(a)(2) ................................................................................ 2

720 ILCS 5/24-1.6(a)(3)(A) ........................................................................... 2

720 ILCS 5/24-1.6(a)(3)(B) ........................................................................... 2

720 ILCS 5/24-1.6(a)(3)(C) ........................................................................... 18
720 ILCS 5/24/1(b) ....................................................................................... 2

720 ILCS 5/24-1.6(d) ..................................................................................... 3

720 ILCS 5/24-2(a)-(b) .................................................................................. 3

Ind. Code § 35-47-2-3(e) ............................................................................... 1

Iowa Code § 724.7 ........................................................................................ 1

Kan. Stat. § 75-7c03 ...................................................................................... 1

Ky. Rev. Stat. § 237.110(2) ........................................................................... 1

La. Rev. Stat S. 40:1379.3 ............................................................................. 1

Md. Code, Pub. Safety § 5-306 ..................................................................... 1

Mass. Gen. Laws ch. 140, § 131(d) .............................................................. 1

Me. Rev. Stat. tit. 25, § 2003 ......................................................................... 1

Mich. Comp. Laws § 28.422(3) ..................................................................... 1

Minn. Stat. § 624.714, subdiv. 2(b) .............................................................. 1

Miss. Code § 45-9-101(2) .............................................................................. 1

Mo. Stat. § 571.101 ....................................................................................... 1

Mont. Code § 45-8-321(1) ............................................................................. 1

Neb. Rev. Stat. § 28-1202 ............................................................................. 1

Nev. Rev. Stat.§ 202.3657(2) ........................................................................ 1

N.H. Rev. Stat.§ 159.6 ................................................................................ 1

N.J. Stat. § 2C:58-4 ................................................................................... 1

N.M. Stat. § 29-19-4 .................................................................................. 1

N.Y. Penal Law § 400.00(1) ........................................................................ 1

N.Y. Penal Law § 400.00(3)(a) .................................................................... 1

N.C. Gen. Stat. § 14-415.1l(b) ..................................................................... 1

N.D. Cent. Code § 62.1-04-03 ..................................................................... 1

Ohio Rev. Code § 2923.125(D)(l) ................................................................ 1

Okla. Stat. tit. 21, § 1290.12(A) ................................................................... 1

Or. Rev. Stat § 166.291 ............................................................................... 1

18 Pa. Cons. Stat. § 6109(e) ........................................................................ 1

R.I. Gen. Laws § 11-47-ll(a) ....................................................................... 1

S.C. Code § 23-31-215(A) ........................................................................... 1

S.D. Codified Laws § 23-7-7 ....................................................................... 1

Tenn. Code § 39-17-1351(b) ........................................................................ 1

Tex. Gov't Code § 411.177(a) ...................................................................... 1

Utah Code § 53-5-704(1)(a) ......................................................................... 1

Va. Code § 18.2-308(D) ............................................................................... 1

13 Vermont Stat. Ann. § 4003 ...................................................................... 1

Wash. Rev. Code § 9.41.070(1) .................................................................... 1

W.Va. Code § 61-7-4(f) ............................................................................... 1

WI. ST. § 941.23 ......................................................................................... 1

WI. ST. § 175.60(2) (effective Nov. 1, 2011) ............................................... 1

Wyo. Stat. Ann. § 6-8-104(b) ...................................................................... 1

Statute of Northampton, 2 Edw. 3., c. 3 (1328) ......................................... 15

FED. R. CIV. P. 56(a) .................................................................................. 4

## Other

An Act for the Better Ordering and Governing Negroes and Other Slaves in this Province, and to Prevent the Inveigling or Carrying Away Slaves from Their Masters or Employers (Ga. 1765) *in* ACTS PASSED BY THE GENERAL ASSEMBLY OF GEORGIA 256 (1765) .............. 17

An Act for the Better Security of the Inhabitants, By Obliging the Male White Persons to Carry Fire Arms To Places of Public Worship (Ga. 1770) *in* A DIGEST OF THE LAWS OF THE STATE OF GEORGIA 157-58 (1800) .................................................................. 12

An Act for the Protection and Security of the Sheep and Other Stock on Tarpaulin-Cove-Island, Otherwise Called Naushon-Islands, and on Nennemesset-Island; and Several Small Islands Contiguous, Situated in the County of Dukes'-County *in* LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 34 (Mass. 1790)...................................................... 16

An Act Forbidding and Punishing Affrays (Va. 1786) *in* A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA 33 (Augustine Davis ed., 1794) ......................... 16

1 BLACKSTONE COMMENTARIES *136 ......................................................................... 9

1 BLACKSTONE COMMENTARIES *139 ......................................................................... 9

BLACKSTONE COMMENTARIES *140 ......................................................................... 10

2 BLACKSTONE COMMENTARIES *411-12 n.2 (Christian ed., 1794)........................................... 10

4 BLACKSTONE COMMENTARIES *148-49 ......................................................................... 15

4 BLACKSTONE COMMENTARIES *184 ......................................................................... 8

5 BLACKSTONE COMMENTARIES App. n.B (St. George Tucker ed., 1803)................................. 11

BENJAMIN OGLE TAYLOE, IN MEMORIAM: ANECDOTES AND REMINISCENCES 95 (Washington, D.C., 1872), *available at* http://www.archive .org/details/inmemoriambenjam00wats (last accessed May 10, 2011) ............................... 11

C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J. L. & PUB. POL'Y 695 (2009) ......................................................................................................... 15

Charles F. Wellford *et al.* (eds.), *Firearms and Violence: A Critical Review* 2005 ................... 19

CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822)......................................................................................................... 16

DAVID MCCULLOUGH, JOHN ADAMS 177 (2001) .................................................... 11

1 DOCUMENTARY OF HISTORY OF RECONSTRUCTION  .............................................. 13

*First Reports Evaluating the Effectiveness of Strategies for Preventing Violence: Firearms Laws*, 52 MORBIDITY & MORTALITY WEEKLY REPORT 11 (CDC Oct. 3, 2003) (No. RR-14), available at http://www.cdc.gov/mmwr/PDF/rr/rr5214.pdf .......................... 19

Gary Kleck, TARGETING GUNS: FIREARMS AND THEIR CONTROL 151-52 (1997) ....................... 20

HALBROOK, FREEDMEN, THE FOURTEENTH AMENDMENT, AND THE RIGHT TO BEAR ARMS, 1866-1876 (1998) ......................................................................................... 12

John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770, in* 6 MASTERPIECES OF ELOQUENCE 2569 (Hazeltine et al. eds. 1905)............................................................................. 11

JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS 139 (1994).............................................. 12

Philip J. Cook, Jens Ludwig, & Adam M. Samaha, *Gun Control After* Heller*: Threats and Sideshows from a Social Welfare Perspective*, 56 U.C.L.A. L. REV. 1041 (2009) ............... 20

RICHARD FROTHINGHAM, LIFE AND TIMES OF JOSEPH WARREN 452 (Boston: Little, Brown, & Co., 1865)......................................................................................................... 12

Robert A. Hahn, *et al.*, *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREV. MED. 40 (2005)........................................................................ 19

*State v. Wash Lowe*, *reprinted in* New York Times, Oct. 26, 1866 (*quoted in* STEPHEN P. *Nunn v. State*, 1 Ga. 243, 251 (1846) .............................................. 12

THOMAS JEFFERSON, WRITINGS 816–17 (letter of August 19, 1785) (Merrill D. Peterson ed., 1984).................................................................... 12

1 W. HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 72 (1716)....................................8, 15

WILLIAM W. HENING, THE NEW VIRGINIA JUSTICE, COMPRISING THE OFFICE AND AUTHORITY OF A JUSTICE OF THE PEACE, IN THE COMMONWEALTH OF VIRGINIA 49-50 (2d ed. 1810)…...16

# INTRODUCTION

Illinois, alone amongst the States of the Union, completely prohibits individuals from carrying firearms in public for their own protection. *See* 720 ILCS 5/24-1 & 720 ILCS 5/24-1.6.[1] Through the operation of this unique proscription, Illinois broadly prohibits the public exercise of "the core component" of the "individual right to keep and bear arms": "the right to possess operable firearms … for self-defense." *Ezell v. City of Chicago*, No. 10-3525, 2011 WL 2623511, at *1 (7th Cir. July 6, 2011). Under the Second Amendment, applicable to the States through the Fourteenth Amendment, Illinois's flat ban is "categorically unconstitutional" both on its face and as applied to Plaintiffs. *Id.* at *13.

# STATEMENT OF FACTS

## I. STATUTORY FRAMEWORK

Taken together, the overlapping provisions challenged in this action ban the public carriage of operable firearms anywhere in the State of Illinois. The provision with the broadest scope is in Illinois's Aggravated Unlawful Use of a Weapon ("AUUW") law, codified at 720 ILCS 5/24-1.6, which prohibits a person from "[c]arr[ying] on or about his or her person

---

[1] *See* Ala. Code § 13A-11-75; Alaska Stat. §§ 11.61.220(a), 18.65.700(a); Ariz. Rev. Stat. Ann. §§ 13-3102(A), 13-3112(A); Ark. Code § 5-73-309(a); Cal. Penal Code § 12050; Colo. Rev. Stat. § 18-12-203(1); Conn. Gen. Stat. §§ 29-28(b), 29-35(a); Del. Code tit. 11 § 1441; Fla. Stat. § 790.06(2); Ga. Code § 16-11-129; Haw. Rev. Stat. § 134-9; Idaho Code § 18-3302(1); Ind. Code § 35-47-2-3(e), Iowa Code § 724.7; Kan. Stat. § 75-7c03; Ky. Rev. Stat. § 237.110(2); La. Rev. Stat S. 40:1379.3; Md. Code, Pub. Safety § 5-306; Mass. Gen. Laws ch. 140, § 131(d); Me. Rev. Stat. tit. 25, § 2003; Mich. Comp. Laws § 28.422(3); Minn. Stat. § 624.714, subdiv. 2(b); Miss. Code § 45-9-101(2); Mo. Stat. § 571.101; Mont. Code § 45-8-321(1); Neb. Rev. Stat. § 28-1202; Nev. Rev. Stat.§ 202.3657(2); N.H. Rev. Stat.§ 159.6; N.J. Stat. § 2C:58-4; N.M. Stat.§ 29-19-4; N.Y. Penal Law § 400.00(1), (3)(a); N.C. Gen. Stat. § 14-415.1l(b); N.D. Cent. Code § 62.1-04-03; Ohio Rev. Code § 2923.125(D)(l); Okla. Stat. tit. 21, § 1290.12(A); Or. Rev. Stat § 166.291; 18 Pa. Cons. Stat. § 6109(e); R.I. Gen. Laws § 11-47-ll(a); S.C. Code § 23-31-215(A); S.D. Codified Laws § 23-7-7; Tenn. Code § 39-17-1351(b); Tex. Gov't Code § 411.177(a); Utah Code § 53-5-704(1)(a); Va. Code § 18.2-308(D); 13 Vermont Stat. Ann. § 4003; Wash. Rev. Code § 9.41.070(1); W.Va. Code § 61-7-4(f); WI. ST. § 941.23; *id.* § 175.60(2) (effective Nov. 1, 2011); Wyo. Stat. Ann. § 6-8-104(b).

…any…firearm [if]…the firearm possessed [is] uncased, loaded and immediately accessible at the time of the offense; or…the firearm possessed [is] uncased, unloaded and the ammunition for the weapon [is] immediately accessible at the time of the offense." 720 ILCS 5/24-1.6(a)(1), (a)(3)(A)&(B). The prohibition does not apply to a person "on his or her land or in his or her legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission," *id.* 5/24-1.6(a)(1), but it plainly bars public carriage of an operable (*i.e.*, loaded or readily loadable) firearm anywhere in the State of Illinois.

The remaining challenged provisions add up to a similarly broad prohibition, albeit in a more piecemeal fashion. Subject to the same carve-outs listed above, both the Unlawful Use of Weapons ("UUW") law, codified at 720 ILCS 5/24-1, and the AUUW law prohibit an individual from carrying a firearm (a) "concealed on or about his or her person" and (b) "on or about his or her person" – whether concealed or not – "upon any public street, alley, or other public lands within the corporate limits of a city, village, or incorporated town." *Id.* 5/24-1(a)(4)&(10), 5/24-1.6(a)(1)-(2).[2] Under the UUW law, these prohibitions apply even if a weapon is unloaded with no accessible ammunition, *id.*,[3] while under the AUUW law they apply when a firearm is loaded or readily loadable, *id.* 5/24-1.6(a)(3)(A)&(B).

A first-time violation of one of the challenged UUW provisions is classified as a Class A misdemeanor, and a repeat offense is a Class 3 felony. *Id.* 5/24-1(b). A first-time violation of one of the challenged AUUW provisions is a Class 4 felony, and a repeat offense (or an offense

---

[2] The latter provision contains an additional carve-out for a person who is "an invitee thereon or therein, for the purpose of the display of such weapon or the lawful commerce in weapons." *Id.* 5/24-1(10); 5/24-1.6(a)(2).

[3] For the law not to apply, a firearm must be "broken down in a non-functioning state; … not immediately accessible; or … unloaded and enclosed in a container by a person who has been issued a currently valid Firearm Owner's Identification card." *Id.*

by a convicted felon) is a Class 2 felony carrying a mandatory minimum 3-year prison sentence. *Id.* 5/24-1.6(d).

Individuals acting in certain capacities, *e.g.*, as a peace officer or soldier, are exempt from Illinois's ban, as are individuals engaging in certain activities such as shooting at a shooting range or hunting with a hunting license. *See id.* 5/24-2(a)-(b). There is no exemption, however, for law-abiding individuals who wish to carry firearms for self-defense.

## II.   THE PLAINTIFFS

The plaintiffs in this action are Mary Shepard, a 71-year-old resident of Cobden, Illinois, *see* Declaration of Mary Shepard ("Shepard Decl.", filed herewith) ¶ 1, and the Illinois State Rifle Association ("ISRA"), an Illinois organization that seeks to protect the right of citizens to bear arms for the lawful defense of their families, persons, and property, and to promote public safety and law and order, *see* Declaration of Donald Moran ("Moran Decl.", filed herewith) ¶ 3.

Ms. Shepard has experienced first-hand the defenselessness and devastating harm that may result from being unarmed in a sudden, unexpected confrontation with a vicious attacker. On September 28, 2009, Ms. Shepard was unarmed while working at the First Baptist Church in Anna, Illinois. Shepard Decl. ¶¶ 11-18. That afternoon, an attacker broke in to the church and beat Ms. Shepard and another elderly woman nearly to death. *Id.* ¶¶ 13-15. Ms. Shepard sustained four skull fractures, fractures of both cheeks, shattered teeth, a concussion, crushed vertebrae, two torn rotator cuffs, and a mangled arm. *Id.* ¶ 13. She has lost the hearing in her left ear, and now suffers blinding recurrent headaches. *Id.* ¶ 14.

Ms. Shepard has a valid Illinois Firearms Owner Identification ("FOID") Card and has no criminal record. *Id.* ¶¶ 3, 5 & Ex. A.[4]  She is trained in the safe handling and firing of handguns, and she is licensed to carry a handgun in Florida and Pennsylvania, as well as in the many other States that honor these licenses. *Id.* ¶¶ 6-9 & Ex. B-H.  If Illinois law permitted it, Ms. Shepard would carry her personal firearm for self-defense. *Id.* ¶ 21.  She cannot predict when or where she will next need to defend herself from violent attack, but she knows that every day that passes she is at risk of being defenseless against predatory criminals. *Id.* ¶¶ 19-20.

The ISRA has many members who, like Ms. Shepard, are legally qualified to possess a firearm and who, but for Illinois's ban, would carry firearms in public for personal protection. *See* Moran Decl. ¶ 5.  The ISRA brings this action on behalf of those members.[5]

## III.   THIS ACTION

On May 13, 2011, Ms. Shepard and the ISRA filed this action to vindicate their fundamental right to carry firearms for self-defense.  Plaintiffs contend that Illinois's public carriage ban, both on its face and as applied, violates the Second Amendment, as incorporated against the States by the Fourteenth Amendment.  They seek a declaration to that effect and an injunction prohibiting the ban's enforcement against individuals otherwise qualified to possess firearms in the State of Illinois.  On July 8, Plaintiffs filed a motion for preliminary and/or permanent injunctive relief.  Because there are no material factual issues and Plaintiffs are entitled to judgment as a matter of law, *see* FED. R. CIV. P. 56(a), Plaintiffs now seek summary judgment.

---

[4] To lawfully acquire or possess a firearm in Illinois, a person generally must possess a valid FOID Card issued by the Department of State Police.  *See* 430 ILCS 65/2.

[5] Subsequent references to the ISRA in this brief encompass the organization's members.

4

# ARGUMENT

## I.   FRAMEWORK FOR REVIEW

The Seventh Circuit's decision in *Ezell v. City of Chicago*, No. 10-3525, 2011 WL

2623511 (7th Cir. July 6, 2011), governs this Court's review of Plaintiffs' Second Amendment

claim.  In *Ezell*, the Seventh Circuit ordered entry of a preliminary injunction against enforce-

ment of the City of Chicago's ban on firing ranges.  In making this decision, the Court estab-

lished a two-step framework for reviewing Second Amendment claims.  The first step is a

"threshold inquiry" into whether "the restricted activity [is] protected by the Second Amend-

ment."  *Id.* at *12.  The "answer requires a textual and historical inquiry into original meaning,"

and the government bears the burden conclusively to "establish that a challenged firearms law

regulates activity falling outside the scope of the Second Amendment."  *Id.*[6]  If the government

---

[6] The State suggests that the Seventh Circuit erred in holding that "the Second Amend-
ment's scope as a limitation on the States depends on how the right was understood when the
Fourteenth Amendment was ratified," and we would agree if the court meant to suggest that the
understanding of the Fourteenth Amendment would supplant the understanding of the scope of
the Second Amendment when it was ratified.  *Id.*; *see* State Mot. to Dismiss Br. (Doc. No. 27)
18-19.  *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), makes clear that the right to keep
and bear arms incorporated against the States by the Fourteenth Amendment simply *is* the Sec-
ond Amendment right:  "we hold," the Court explained, "that the *Second Amendment right* is
*fully applicable* to the States."  *McDonald*, 130 S. Ct. at 3025 (emphasis added); *see also id.* at
3058 (Thomas, J., concurring in part and concurring in the judgment) (same); *id.* at 3054 n.5
(Scalia, J., concurring) ("it is *precisely* the Second Amendment right to keep and bear arms that
petitioners argue is incorporated by the Due Process Clause) (emphasis added, quotation marks
omitted).  Indeed, the Court emphasized that it has long "abandoned the notion that the Four-
teenth Amendment applies to the States only a watered-down, subjective version of the individ-
ual guarantees of the Bill of Rights."  *Id.* at 3035.  Thus, in determining the scope of the Second
Amendment as applied to either the Federal Government or to the States (as opposed to deter-
mining whether or not the right it protects is a fundamental one for incorporation purposes),
courts are to look to the framing of the Bill of Rights, not the Fourteenth Amendment, because
the Second Amendment is "enshrined with the scope [it was] understood to have when the peo-
ple adopted [it]."  *District of Columbia v. Heller*, 554 U.S. 570,  634-35 (2008).

can do so, "the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Id.*

But if the government cannot make such a showing, the analysis must proceed to "evaluate the regulatory means the government has chosen and the public-benefits end it seeks to achieve." *Id.* at *13. For "broadly prohibitory laws restricting the core Second Amendment right," this analysis is a simple one, for "[b]oth *Heller* and *McDonald* suggest that" such laws "are categorically unconstitutional." *Id.* "For all other cases, however, [a court is] left to choose an appropriate standard of review from among the heightened standards of scrutiny the Court applies to governmental actions alleged to infringe enumerated constitutional rights," including strict scrutiny. *Id.* Looking to the First Amendment context for guidance, the Court "extrapolate[d] a few general principles [for choosing an appropriate standard of review] to the Second Amendment context":

> First, a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end. Second, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right."

*Id.* at *17.

Because Illinois's public carriage ban broadly prohibits law-abiding individuals from exercising their core Second Amendment right to carry firearms for self-defense, under *Heller*,

---

At any rate, this distinction does not make a difference in this case: as we demonstrate below, the right to keep and bear arms was understood to extend beyond the home both in 1791 and in 1868. Indeed, the State *concedes* it cannot make the requisite showing that "carrying weapons openly for self-defense outside the home was considered 'conclusively' outside the scope of the right to bear arms at the time of the ratification of the Fourteenth Amendment." State Mot. to Dismiss Br. 20.

*McDonald*, and *Ezell* the ban is categorically unconstitutional, or, at a minimum, subject to strict scrutiny.  Either way, it is unconstitutional.

## II.   THE CORE SECOND AMENDMENT RIGHT TO CARRY FIREARMS FOR SELF-DEFENSE IS NOT LIMITED TO THE HOME

The Second Amendment provides that "the right of the people to keep and bear Arms shall not be infringed."  As the Supreme Court explained in *Heller*, "[a]t the time of the Founding, as now, to 'bear' meant to 'carry.' " *Id*. at 584.   Consequently, the Second Amendment "guarantee[s] the individual right to … carry weapons in case of confrontation."  *Id*. at 592. Both *Heller* and the textual and historical mode of analysis it employed refute any argument that this guarantee is limited to the home.

At its core, the Second Amendment protects the right of law-abiding citizens to keep and carry firearms for self-defense.  *See, e.g.*, *Heller*, 554 U.S. at 599 ("self-defense" is the "*central component* of the right itself") (original emphasis); *id.* at 628 ("the inherent right of self-defense has been central to the Second Amendment right"); *id.* at 630 ("core lawful purpose of self-defense"); *McDonald*, 130 S. Ct. at 3036 ("[*Heller*] concluded that citizens must be permitted to use handguns for the core lawful purpose of self-defense") (brackets and quotation marks omitted).  It was "this understanding" that led the Court to invalidate the District of Columbia's handgun ban in *Heller*, for "the Court … conclude[d] that the Second Amendment secures a preexisting natural right to keep and bear arms; that the right is personal …; and that the 'central component of the right' is the right of armed self-defense, most notably in the home." *Ezell*, 2011 WL 2623511, at *11.  Thus, while the core right of "armed self-defense" may be most *notable* in the home, its scope is plainly not *limited* to the home.

*Ezell* further cements the point, for it held that Chicago's ban on firing ranges amounted to "a serious encroachment on the right to maintain proficiency in firearm use" – a right the

7

Court characterized as "an important corollary to the meaningful exercise of the core right to possess firearms for self defense, *id.* at \*17" – and thus ordered entry of a preliminary injunction facilitating the right of Chicagoans to train with firearms *outside of the confines of their homes*. *See id.* at \*19 (holding that injunction must prohibit enforcement of the ban on firing ranges, as well as "other provisions of the Ordinance" to the extent that they "prohibit law-abiding, responsible citizens from using a firing range in the city," including the provision "prohibiting the possession of handguns outside the home"). Thus, the Seventh Circuit has made clear that Second Amendment rights extend beyond the home.

Indeed, because the need to defend oneself extends to public spaces, the right to do so with arms necessarily does as well. For as Blackstone explained, at common law the "right of natural defence" could be "legally exercise[d]" whenever "certain and immediate suffering would be the consequence of waiting for the assistance of the law." 4 BLACKSTONE COMMENTARIES \*184; *see also* 3 *id.* \*4 ("Self-defense … is justly called the primary law of nature, so it is not, neither can it be in fact, taken away by the law of society. In the English law particularly it is held an excuse for breaches of the peace, nay even for homicide itself"); 1 W. HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 72 (1716) (there is "no Reason why a Person, who without Provocation, is assaulted by another *in any Place whatsoever*, in such a Manner as plainly shews an Intent to murder him, … may not justify killing such an Assailant") (emphasis added).

This conclusion is reinforced by the Second Amendment's plain text. Limiting the right to carry arms to the home would effectively read the term "bear" out of the Constitution, for the Second Amendment also protects the right to "keep" arms—that is, to "have weapons." *Heller*, 554 U.S. at 582; *see also id.* at 615 ("the founding generation 'were for every man bearing his arms about him *and* keeping them in his house, his castle, for his own defense' ") (emphasis

8

added) (quoting Cong. Globe, 39th Cong., 1st Sess., 362, 371 (1866), statement of Sen. Davis regarding the Freedmen's Bureau Act).  The explicit textual guarantee of the right to "bear" arms would mean little if it did not protect the right to "bear" arms outside of the home where they are "kept."  The most fundamental canons of construction forbid any interpretation that would relegate this language to the status of meaningless surplusage.  *See, e.g., Wright v. United States*, 302 U.S. 583, 588 (1938).  The Third Amendment confirms that the authors of the Bill of Rights knew how to draft a constitutional right limited to the confines of the home; they did not write such a limited scope into the Second Amendment.  *See* U.S. CONST. amend. III ("No soldier shall, in time of peace, be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.").

It is essential to keep in mind that the Second Amendment did not create a new right – it "codified a *pre-existing*" one.  *Wright,* 302 U.S. at 592 (emphasis in original).  The "right … long … understood to be the predecessor to our Second Amendment" was the provision in the English Bill of Rights  stating that individuals " 'may have arms for their defense suitable to their conditions and as allowed by law.' "  *Id*. at 593 (quoting 1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689)).  By the time our Constitution was written, the right to bear arms "had become fundamental for English subjects" and was "understood to be an individual right protecting against both public and private violence."  *Id*. at 593-94.  It is equally clear that this right extended to carrying arms for protection against violence *in public*.

This is apparent from Blackstone's discussion of the right to arms.  Blackstone classified the right of British subjects "of having arms for their defence" as among "auxiliary" rights "which serve principally as barriers to protect and maintain inviolate the three great and primary rights, of personal security, personal liberty, and private property."  1 BLACKSTONE COMMEN-

TARIES *136, *139.  The right to arms, Blackstone explained, "is indeed a public allowance … of

the natural right of resistance and self-preservation; when the sanctions of society and laws are

found insufficient to restrain the violence of oppression."  1 BLACKSTONE COMMENTARIES *139;

*id.* at *140 ("the subjects of England are entitled … to the right of having and using arms for

self-preservation and defence").  Inasmuch as threats to liberty, security, and property know no

bounds, a right to arms limited to the home plainly would have been insufficient to meet its high

purposes.

Other British sources confirm that the right to carry arms for self-defense was not limited

to the home.  By the late 17th century, the English courts recognized that it was the practice and

privilege of "gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330 (1686).

In the early 1790's, Edward Christian, a lawyer and professor of the laws of England at the Uni-

versity of Cambridge, published an edition of Blackstone's Commentaries in which he noted that

"every one is at liberty to keep or carry a gun, if he does not use it for the destruction of game."

2 BLACKSTONE COMMENTARIES *411-12 n.2 (Christian ed., 1794).  And in 1820 an English court

explained that a "man has a clear right to protect himself [with arms] when he is going singly or

in a small party upon the road where he is traveling or going for the ordinary purposes of busi-

ness." *King v. Dewhurst*, 1 St. Tr. 529, 601-02 (Lancaster Assize 1820).

The right to bear arms was understood by the Framers of our Constitution to have similar

scope.  In *Heller*, the Court noted a wealth of support for this interpretation of the public scope of

the right to bear arms.  "The most prominent examples are those most relevant to the Second

Amendment: Nine state constitutional provisions written in the 18th century or the first two dec-

ades of the 19th, which enshrined a right of citizens to 'bear arms in defense of themselves and

the state' or 'bear arms in defense of himself and the state.' "  *Heller*, 554 U.S. at 584-85 & n.8.

10

Just as "it is clear from those formulations that 'bear arms' did not refer only to carrying a weapon in an organized military unit," *id.* at 585, it is likewise clear that "bear arms" did not refer only to toting a weapon from room to room in one's house.  Citizens could not effectively bear arms either in defense of themselves or in defense of the state if they were not free to carry their weapons where they were needed for both purposes.

"Justice James Wilson interpreted the Pennsylvania Constitution's arms-bearing right … as a recognition of the natural right of defense 'of one's person *or* house,' " demonstrating that the right of "bearing arms" in defense of the person was understood to extend beyond the home. *Heller,* 554 U.S. at 585 (quoting 2 COLLECTED WORKS OF JAMES WILSON 1142, at n.x (K. Hall & M. Hall eds., 2007)) (emphasis added).  And in defending British soldiers against murder charges in the Boston Massacre, John Adams recognized that "here every private person is authorized to arm himself; and on the strength of this authority I do not deny the inhabitants had a right to arm themselves at that time for their defence."  John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 MASTERPIECES OF ELOQUENCE 2569, 2578 (Hazeltine et al. eds. 1905).  In other words, even while defending the British soldiers, Adams acknowledged the understanding that the inhabitants of Boston had the right to carry arms publicly for their own defense.

The practices of the Founding generation confirm that the right to carry a firearm was well-established.  Judge St. George Tucker observed, "In many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 BLACKSTONE COM-

MENTARIES App. n.B, at 19 (St. George Tucker ed., 1803).[7]  As the Court noted in *Heller,*

"[m]any colonial statutes *required* individual arms-bearing for public-safety reasons."  554 U.S.

at 601 (emphasis added).[8]

Those who wrote and ratified the 14th Amendment in 1868 understood the right to bear

arms in precisely the same way.  *Cf. Ezell, supra*, at *12.  An 1866 report to Congress from the

Freedmen's Bureau stated: "There must be 'no distinction of color' in the right to carry arms,

any more than in any other right." Ex. Doc. No. 70, House of Representatives, 39th Cong., 1st

Sess., at 297 (1866). A Mississippi court recognized this in 1866 when it struck down a state ban

on carrying a firearm without a license: "While, therefore, the citizens of the State and other

white persons are allowed to carry arms, the freedmen can have no adequate protection against

acts of violence unless they are allowed the same privilege." *State v. Wash Lowe*, *reprinted in*

New York Times, Oct. 26, 1866, at 2 (*quoted in* STEPHEN P. HALBROOK, FREEDMEN, THE FOUR-

TEENTH AMENDMENT, AND THE RIGHT TO BEAR ARMS, 1866-1876, 57-58 (1998)).  Thus bearing

arms included carrying them for personal self-defense.  The Supreme Court embraced this under-

standing in *McDonald* when it cited, as examples of laws that would be nullified by the 14th

---

[7] And the Founders regularly exercised their right. For example, George Washington car-
ried a pistol for self-defense and is said to have drawn one to fend off a "desperado" who threat-
ened to shoot him on his ride from Mt. Vernon to Alexandria shortly after the Revolutionary
War. *See* BENJAMIN OGLE TAYLOE, IN MEMORIAM: ANECDOTES AND REMINISCENCES 95 (Wash-
ington, D.C., 1872), *available at* http://www.archive
.org/details/inmemoriambenjam00wats (last accessed May 10, 2011).  John Adams brought a
pistol with him when he sailed to France in 1778. *See* DAVID MCCULLOUGH, JOHN ADAMS 177
(2001).  Thomas Jefferson wrote his nephew, "Let your gun therefore be the constant companion
of your walks."  *See* THOMAS JEFFERSON, WRITINGS 816–17 (letter of August 19, 1785) (Merrill
D. Peterson ed., 1984).  And Dr. Joseph Warren, a prominent Boston patriot, carried pistols when
making his rounds. RICHARD FROTHINGHAM, LIFE AND TIMES OF JOSEPH WARREN 452 (Boston:
Little, Brown, & Co., 1865).

[8] *See, e.g.,* An Act for the Better Security of the Inhabitants, By Obliging the Male White
Persons to Carry Fire Arms To Places of Public Worship (Ga. 1770) *in* A DIGEST OF THE LAWS
OF THE STATE OF GEORGIA 157-58 (1800); *see also* JOYCE LEE MALCOLM, TO KEEP AND BEAR
ARMS 139 (1994) (citing several examples of laws that "required colonists to carry weapons").

Amendment, a statute providing that "no freedman, free negro or mulatto, not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind."  130 S. Ct. at 3038.  *McDonald* also referred to "Regulations for Freedman in Louisiana" which stated that no freedman "shall be allowed to carry firearms, or any kind of weapons, within the parish, without the written special permission of his employers, approved and indorsed by the nearest and most convenient chief of patrol." 1 DOCUMENTARY OF HISTORY OF RECONSTRUCTION at 279-80.

The Second Amendment's "prefatory" clause cements the interpretation of the right to carry protected by the operative clause.  The prefatory clause "announces the purpose for which the right was codified: to prevent elimination of the militia."  *Heller*, 554 U.S. at 599.  Indeed, "it was understood across the political spectrum that the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down."  *Id*.  In *Nunn v. State*, the Georgia Supreme Court "perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause," *Heller*, 554 U.S. at 612-13:

> [T]he right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree; and all this for the important end to be attained:  the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State.

*Nunn v. State*, 1 Ga. 243, 251 (1846) (emphasis omitted).  A right to bear arms limited to the home plainly would be ill-suited to the purpose of "the rearing up and qualifying a well-regulated militia," for if citizens could be prohibited from carrying arms in public they simply could not act as the militia at all.

Of course, "the militia was not the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting." *Heller*, 554 U.S. at 599.  Hunting, like self-defense from assailants at large, cannot be conducted by those bearing arms only within their homes.

## III.   ILLINOIS'S PROHIBITION IS NOT SUPPORTED BY LIMITATIONS THAT HAVE HISTORI-CALLY BEEN UNDERSTOOD AS CONSISTENT WITH THE SECOND AMENDMENT

The right to bear arms is "not unlimited," and Plaintiffs do not claim a right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.  The potential limits on firearms carriage mentioned by *Heller*, however, *underscore* the impermissible infringement wrought by Illinois on Plaintiffs' Second Amendment rights.

First, the Court cautioned that its decision should not "be taken to cast doubt on long-standing prohibitions on … laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 626.  But it would make no sense for the Court to carve out this narrow limitation if the Second Amendment allowed states to ban the carrying of firearms in *all* public spaces, not just particularly sensitive ones.

Second, the Court distinguished between laws regulating the *manner* in which firearms may be borne for self-defense purposes and those *prohibiting* carriage, implying that the latter are plainly illegitimate.[9]  Indeed, the Court characterized laws broadly prohibiting handgun carriage as among the "few" that "come close to the severe restriction of the District's handgun ban" the Court struck down.  *Id.*  Plaintiffs assert no constitutional right to carry concealed

---

[9] *Compare id.* at 626 ("the majority of the 19th-century courts to consider the question held that prohibitions on carrying *concealed* weapons were lawful under the Second Amendment or state analogues") (emphasis added), *with id.* at 629 (" 'A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.' ") (quoting *State v. Reid*, 1 Ala. 612, 616-17 (1840)).

weapons; although we contend that bearing firearms outside the home for purposes of self-defense is at the core of the Second Amendment right identified in *Heller*, the choice of concealed or open carry is left to Illinois because either facilitates the right of armed self-defense.

Because *Heller* did not purport to map "the full scope of the Second Amendment," these potential limits on the scope of the Second Amendment for the most part are only that:  potential limits, subject to revision following the necessary "historical analysis."  *Id*. at 626.  Unlike the laws at issue here, however, these limits arguably find support in the traditional ban on going armed to terrify the populace, a prohibition which was understood in 18th century England to be based in the common law and codified in the Statute of Northampton, 2 Edw. 3., c. 3 (1328).[10] As William Hawkins explained in his "widely read Treatise of the Pleas of the Crown," *Atwater v. City of Lago Vista*, 532 U.S. 318, 331 (2001), published in 1716, "no wearing of Arms is within the meaning of this Statute, unless it be accompanied with such Circumstances as are apt to terrify the People."  1 W. HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN at 136.  While this prohibition on bearing arms to terrify may therefore be understood as an antecedent to the potential exceptions on the right to bear arms mentioned by the Court in *Heller*, it actually militates *against* the validity of laws like Illinois's that broadly prohibit law-abiding citizens from peaceably carrying commonly used weapons for their own protection.

This understanding was echoed in early America.  No person fell within this narrow exception to the right to bear arms "unless such wearing [of a firearm] be accompanied with such circumstances as are apt to terrify the people; consequently the wearing of common weapons, or

---

[10] *See* C. Kevin  Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J. L. & PUB. POL'Y 695, 716 (2009) ("English law in the 1700s depended on just one common-law rule for the regulation of arms: a prohibition against going armed so as to terrify the people."); 4 BLACKSTONE COMMENTARIES *148-49 ("The offense of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land, and is particularly prohibited by the statute of Northampton, 2 Edw. III. c. 3.").

having the usual number of attendants, merely for ornament or defence, where it is customary to make use of them, will not subject a person to the penalties of this act." WILLIAM W. HENING, THE NEW VIRGINIA JUSTICE, COMPRISING THE OFFICE AND AUTHORITY OF A JUSTICE OF THE PEACE, IN THE COMMONWEALTH OF VIRGINIA 49-50 (2d ed. 1810) (citing Hawkins).  Thus, although "going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land … it should be remembered, that in this country the constitution guaranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily." CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822).[11]  Indeed, the Tennessee Supreme Court went so far as to hold that the common-law offense could not be carried over from England due to the State's guarantee of the right to bear arms:  "after so solemn an instrument hath said the people may carry arms," the Court explained, it could not "be permitted to impute to the acts thus licensed such a necessarily consequent operation as terror to the people to be incurred thereby." *Simpson v. State*, 13 Tenn. 356, 360 (1833).

Nor do statutes in effect during the founding era support Illinois's restrictive laws.  To the contrary, typical regulations of arms-bearing at that time were narrowly framed for specific purposes, such as laws codifying the common-law offense of carrying unusual arms to the terror of

---

[11] *See also State v. Huntly*, 25 N.C. (3 Ired.) 418, 422-23 (1843) ("[I]t is to be remembered that the carrying of a gun *per se* constitutes no offence.  For any lawful purpose … the citizen is at perfect liberty to carry his gun.  It is the wicked purpose – and the mischievous result – which essentially constitute the crime.").

the people,[12] regulating the carrying of guns in certain locations to protect wildlife,[13] and prohib-

iting slaves from bearing arms.[14]   In fact, as *Heller* explained, many jurisdictions "*required* indi-

vidual arms-bearing for public-safety reasons." 554 U.S. at 601 (emphasis added).

Finally, although such laws were not in place when the Second Amendment was ratified,

later in the 19th century some state legislatures started to ban the carrying of concealed firearms.

The first state high court to consider such a ban struck it down under the state constitution's

right-to-arms provision, *see Bliss v. Commonwealth*, 12 Ky. 90 (1822), but by the end of the 19th

century, a "majority of the … courts to consider the question held that prohibitions on carrying

concealed weapons were lawful under the Second Amendment or state analogues."  *Heller*, 554

U.S. at 626.  In upholding bans on concealed arms, 19th century courts emphasized that such

laws "do[] not deprive the citizen of his natural right of self-defence, or of his constitutional right

to keep and bear arms," *Nunn v. State*, 1 Ga. 243, 251 (1846), because such laws merely regulate

"the manner in which arms shall be borne," *State v. Reid*, 1 Ala. 612, 616 (1840).  *See also State*

*v. Chandler*, 5 La. Ann. 489 (1850).  The same is not true, of course, of laws like Illinois's that

prohibit *any* carrying of operable firearms, whether concealed or not, and 19th century courts

were accordingly much less receptive to such laws.  *See Nunn*, 1 Ga. at 251 (striking down ban

on carrying pistols openly while upholding ban on carrying concealed weapons); *Andrews v.*

---

[12] *See* An Act Forbidding and Punishing Affrays (Va. 1786) *in* A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA 33 (Augustine Davis ed.,1794).

[13] *See, e.g.*, An Act for the Protection and Security of the Sheep and Other Stock on Tarpaulin-Cove-Island, Otherwise Called Naushon-Islands, and on Nennemesset-Island; and Several Small Islands Contiguous, Situated in the County of Dukes'-County *in* LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 34 (Mass. 1790) (restricting gun carriage on parts of named islands absent a "special licence" or "sufficient reason" for such carriage).

[14] *See, e.g.*, An Act for the Better Ordering and Governing Negroes and Other Slaves in this Province, and to Prevent the Inveigling or Carrying Away Slaves from Their Masters or Employers (Ga. 1765) *in* ACTS PASSED BY THE GENERAL ASSEMBLY OF GEORGIA 256 (1765) (making it unlawful for "any slave, unless in the presence of some white person, to carry and make use of fire-arms," subject to limited exceptions).

*State*, 50 Tenn. 165, 187 (1871) (striking down law prohibiting carrying a pistol in any manner); *State v. Reid*, 1 Ala. 612, 616-17 (1840) ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.").

## IV.   ILLINOIS'S BAN IS UNCONSTITUTIONAL

The foregoing textual and historical analysis demonstrates that Illinois's carriage ban is a "broadly prohibitory law[] restricting the core Second Amendment right" and is thus "categorically unconstitutional" – period. *Ezell*, 2011 WL 2623511 at *13. No trip into the " 'levels of scrutiny' quagmire" – and no factual development – is necessary. *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (*en banc*).

The end result is the same under a levels of scrutiny analysis. Because Illinois's carriage ban imposes "a severe burden on the core Second Amendment right of armed self-defense," only "an extremely strong public interest justification and a close fit between the government's means and its end" could sustain it. *Ezell*, 2011 WL 2623511 at *17. The ban, in other words, must satisfy strict scrutiny.

This the law *cannot* do. As an initial matter, it strains credulity to claim that an individual carrying a firearm for self-defense in public "creates such genuine and serious risks to public safety that prohibiting [the activity] is justified," *id.* at *17-18, when *every other State of the Union allows some form of carrying of firearms for self-defense*.

Further, Plaintiffs do not challenge Illinois's ban on carrying a firearm without a valid FOID card, *see* 720 ILCS 5/24-1.6(a)(3)(C), and to obtain a FOID card an individual must submit evidence that he or she is not, among other things, a convicted felon, a drug addict, mentally disabled, or a domestic batterer. *See id.* 65/4. In other words, to sustain its ban Illinois would

have to make the facially implausible showing that public safety demands that it prohibit law-abiding individuals who are willing and able to shoulder the burden to obtain a FOID card from carrying firearms in public.

Any such effort is destined to fail here – as demonstrated by the only two comprehensive studies of the gun-control literature that have been conducted.  The federal Centers for Disease Control ("CDC") convened an independent Task Force to conduct "a systematic review of scientific evidence regarding the effectiveness of firearms laws in preventing violence, including violent crimes, suicide and unintentional injury." *First Reports Evaluating the Effectiveness of Strategies for Preventing Violence: Firearms Laws*, 52 MORBIDITY & MORTALITY WEEKLY REPORT 11 (CDC Oct. 3, 2003) (No. RR-14), available at http://www.cdc.gov/mmwr/PDF/rr/rr5214.pdf.  The Task Force exhaustively examined firearms studies conducted over a 20-year period in eleven different databases of law, public health and public policy research.  *See* Robert A. Hahn, *et al.*, *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREV. MED. 40, 44 (2005).  The Task Force examined laws licensing and restricting the carriage of firearms in public and concluded that the evidence "was insufficient to determine the effectiveness" of such laws in "reducing violence." *Id.* at 7.  Likewise, the National Research Council of the National Academies of Science ("NRC") conducted its own survey of the scientific literature and reached the same conclusion.  *See* (Charles F. Wellford *et al.* (eds.), *Firearms and Violence: A Critical Review* 2005).  "[A]nswers to some of the most pressing questions cannot be addressed with existing data and research methods, however well designed.  For example, despite a large body of research, the committee found no credible evidence that the passage of right-to-carry laws decreases or increases violent crime." NRC at 2.  *See also id.* at 49 & n.12.  It is thus not surprising that public health experts who zeal-

19

ously advocate handgun controls have conceded – in the wake of *Heller* – that, "based on available empirical data," there would be "relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home."  Philip J. Cook, Jens Ludwig, & Adam M. Samaha, *Gun Control After* Heller*: Threats and Sideshows from a Social Welfare Perspective*, 56 U.C.L.A. L. REV. 1041, 1082 (2009).

On the other hand, *denying* law-abiding citizens the right to keep and bear arms would prevent citizens from defending themselves against criminal assault.  Such defensive gun use ("DGU") occurs approximately two-and-a-half million times a year in the United States, which means that crime victims use firearms to thwart crime three to four times more often than criminals use guns to commit crimes.  *See* Gary Kleck, TARGETING GUNS: FIREARMS AND THEIR CONTROL 151-52, 184-88 (1997).  The NRC acknowledged that there was some uncertainty in the debate about DGU, NRC at 6-7, 102, 110, but noted that Dr. Kleck's figures have been confirmed by others:  "At least 19 other surveys have resulted in estimated numbers of defensive gun use that are similar (*i.e.*, statistically indistinguishable) to the results found[ ] by Kleck and Gertz. . . .  No other surveys have found numbers consistent with" the lower figures reported by other researchers.  *Id*. at 103.

In sum, "the harms [the government claims will result] are entirely speculative and in any event may be addressed by more closely tailored regulatory measures." *Ezell*, 2011 WL 2623511, at *19.  The State's public carriage ban must fall, and it must fall as a matter of law.

**CONCLUSION**

For these reasons, Plaintiffs' motion for summary judgment should be granted.

Respectfully Submitted,

**MARY E. SHEPARD and THE ILLINOIS
STATE RIFLE ASSOCIATION**,
Plaintiffs

By: ___s/ William N. Howard_____
       One of their attorneys

William N. Howard
FREEBORN & PETERS LLP
311 S. Wacker Dr., Suite 3000
Chicago, Illinois   60606
Tel: (312) 360-6415
Fax: (312) 360-6996
Email: whoward@freebornpeters.com

21

## CERTIFICATE OF SERVICE

The undersigned attorney states that he caused a true and correct copy of **Memorandum in Support of Plaintiffs' Motion for Summary Judgment,** to be served upon the parties of record, as shown below, via the Court's CM/ECF system on the **8th** day of **August, 2011**.

By: ___ s/ William N. Howard _____

## SERVICE LIST

Terence J. Corrigan
Karen L. McNaught
Illinois Attorney General's Office
500 S. Second St.
Springfield, IL  62706
Fax:  (217) 524-5091
tcorrigan@atg.state.il.us
***Counsel for Lisa Madigan, Pat Quinn and Tyler Edmonds***

David A. Simpson
Illinois Attorney General's Office
100 West Randolph St., 12th Floor
Chicago, IL 60601-3175
312-814-3419
dasimpson@atg.state.il.us
***Counsel for Lisa Madigan, Pat Quinn and Tyler Edmonds***

Joseph A. Bleyer
Bleyer & Bleyer
601 West Jackson
P.O. Box 487
Marion, IL 62959-0487
jableyer@bleyerlaw.com
***Counsel for David Livesay***

Jonathan Lee Diesenhaus
Hogan Lovells LLP
555 13th Street, NW
Washington, DC 20004
jonathan.diesenhaus@hoganlovells.com
***Counsel For Brady Center to Prevent Gun Violence***