IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
BENTON DIVISION

| | | |
|---|---|---|
| MARY E. SHEPARD and the ILLINOIS STATE RIFLE ASSOCIATION, | ) ) ) | |
| Plaintiffs, | ) ) | No. 3:11-cv-00405-WDS-PMF |
| v. | ) ) ) | Honorable Judge William D. Stiehl |
| LISA M. MADIGAN, solely in her official capacity as ATTORNEY GENERAL OF ILLINOIS, GOVERNOR PATRICK J. QUINN, solely in his official capacity as Governor of the State of Illinois, TYLER R. EDMONDS, solely in his official capacity as the State's Attorney of Union County, Illinois, and SHERIFF DAVID LIVESAY, solely in his official capacity as Sheriff of Union County, | ) ) ) ) ) ) ) ) ) ) ) ) | Magistrate Judge Philip M. Frazier |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE TO THE STATE'S MOTION TO DISMISS

William N. Howard
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Tel.: 312/360-6000
Fax: 312/360-6596

*Attorney for Plaintiffs,*
*Mary E. Shepard and The Illinois State Rifle Association*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

BACKGROUND ............................................................................................... 1

ARGUMENT .................................................................................................... 1

I.      PLAINTIFFS CLAIM THAT ILLINOIS'S BAN ON CARRYING FIREARMS IN PUBLIC IS UNCONSTITUTIONAL BOTH ON ITS FACE AND AS APPLIED ................................................... 1

II.    ILLINOIS'S BAN ON CARRYING FIREARMS IN PUBLIC INFRINGES THE CORE SECOND AMENDMENT RIGHT OF ARMED SELF-DEFENSE ................................................ 5

        A.     Illinois's Ban Prohibits Activity at the Core of the Second Amendment Right to Armed Self-Defense ................................................................... 5

               1.     Illinois's ban is unsupported by founding-era history. ............................... 7

               2.     Illinois's ban is unsupported by reconstruction-era history. ...................... 11

        B.     This Court Cannot Sidestep Plaintiffs' Second Amendment Claim .................... 13

III.   ILLINOIS'S BAN IS UNCONSTITUTIONAL ................................................................ 16

CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Association of Cmty. Organizations for Reform Now v. Corbett*, CIV.A. 09-951,
   2010 WL 3885373 (W.D. Pa. Sept. 28, 2010)...................................................................5

*Aymette v. State*, 2 Humph. (21 Tenn.) 154 (Tenn. 1840) ...................................................11

*Bliss* v. *Commonwealth*, 2 Litt. (Ky.) 90, 13 Am. Dec. 251 (1822) ....................................12

*Chicago & G.T. Ry. Co. v. Wellman*, 143 U.S. 339 (1892) ..................................................15

*Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876 (2010) .........................................5

*Cohens v. Virginia*, 19 U.S. 264 (1821)...............................................................................15

*Cole Energy Development Co. v. Ingersoll-Rand Co.*, 8 F.3d 607 (7th Cir. 1993)...............14

*County of Ulster County, N.Y. v. Allen*, 442 U.S. 140 (1979) ..............................................16

*District of Columbia v. Heller*, 554 U.S.570 (2008)................................................... *passim*

*Dred Scott* v. *Sandford*, 60 U.S. (19 How.) 393 (1857) .......................................................13

*English v. State*, 35 Tex. 473 (1871)....................................................................................13

*Ezell v. City of Chicago*, No. 10-3525, 2011 WL 2623511 (7th Cir. July 6, 2011) ............. *passim*

*Fife v. State*, 31 Ark. 455 (1876) .........................................................................................12

*George Moore Ice Cream Co. v. Rose*, 289 U.S. 373 (1933) ...............................................16

*Hill v. State*, 53 Ga. 472 (1874) ..........................................................................................12

*Jacobs v. The Florida Bar*, 50 F.3d 901 (11th Cir. 1995) ......................................................5

*Marbury v. Madison*, 5 U.S. 137 (1803)..............................................................................15

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010)..........................................,.....1, 6, 16

*Nichol v. Pullman Standard, Inc.*, 889 F.2d 115 (7th Cir. 1989)..........................................14

*Nunn v. State*, 1 Ga. 243 (1846)...........................................................................................12

*Owen v. State*, 31 Ala. 387 (1858) .......................................................................................12

*Ramos v. Town of Vernon*, 353 F.3d 171 (2d Cir. 2003) .................................................4, 5

*Rex* v. *Dewhurst*, 1 State Trials, New Series 529 (1820).........................................................8

*Rex* v. *Smith*, 2 Ir. R. 190 (K.B. 1914)................................................................................10

*Sarnoff v. American Home Products Corp.*, 798 F.2d 1075 (7th Cir. 1986) ...............................14

*Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947 (1984).................................2

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996)..........................................................14

*Simpson* v. *State*, 13 Tenn. 356 (1833) ................................................................................10

*Sir John Knight*'s *Case*, 3 Mod. 117, 87 Eng. Rep. 75 (K.B. 1686)........................................9

ii

*State* v. *Buzzard*, 4 Ark. 18 (1842) ........................................................................... 11

*State v. Chandler*, 1850 WL 3838 (1850) ...................................................................... 12

*State v. Jumel*, 13 La. Ann. 399 (1858) ......................................................................... 12

*State* v. *Newsom*, 27 N.C. 203 (1844) ......................................................................... 13

*State v. Reid*, 1 Ala. Reports 612 (1840) ....................................................................... 12

*State v. Workman*, 35 W.Va. 367 (1891) ....................................................................... 12

*United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998) .................................................. 14

*United States v. Mendoza*, 464 U.S. 154 (1984) ........................................................... 16

*United States v. Salerno*, 481 U.S. 739 (1987) .............................................................. 2

*United States v. Stevens*, 130 S. Ct. 1577 (2010) ........................................................ 2, 3

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008) ............. 2

## **Statutes and Legislative Materials**

430 ILCS 65/1 ................................................................................................................. 20

430 ILCS 65/4 ................................................................................................................. 18

720 ILCS 5/24-1(a)(4) ...................................................................................................... 1

720 ILCS 5/24-1(a)(7) ................................................................................................... 4, 18

720 ILCS 5/24-1(a)(10) .................................................................................................... 1

720 ILCS 5/24-1.1(a) ....................................................................................................... 4

720 ILCS 5/24-1.6(a)(1)-(3)(B) ....................................................................................... 1

720 ILCS 5/24-1.6(a)(3)(C) ............................................................................................ 18

720 ILCS 5/24-3.1(5) ....................................................................................................... 4

## **Other**

Ark. Act of April 1, 1881 ................................................................................................ 11

1 BLACKSTONE, COMMENTARIES *140-41 ..................................................................... 7

1 BLACKSTONE, COMMENTARIES *143-144 (St. Geo. Tucker, ed., 1st ed. 1803) ........... 8

4 Blackstone, *Commentaries* *148 ................................................................................. 10

C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*,
    32 HARV. J.L. & PUB. POL'Y 695 (2009) ................................................................... 8

COKE, THIRD INSTITUTE 160 ...................................................................................... 9, 10

2 Edw. III c. 3 (1328) ....................................................................................................... 8

1 HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN, ch. 63, § 9 (1716) .................. 9

2 J. KENT, COMMENTARIES ON AMERICAN LAW *340 (O. Holmes ed., 12th ed. 1873)................13

FIREARMS AND VIOLENCE: A CRITICAL REVIEW (Charles F. Wellford et al., eds. 2005) .............19

Gary Kleck & Marc Gertz, *Armed Resistance to Crime*, 86 J. CRIMINAL LAW & CRIMINOLOGY
    150 (1995) ........................................................................................................19

H. Sterling Burnett, National Center for Policy Analysis,
    *Texas Concealed Handgun Carriers: Law-Abiding Public Benefactors* 1 (2000),
    *available at* http://www.ncpa.org/pdfs/ba324.pdf ...................................................20

John J. Donohue, *Guns, Crime, and the Impact of State Right-to-Carry Laws*,
    73 Fordham L. Rev. 623 (2004)..............................................................................20

Jongyeon Tark & Gary Kleck, *Resisting Crime*, 42 CRIMINOLOGY 861 (2004) ..........................19

Marc E. Isserles, *Overcoming Overbreadth: Facial Challenges and the Valid
    Rule Requirement*, 48 Am U.L. Rev. 359 (1998) ......................................................2

2 *Perpetual Laws of the Commonwealth of Massachusetts* 259 (1801) .......................................10

Philip J. Cook, Jens Ludwig, & Adam M. Samaha, *Gun Control After Heller: Threats and
    Sideshows from a Social Welfare Perspective*, 56 U.C.L.A. L. REV. 1041 (2009)...............20

Robert A. Hahn, *et al.*, *Firearms Laws and the Reduction of Violence: A Systematic Review*,
    28 AM. J. PREV. MED. 40 (2005) ...........................................................................19

2 T. Jefferson, *Papers* 519 (1951) ..........................................................................................10

Virginia's Act Forbidding and Punishing Affrays (1786) ..............................................................10

W. HOLDSWORTH, A HISTORY OF ENGLISH LAW 241 (7th ed. 1956)..............................................7

1 W. & M., Sess. 2, c.2, (1689)................................................................................................7

iv

Plaintiffs Mary E. Shepard and the Illinois State Rifle Association ("ISRA"), by and through their undersigned attorney, hereby respond to the motion to dismiss filed by Defendants Lisa M. Madigan, Patrick J. Quinn,[1] and Tyler R. Edmonds (collectively, "the State"), stating:

## BACKGROUND

It is a crime for law abiding citizens to carry a loaded, operable firearm in public in the State of Illinois. *See* 720 ILCS 5/24-1.6(a)(1)-(3)(B) & 5/24-1(a)(4)&(10). Because of this ban, Illinoisans like Ms. Shepard and similarly situated members of the ISRA who are legally qualified to possess firearms cannot carry those firearms to protect themselves from violent attack in public. Illinois's ban cannot be squared with the Second Amendment, which guarantees an individual right to "carry weapons in case of confrontation" for the "core lawful purpose of self-defense." *District of Columbia v. Heller*, 554 U.S. 570, 592, 630 (2008). Because the Second Amendment right applies to the States, *see McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), Illinois's ban must fall. Indeed, Plaintiffs have already demonstrated that they are entitled to judgment as a matter of law, *see* Doc. No. 39 ("Pl. SJ Br."), and as we demonstrate below the State's contention that this action should be dismissed is erroneous.

## ARGUMENT

I. **PLAINTIFFS CLAIM THAT ILLINOIS'S BAN ON CARRYING FIREARMS IN PUBLIC IS UN-CONSTITUTIONAL BOTH ON ITS FACE AND AS APPLIED**

The State argues that this case must be dismissed because Plaintiffs cannot mount a successful facial challenge to Illinois's ban. For this argument to succeed, two premises must be true: (a) Plaintiffs fail to assert a valid facial challenge to Illinois's public carriage ban, and (b) Plaintiffs only attack the ban on its face. *See* Doc. No. 27 ("State Br.") 6. Both are incorrect.

---

[1] Plaintiffs concede that the claims against Governor Quinn may be dismissed. *See* Doc. No. 27 at 6-7.

1

Illinois's ban on carrying operable firearms in public is facially unconstitutional because "no set of circumstances exists under which [it] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). While the *Salerno* principle has proven controversial, its application does not preclude a facial challenge here.[2] "The flaw in the [ban] is not simply that it includes within its sweep some impermissible applications, but that in all its applications it operates on a fundamentally mistaken premise that" the Second Amendment permits a State to ban carrying firearms for self-defense in public. *Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 966 (1984). "[T]he point is that there is no reason to limit challenges to case-by-case 'as applied' challenges when [Illinois's ban] on its face and therefore in all its applications falls short of constitutional demands." *Id.* at 965 n.13; *see also* Marc E. Isserles, *Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement*, 48 Am U.L. Rev. 359, 400 (1998) ("*Salerno*'s 'no set of circumstances' is, in effect, a descriptive claim about any rule of law that is ultimately judged invalid when measured against the relevant constitutional requirements:  such a rule never could have been applied constitutionally to any set of circumstances.").

In *Ezell v. City of Chicago*, No. 10-3525, 2011 WL 2623511 (7th Cir. July 6, 2011), the Seventh Circuit ordered entry of a preliminary injunction against enforcement of Chicago's ban on firing ranges.  Its description of the facial challenge at issue in that case aptly describes Plaintiffs' facial challenge here:

---

[2] Given that there are no set of circumstances in which Illinois's ban would be valid, it necessarily follows that the ban lacks any plainly legitimate sweep and thus fails either standard the Supreme Court has articulated for facial challenges of this type. *See, e.g., Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) ("While some Members of the Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail where the statute has a plainly legitimate sweep.") (quotation marks omitted); *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010) ("To succeed in a typical facial attack, Stevens would have to establish that no set of circumstances exists under which [the law] would be valid, or that the statute lacks any plainly legitimate sweep.  Which standard applies in a typical case is a matter of dispute that we need not and do not address.") (quotation marks and citations omitted).

> In a facial challenge like this one, the claimed constitutional violation inheres in the terms of the statute, not its application. The remedy is necessarily directed at the statute itself and *must* be injunctive and declaratory; a successful facial attack means the statute is wholly invalid and cannot be applied *to anyone*. [The government's] law, if unconstitutional, is unconstitutional *without regard* to its application – or *in all* its applications, as *Salerno* requires. That is, [the legislature] violated the Second Amendment when it made this law; its very existence stands as a fixed harm to every [citizen's] Second Amendment right . . . .

*Id.* at *10 (citation omitted).

Indeed, *Ezell* answers the State's argument that Plaintiffs' facial challenge must fail because the right to armed self-defense may not apply in full force to certain "persons, locations, and weapons," State Br. 6, for the same is true of the right to maintain proficiency in firearm use recognized by *Ezell*. Persons who do not enjoy the right to possess firearms for self-defense surely do not enjoy the "corollary" right to train with them. *Id.* at *17. There can be no right to train with weapons that enjoy no Second Amendment protection, and there may be certain locations where the government can prohibit firing ranges from operating. *See id.* at *20 ("[t]he City may promulgate zoning and safety regulations governing the operation of ranges not inconsistent with the Second Amendment rights of its citizens"). Yet none of these issues stood in the way of a facial challenge in *Ezell*, and they likewise do not do so here.[3]

---

[3] The State's error is rooted in confusion about the nature of Plaintiffs' facial challenge, for the State focuses on the fact that "overbreadth" challenges traditionally have been limited to the First Amendment context. *See* State Br. 1. But "[o]verbreadth claims are a distinct type of facial challenge … 'whereby a law may be invalidated as overbroad if a *substantial number* of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep,' " *Ezell*, 2011 WL 2623511, at *9 n.8 (quoting *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010)). Plaintiffs' facial challenge, by contrast, is of the "typical" sort we have described in the text. *Stevens*, 130 S. Ct. at 1587. At any rate, Plaintiffs do not concede that precluding overbreadth challenges from Second Amendment cases is consistent with *Heller*. Indeed, "[b]oth *Heller* and *McDonald* suggest that [looking to] First Amendment analogues" is appropriate in Second Amendment cases, and thus in reviewing Second Amendment claims "[the Seventh] and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context." *Ezell*, 2011 WL 2623511, at *15.

3

Furthermore, because wholly apart from its blanket public carriage ban Illinois bans possession of guns not typically used for lawful purposes (*e.g.*, sawed-off shotguns, *see* 720 ILCS 5/24-1(a)(7)) and possession of guns by people who are disqualified from exercising Second Amendment rights (*e.g.*, felons and the insane, *see id.* 5/24-1.1(a), 5/24-3.1(5)), the marginal effect of the laws challenged here is simply to prohibit law-abiding individuals from carrying common firearms in public.

At any rate, the State's naked assertion that "Plaintiffs raise only a facial challenge" is mistaken. State Br. 6. Even if there are circumstances in which Illinois's ban is valid, it cannot constitutionally be applied to law-abiding citizens like Ms. Shepard who desire to carry weapons typically used for self-defense. Indeed, Plaintiffs' facial challenge *necessarily* includes an as-applied component, for otherwise Plaintiffs could not assert that there exists no set of circumstances in which Illinois's ban would be constitutional. *See Ramos v. Town of Vernon*, 353 F.3d 171, 174 n.1 (2d Cir. 2003) ("Even if a facial challenge was intended, a facial challenge … claim would logically include within it an as-applied challenge, and thus we cannot ignore the constitutional violation simply because the words 'as-applied' were not used.").

Furthermore, a cursory review of Plaintiffs' complaint reveals allegations sufficient to pursue an as-applied challenge. *See, e.g.*, Doc. No. 2 ("Complaint") ¶ 16 ("Because the Illinois statutes set forth above prohibit the right to keep and bear arms and the ability to carry handguns in Illinois, they infringe on the right of the People, *including* Ms. Shepard [and] Members of the ISRA … to keep and bear arms as guaranteed by the Second and Fourteenth Amendments to the United States Constitution.") (emphasis added); *see also id.* ¶¶ 17-21, 26-32. And while in their prayer for relief Plaintiffs ask for broad declaratory and injunctive relief, they also ask for "any other … relief that the Court deems just and appropriate." Complaint at 10.

In all events, there are no magic words that plaintiffs must plead to support an as-applied (or a facial) challenge. As the Supreme Court has recently explained, the facial/as-applied distinction "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 893 (2010). The State thus cannot succeed in its motion to dismiss based solely on the naked assertion that Plaintiffs' challenge is only facial in nature. *See Association of Cmty. Orgs. for Reform Now v. Corbett*, CIV.A. 09-951, 2010 WL 3885373, at *7 (W.D. Pa. Sept. 28, 2010) ("Given the Supreme Court's admonition in *Citizens United* that the distinction between facial and as-applied challenges 'goes to the breadth of the remedy employed by the Court' rather than to 'what must be pleaded in a complaint,' the Attorney General cannot obtain a 'judgment on the pleadings' under Rule 12(c) based *solely* on that distinction."); *see also Ramos*, 353 F.3d at 174 n.1; *Jacobs v. The Florida Bar*, 50 F.3d 901, 905 & n.17 (11th Cir. 1995).

## II.   ILLINOIS'S BAN ON CARRYING FIREARMS IN PUBLIC INFRINGES THE CORE SECOND AMENDMENT RIGHT OF ARMED SELF-DEFENSE

As the State recognizes, this Court's review of Plaintiffs' Second Amendment claim is governed by the two-step framework established in *Ezell*. *See* State Br. 7-8. The first step is a "threshold inquiry" into whether "the restricted activity [is] protected by the Second Amendment." *Ezell*, 2011 WL 2623511, at *12. The "answer requires a textual and historical inquiry into original meaning," and the government bears the burden conclusively to "establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment." *Id.* If it does, "the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Id.*

But if the government cannot make such a showing, the analysis must proceed to "evaluate the regulatory means the government has chosen and the public-benefits end it seeks to

5

achieve." *Id.* at *13. For "broadly prohibitory laws restricting the core Second Amendment right," this analysis is a simple one, for "[b]oth *Heller* and *McDonald* suggest that" such laws "are categorically unconstitutional." *Id.* "For all other cases, however, [a court is] left to choose an appropriate standard of review from among the heightened standards of scrutiny the Court applies to governmental actions alleged to infringe enumerated constitutional rights," including strict scrutiny. *Id.*

Because Illinois's public carriage ban broadly prohibits law-abiding individuals from exercising their core Second Amendment right to carry firearms for self-defense, under *Heller*, *McDonald*, and *Ezell* the ban is categorically unconstitutional, or, at a minimum, subject to strict scrutiny. Either way, it is unconstitutional.

## A. Illinois's Ban Prohibits Activity at the Core of the Second Amendment Right to Armed Self-Defense

The Second Amendment provides that "the right of the people to keep and bear Arms shall not be infringed." The right to have and carry firearms for self-defense is not only within the scope of the Second Amendment, it is the core right protected by the Second Amendment. *See, e.g.*, *McDonald*, 130 S. Ct. at 3036 ("[*Heller*] concluded that citizens must be permitted to use handguns for the core lawful purpose of self-defense.") (brackets and quotation marks omitted). At its core, in other words, the Second Amendment guarantees "the individual right to … carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, and that core protection is not limited to the home. *See* Pl. SJ Br. 7-18.

Indeed, the State (apparently unwittingly) acknowledges that Supreme Court and Seventh Circuit precedent establishes that the core right to carry handguns for self-defense is not limited to the home. "Under *Heller*," they argue, " 'the core component' of the Second Amendment is 'the right to possess operable firearms – handguns included – for self-defense, *most notably* in

the home.' " State Br. 11 (quoting *Ezell*, 2011 WL 2623511, at *1) (emphasis added). In other words, according to the State, the core component of the Second Amendment is the right to possess operable firearms for self-defense – full stop. The State nevertheless presses forward with its historical case that the Second Amendment's core protection does not extend beyond the home, but that case is flawed.

### 1.    Illinois's ban is unsupported by founding-era history.

The State focuses primarily on the founding era, as in its view (and ours) the scope of the right to keep and bear arms was established with the ratification of the Second Amendment. *See* State Br. 18; *Heller*, 554 U.S. at 634-35.[4]  And the State looks to English sources for evidence of the founding generation's understanding, as the right to arms contained in the English Declaration of Right "has long been understood to be the predecessor of our Second Amendment." *Heller*, 554 U.S. at 593.  But contrary to the State's contention, the English Declaration of Right recognized a general right to arms not limited to one's home.  The Declaration provided: "That the Subjects which are Protestants, may have Arms for their Defence suitable to their Condition, and as are allowed by Law." 1 W. & M., Sess. 2, c.2, (1689).  As stated by a neutral scholar, the Declaration complained of the "refusal to allow Protestants the right to carry arms for self-defense." W. HOLDSWORTH, A HISTORY OF ENGLISH LAW 241 (7th ed. 1956).

Blackstone discusses the right as general and not limited to the home.  He described the right to arms as necessary "to protect and maintain inviolate the three great and primary rights, of personal security, personal liberty, and private property."  1 BLACKSTONE, COMMENTARIES *140-

---

[4] The State suggests that the Seventh Circuit in *Ezell* erred in holding that "the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified," and we would agree if the court meant to suggest that the understanding of the Fourteenth Amendment would supplant the understanding of the scope of the Second Amendment when it was ratified.  *See* State Br. 18-19; *see also* Pl. SJ Br. 5 n.6.

41. He described "the right of having and using arms for self-preservation and defense" as stemming from "the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression." *Id.* *143-44. He did not suggest that this right vanished when one leaves one's dwelling.

English courts interpreted the right as including the carrying of arms in public. *Rex* v. *Dewhurst*, 1 State Trials, New Series 529, 601-02 (1820), stated that:

> "The subjects which are Protestants may have arms for their defence suitable to their condition, and as allowed by law."
>
> But are arms suitable to the condition of people in the ordinary class of life, and are they allowed by law? ... A man has a clear right to protect himself when he is going singly or in a small party upon the road where he is travelling or going for the ordinary purposes of business. But I have no difficulty in saying you have no right to carry arms to a public meeting, if the number of arms which are so carried are calculated to produce terror and alarm. . . .

The Americans did not simply copy English rights but strengthened them. Referring to the Declaration of Right's words, "suitable to their condition and such as are allowed by law," St. George Tucker distinguished the Second Amendment, whereby the right of the people to have arms exists "without any qualification as to their condition or degree, as in the case of the British government." 1 BLACKSTONE, COMMENTARIES *144 n. 40, (St. Geo. Tucker, ed., 1st ed. 1803).

To support its historical argument, the State unsurprisingly points to the Statute of Northampton, which provided that no person other than the king's servants and ministers shall "come before the King's Justices . . . with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere." 2 Edw. III c. 3 (1328); *see also* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 716 (2009) ("Those hostile to an individual-right view of the Second Amendment long have invoked Northampton

8

casually to claim that there was no real English right to have arms, or at least not much of one."). But the statute, which predated the Declaration of Right by more than three centuries, was not interpreted as prohibiting a person from going or riding armed peacefully.

*Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K.B. 1686), dismissed a criminal information alleging that Sir John Knight "did walk about the streets armed with guns" and that he went into a church with a gun, thereby "going or riding armed in affray of peace." This failed to allege an essential element: "The Chief Justice said, that the meaning of the statute . . . was to punish people who go armed *to terrify the King's subjects*." *Id.*, 3 Mod. 118, 87 Eng. Rep. 76 (emphasis added).

William Hawkins explained that "no wearing of Arms is within the meaning of this Statute, unless it be accompanied with such Circumstances as are apt to terrify the People." 1 HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN, ch. 63, § 9 (1716). Thus, "Persons of Quality are in no Danger of Offending against this Statute by wearing common Weapons," as it did not cause "the least Suspicion of an Intention to commit any Act of Violence or Disturbance of the Peace." *Id.*

Similarly, Sir Edward Coke read the Statute to prohibit affrays, *i.e.*, breaches, of the peace, not the mere carrying of a weapon. COKE, THIRD INSTITUTE 160. Indeed, he noted:

> And yet in some case a man may not only use force and arms, but assemble company also. As any may assemble his friends and neighbors, to keep his house against those that come to rob, or kill him, or to offer him violence in it . . . . [A]nd in this sense it is truly said; *Armaque in armatos sumere jura sinunt* [and the laws permit the taking up of arms against armed persons].

*Id.* at 161-62.

Coke added, however, that such company may not be assembled in arms in public places: "But he cannot assemble force, though he be extremely threatened, to go with him to church, or

9

market, or any other place." *Id*. at 162.  That could result in terrorizing the King's subjects.  Coke did *not* say that an individual could not carry an arm for self defense in public.

Similarly, Blackstone wrote: "The offence of riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land."  4 Blackstone, *Commentaries* *148.  Carrying common weapons was not.

The Statute was held inapplicable to a person who peaceably walked down a public road while armed with a loaded revolver, because the offense was "to ride or go armed without lawful occasion in terrorem populi." *Rex* v. *Smith*, 2 Ir. R. 190, 204 (K.B. 1914).  The court explained:

> The words "in affray of the peace" in the statute, being read forward into the "go-ing armed," render the former words part of the description of the statutable of-fence.  The indictment, therefore, omits two essential elements of the offence – (1) That the going armed was without lawful occasion; and (2) that the act was *in terrorem populi.*

*Id.*

Some American states incorporated the ban on using firearms to terrorize the population.  Virginia's Act Forbidding and Punishing Affrays (1786) recited that no man shall "go nor ride armed . . . in terror of the country." 2 T. Jefferson, *Papers* 519 (1951).  A 1795 Massachusetts' enactment punished "such as ride or go armed offensively, to the fear or terror of the good citi-zens of this commonwealth." 2 *Perpetual Laws of the Commonwealth of Mass.* 259 (1801).

American courts rejected any application of the Statute as expressing a common-law of-fense of merely carrying arms.  *Simpson* v. *State*, 13 Tenn. 356 (1833) (citing Blackstone's stipu-lation that violence which terrifies the people must also be present).  Even if such a common-law offense existed, it could not override a constitutional right: "By this clause of the constitution, an express power is given and secured to all the free citizens of the State to keep and bear arms for their defense, without any qualification whatever as to their kind or nature." *Id.* at 360.

10

### 2. Illinois's ban is unsupported by reconstruction-era history.

The State also argues that carrying arms outside the home was not viewed as part of the core Second Amendment right at the time of the 14th Amendment's ratification (while conceding that it cannot show that doing so was understood to be completely outside the scope of the right to keep and bear arms at that time, *see* State Br. 20). In support of this argument, the State claims that "State and local governments frequently restricted citizens from carrying firearms in public when the Fourteenth Amendment was ratified." State Br. 13. But the State cites only an 1858 D.C. ordinance banning concealed weapons, an 1876 Wyoming law banning the bearing of a firearm in a city, town, or village, and an 1871 Texas law banning the carrying of pistols without grounds to fear attack.[5] These few laws cannot alone determine the scope of the Second Amendment right,[6] and at any rate they are not precedent for Illinois's ban because none of them went so far as to ban all public carriage of firearms for self-defense throughout the jurisdiction. The State cites no law banning the carrying of firearms during 1866-68, when the Fourteenth Amendment was proposed and ratified, and there were no such laws other than the Black Codes.

The State cites two cases as in accord with the laws it identifies, but they only upheld bans on concealed weapons. *See Aymette v. State*, 2 Humph. (21 Tenn.) 154 (Tenn. 1840); *State*

---

[5] The Brady Center also points to an 1881 Arkansas law. *See* Doc. No. 37 ("Brady Ctr. Br.") at 8. But in addition to post-dating ratification of the Fourteenth Amendment by over a decade, that law did not prohibit carrying long guns or carrying openly pistols of a kind used in the Army or Navy, nor did it prohibit carrying firearms while "on a journey." *See* Ark. Act of April 1, 1881, §§ 1-2.

[6] *See Ezell*, 2011 WL 2623511, at *15 (holding that two 19th-century statutes that "flatly prohibited the discharge of firearms based on concerns unrelated to fire suppression" fall "far short of establishing that target practice is wholly outside the Second Amendment as it was understood when incorporated as a limitation on the States."); *cf. Heller*, 554 U.S. at 632 ("[W]e would not stake our interpretation of the Second Amendment upon a single law … that contradicts the overwhelming weight of other evidence.").

11

v. *Buzzard*, 4 Ark. 18 (1842).[7]  And oblivious to the fact that no law in any state banned the carrying of arms, openly or concealed, when the Second Amendment was adopted, the State argues that no right to do so was recognized at that time, but that antebellum courts invented the right. State Br. 19, citing *State v. Chandler*, 1850 WL 3838, *2 (1850); *Nunn v. State*, 1 Ga. 243, 251 (1846).  The State cites no antebellum court decision upholding a ban on carrying firearms per se, as none existed.  The earliest case held that a ban on concealed arms violated the right. *Bliss v. Commonwealth*, 2 Litt. (Ky.) 90, 13 Am. Dec. 251 (1822).  And while thereafter antebellum courts sustained concealed-carry bans, they neither held nor implied that a complete ban on carrying firearms in public would be valid.  Indeed, the contrary is true.  *See, e.g.*, *State v. Reid*, 1 Ala. Reports 612, 616-17 (1840) ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional."); *State v. Jumel*, 13 La. Ann. 399, 400 (1858) (holding that a concealed carry ban did "not infringe the right of the people to keep or bear arms" because it prohibited "only a *particular mode* of bearing arms"); *Owen v. State*, 31 Ala. 387 (1858) (holding that a concealed carry ban "was not designed to destroy the right" to bear arms because it was "a mere regulation of the manner in which certain weapons are to be

---

[7] Additional 19th Century cases cited by the Brady Center are likewise inapposite.  *See* Brady Ctr. Br. 8-9.  *State v. Jumel*, 13 La. Ann. 399 (1858), upheld a concealed carry ban.  *English v. State*, 35 Tex. 473, 477 (1871), upheld the Texas statute that the State cites, emphasizing that the law did not reach the types of arms used by "a militiaman or soldier" and permitted the weapons it did reach to be "carried as means of self-defense" in certain situations.  *Hill v. State*, 53 Ga. 472 (1874), upheld a statute that barred carrying deadly weapons at courts, election grounds, churches, and public gatherings, while preserving a "general right to carry … in the fields, and in the woods, on the highways and byeways, at home and abroad," *id.* at 474, 476. *Fife v. State*, 31 Ark. 455 (1876),  upheld a ban on carrying pistols by construing it not to apply to pistols of a type "in ordinary use, and effective as a weapon of war, and useful and necessary for 'the common defense, ' " *id.* at 461.  *State v. Workman*, 35 W.Va. 367 (1891), upheld a ban with a self-defense exception and that did not apply to "arms to be used in defending the state and civil liberty," but rather to weapons "only habitually carried by bullies, blackguards, and desperadoes."

borne"). As we demonstrated in our summary judgment brief, it is a fantasy to suggest that in 1791, a right to bear arms outside the home was not recognized, and that only limited support for such recognition appeared in the nineteenth century. Indeed, the debate over the validity of concealed carry bans demonstrates that the right to bear arms was understood to extend beyond the home, for otherwise the issue would have been an easy one. *See* 2 J. KENT, COMMENTARIES ON AMERICAN LAW *340, n.2 (O. Holmes ed., 12th ed. 1873) ("As the Constitution of the United States, and the constitutions of several of the states, in terms more or less comprehensive, declare the right of the people to keep and bear arms, it has been a subject of grave discussion, in some of the state courts, whether a statute prohibiting persons ... from *wearing or carrying concealed weapons,* be constitutional. There has been a great difference of opinion on the question.").

From adoption of the Second Amendment through proposal of the Fourteenth Amendment, only one class of persons was said by some to have no right to carry firearms – African Americans. *State* v. *Newsom*, 27 N.C. 250, 254 (1844), upheld a provision "to prevent free persons of color from carrying fire arms" on the ground that "the free people of color cannot be considered as citizens." Or as (in)famously stated in *Dred Scott* v. *Sandford*, 60 U.S. (19 How.) 393, 417 (1857), African Americans could not possibly be considered as citizens, for otherwise they would have the right "to keep and carry arms wherever they went." The Fourteenth Amendment, of course, would change that. Indeed, it was intended to secure for African Americans the same right to carry firearms enjoyed by other citizens and to protect them from reconstruction-era restrictions infringing that right. *See McDonald*, 130 S. Ct. at 3038-42; Pl. SJ Br. 12-13.

### B.    This Court Cannot Sidestep Plaintiffs' Second Amendment Claim

Because the State's substantive arguments lack merit, its case for limiting the core Second Amendment right of armed self-defense to the home ultimately rests on a misguided plea for

13

judicial "restraint," whereby lower courts simply reject Second Amendment claims that are not directly controlled by *Heller*, thus leaving further development of Second Amendment case law exclusively to the Supreme Court. *See, e.g.*, State Br. 11 ("In the absence of support from *Heller*, this Court should not expand the right recognized in that decision beyond the home."); *id.* at 12 ("On the question of *Heller*'s applicability outside the home environment, we think it prudent to await direction from the Court itself.") (quotation marks omitted).

As an initial matter, this argument rests on a mistaken premise:  that *Heller* provides no "support" for a core Second Amendment right outside the home.  State Br. 11.  While *Heller* precludes lower courts from sustaining a ban on possessing operable firearms in the home, its precedential force is not *limited* to that narrow proposition.  Rather, "[w]hen an opinion issues for the Court, it is not only the result *but also those portions of the opinion necessary to that result*" which are binding.  *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996) (emphasis added); *see also United States v. Bloom*, 149 F.3d 649, 653 (7th Cir. 1998) (a statement that "explains the Court's rationale" is "part of the holding"); *Cole Energy Dev. Co. v. Ingersoll-Rand Co.*, 8 F.3d 607, 609 (7th Cir. 1993) ("explicit rulings on issues that were before the higher court ... are not dicta"); *Sarnoff v. American Home Prods. Corp.*, 798 F.2d 1075, 1084 (7th Cir. 1986) ("dictum is a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding").[8]

In determining whether the Second Amendment's core protection extends to carrying firearms outside of the home, this Court is thus bound by several principles essential to *Heller*'s decision, including:  that the Second Amendment "guarantee[s] the individual right to possess

---

[8]And even Supreme Court dicta, while not binding, cannot simply be ignored. *See Nichol v. Pullman Standard, Inc.*, 889 F.2d 115, 120 n.8 (7th Cir. 1989) ("This Court should respect considered Supreme Court dicta."); *Bloom*, 149 F.3d at 653 (the Supreme Court "uses considered dicta to influence [litigated disputes] for which there is no room on the docket").

14

*and carry* weapons in case of confrontation," *Heller*, 554 U.S. at 592 (emphasis added); that the "core" or "central component" of this right is "self-defense," *id.* at 599, 630; and that the right is "enshrined with the scope [it was] understood to have when the people adopted [it], whether or not future legislatures *or (yes) even future judges* think that scope too broad," *id.* at 634-35 (emphasis added). As our briefing in this case has shown, faithful application of these principles inexorably leads to the conclusion that the Second Amendment's core protection extends beyond the home.

But the State's argument for "restraint" suffers from a more fundamental flaw: it is in reality not an argument for judicial restraint but for abdication of judicial duty. Plaintiffs have asserted a proper Second Amendment claim, to resolve that claim this Court must determine whether the core Second Amendment right to armed self-defense extends beyond the home, and (in the State's view) no binding authority resolves the issue. Foundational principles of American law thus require this Court to confront the issue directly:

> The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. ... With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty.

*Cohens v. Virginia*, 19 U.S. 264, 404 (1821).[9] Indeed, the Seventh Circuit in *Ezell* faulted the district court because it "identified but did not evaluate the Second Amendment merits question"

---

[9] *See also Marbury v. Madison*, 5 U.S. 137, 178 (1803) ("So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty."); *Chicago & G.T. Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892) ("Whenever, in pursuance of an honest and actual antagonis-

at issue in that case. *Ezell*, 2011 WL 2623511, at *11. Simply put, the State is wrong to suggest that district courts cannot – and must not – evaluate Second Amendment claims involving rights outside the home. Precisely the opposite is true.

Furthermore, leaving development of Second Amendment doctrine exclusively to the Supreme Court would "deprive [the] Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before [the] Court grants certiorari." *United States v. Mendoza*, 464 U.S. 154, 160 (1984).

At bottom, the State's argument for "restraint" is grounded in its warning that the potential costs of miscalculation are high. Indeed they are: by stripping individuals of the right to armed self-defense in public, Illinois increases their vulnerability to brutal criminal attacks like the one suffered by Ms. Shepard. *See* Complaint ¶¶ 22-27. And at any rate, the Second Amendment is not unique among constitutional rights in having "controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category." *McDonald*, 130 S. Ct. at 3045 (plurality); *see also id.* at 3056-57 (Scalia, J., concurring). The State's unfounded speculation that a decision for Plaintiffs could lead to "mayhem," State Br. 12-13, thus provides no support for singling out the Second Amendment "for special – and specially unfavorable – treatment," a proposition the Supreme court has expressly rejected, *McDonald*, 130 S. Ct. at 3043.

---

tic assertion of rights by one individual against another, there is presented a question involving the validity of any act of any legislature, state or federal, and the decision necessarily rests on the competency of the legislature to so enact, the court must, in the exercise of its solemn duties, determine whether the act be constitutional or not."); *George Moore Ice Cream Co. v. Rose*, 289 U.S. 373, 379 (1933) ("[A]voidance of a difficulty will not be pressed to the point of disingenuous evasion. Here the intention of the Congress is revealed too distinctly to permit us to ignore it because of mere misgivings as to power. The problem must be faced and answered."); *County Court of Ulster County, N.Y. v. Allen*, 442 U.S. 140, 154 (1979) ("Federal courts … have a duty to decide constitutional questions when necessary to dispose of the litigation before them.").

## III.   ILLINOIS'S BAN IS UNCONSTITUTIONAL

Because Illinois's ban broadly prohibits the exercise of the core Second Amendment right to armed self-defense, it is unconstitutional. *See Ezell*, 2011 WL 2623511, at *11.[10]   Indeed, as a matter of law the State cannot possibly articulate any "interest" sufficient to justify its ban:

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government – even the Third Branch of Government – the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.

*Heller*, 554 U.S. at 634-35. The Second Amendment, in other words, "is the very *product* of an interest-balancing by the people," *id.*, and it "necessarily takes certain policy choices off the table," *id.* at 636. Illinois's ban is thus flatly unconstitutional. The State can no more ban exercise of the core fundamental right of armed self-defense in public than it can ban speaking in public.

Even if this Court were to hold that some form of means-ends analysis should apply in this case, that analysis must be stringent: "a severe burden on the core Second Amendment right

---

[10] The State proceeds as if Plaintiffs allege two distinct claims for two distinct constitutional violations, one asserting a right to carry concealed firearms (and thus challenging Illinois's laws to the extent they prohibit concealed carry) and another asserting a right to carry firearms openly (and thus challenging Illinois's laws to the extent they prohibit open carry. *See, e.g.*, State Br. 10 (arguing that "the concealed and open carry bans are constitutional"). But that is not the case: Plaintiffs assert that the Second Amendment protects the right to carry firearms in public for self-defense *in some manner*, and they thus assert that the challenged laws – which act in concert to ban the practice – are unconstitutional. Of course, if Illinois's ban is struck down (as we believe it should be), the State will remain free to enact laws that *regulate*, and opposed to *ban*, carrying firearms in public for self-defense. And Plaintiffs will remain free to challenge those regulations if they go too far and encroach upon Second Amendment rights. *See Ezell*, 2011 WL 2623511, at *20 ("The City may promulgate zoning and safety regulations governing the operation of ranges not inconsistent with the Second Amendment rights of its citizens; the plaintiffs may challenge those regulations, but not based on the terms of this injunction."). But for now, Illinois must defend the statutory scheme that it has enacted, which operates as a complete bar to carrying operable firearms in public for personal protection.

of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its ends." *Ezell*, 2011 WL 2623511, at *17. Because Illinois's carriage ban imposes such a burden, it must be subject at least to this rigorous form of review akin to strict scrutiny in the First Amendment context.

The State does not even attempt to meet this test. Rather, it pins its case to the argument that carrying a firearm in public lies at "the margins" of the Second Amendment right, and thus that its ban is subject only to intermediate scrutiny. *See* State Br. 16. Because the State is mistaken about this, its motion to dismiss must fail. But the State has failed to make a showing necessary to sustain the ban even under the relatively relaxed standard that it argues should apply, for neither "logic" nor "data" support the State's argument that there exists a substantial relation between Illinois's carriage ban and public safety. *See Ezell*, 2011 WL 2623511, at *17.

As for logic, the State blithely asserts that its carriage ban "will make it more difficult to discharge firearms in public, thereby reducing the risk that guns will fire to deadly effect, purposefully, or accidently." State Br. 17. But the logical implications of Illinois's ban are not so straightforward. Logic suggests that individuals willing to engage in unspeakable acts of criminal violence are unlikely to be deterred from using firearms by Illinois's ban. Instead, it is law-abiding individuals like Ms. Shepard who obey the ban and are thus rendered defenseless in the face of vicious criminal attacks. And Illinois independently bans criminals, drug addicts, and the mentally disabled from carrying guns, *see* 720 ILCS 5/24-1.6(a)(3)(C); 430 ILCS 65/4, and it independently bans carrying particularly dangerous and unusual weapons such as sawed-off shotguns, *see* 720 ILCS 5/24-1(a)(7). The practical effect of the ban is thus to take common firearms out of the hands of the law-abiding. As a logical matter, it is thus highly *unlikely* that Illinois's ban has any net positive effect on public safety. And the State's "logic" is even more

18

suspect when considered along with *every other State's* decision to allow some form of carrying firearms in public for self-defense. *See* Pl. SJ. Br. 1 n.1.

As for data, it supports Plaintiffs' logic, not the State's. Using a gun defensively is an effective method of preventing injury when confronted with a criminal attack. *See, e.g.,* Jongyeon Tark & Gary Kleck, *Resisting Crime*, 42 CRIMINOLOGY 861, 878, 902 (2004) (finding that only 2%-3% of crime victims are injured after using a gun to defend themselves, and concluding that "[r]esistance with a gun appears to be most effective in preventing serious injury"). And carrying guns in public facilitates hundreds of thousands of defensive gun uses every year. *See* Gary Kleck & Marc Gertz, *Armed Resistance to Crime*, 86 J. CRIMINAL LAW & CRIMINOLOGY 150, 164, 174 (1995) (concluding that "each year in the U.S. there are about 2.2 to 2.5 million [defensive gun uses]" and that up to 63% of them – *i.e.,* up to 1.57 million – "entailed public carrying"); *see also* FIREARMS AND VIOLENCE: A CRITICAL REVIEW 103 (Charles F. Wellford et al. eds., 2005) ("At least 19 other surveys have resulted in estimated numbers of defensive gun uses that are … statistically indistinguishable … [from] the results found by Kleck and Gertz."). This data indicates that measures that effectively reduce gun carrying "among the noncriminal majority also would reduce [defensive gun uses] that otherwise would have saved lives, prevented injuries, [and] thwarted rape attempts." Kleck & Gertz, 86 J. CRIMINAL LAW & CRIMINOLOGY at 180; *see also id.* ("as many as 400,000 people a year use guns in situations where the defenders claim that they 'almost certainly' saved a life by doing so").

The most the State can possibly show is that the net effect on violent crime of easing restrictions on carrying guns in public is unsettled or insignificant. *See* FIREARMS AND VIOLENCE 2 (literature review finding "no credible evidence that the passage of right-to-carry laws decreases or increases violent crime"); Robert A. Hahn, *et al., Firearms Laws and the Reduction of Vio-*

19

*lence: A Systematic Review*, 28 AM. J. PREV. MED. 40, 54 (2005) (literature review concluding

that "[f]urther research is needed to assess the effects of shall issue laws on violence").  Indeed,

the lone study the State cites on this point merely claims that "there is no evidence of *reduction*

in violent crime when [right to carry] laws are passed."  John J. Donohue, *Guns, Crime, and the*

*Impact of State Right-to-Carry Laws*, 73 Fordham L. Rev. 623, 638 (2004) (emphasis added).

This does not support the notion that Illinois's public carriage ban promotes public safety.

     And it matters not whether "permitting systems consistently fail to keep guns out of the

hands of dangerous people."  State Br. 17.  Because Plaintiffs do not challenge Illinois's permit-

ting system for possessing firearms, *see* 430 ILCS 65/1 *et seq.*, striking down Illinois's public

carriage ban will have no effect on who may legally possess a gun in the State.  At any rate, as

even researchers sympathetic to gun control have acknowledged, "available data about [con-

cealed carry] permit holders … imply that they are at fairly low risk of misusing guns, consistent

with the relatively low arrest rates observed to date for permit holders."  Philip J. Cook, Jens

Ludwig, & Adam M. Samaha, *Gun Control After* Heller*: Threats and Sideshows from a Social*

*Welfare Perspective*, 56 U.C.L.A. L. REV. 1041, 1082 (2009).  *See, e.g.*, H. Sterling Burnett,

National Center for Policy Analysis, *Texas Concealed Handgun Carriers: Law-Abiding Public*

*Benefactors* 1 (2000), *available at* http://www.ncpa.org/pdfs/ba324.pdf (concluding that "con-

cealed carry licensees [in Texas] had arrest rates far lower than the general population for every

category of crime.").  By contrast, simply looking in isolation at the number of people allegedly

killed by concealed carry permit holders, as the State has done, tells us nothing about the net im-

pact of permitting law-abiding individuals to carry firearms in public.

## CONCLUSION

     For these reasons, the State's motion to dismiss should be denied.

Respectfully Submitted,

**MARY E. SHEPARD and THE ILLINOIS STATE RIFLE ASSOCIATION**,
Plaintiffs

By:     s/ William N. Howard
            One of their attorneys

William N. Howard
FREEBORN & PETERS LLP
311 S. Wacker Dr., Suite 3000
Chicago, Illinois   60606
Tel: (312) 360-6415
Fax: (312) 360-6996
Email: whoward@freebornpeters.com

21

## CERTIFICATE OF SERVICE

The undersigned attorney states that he caused a true and correct copy of **Plaintiffs' Response to the State's Motion to Dismiss,** to be served upon the parties of record, as shown below, via the Court's CM/ECF system on the **15th** day of **August, 2011.**

By: ___ s/ William N. Howard _____

## SERVICE LIST

Terence J. Corrigan
Illinois Attorney General's Office
500 S. Second St.
Springfield, IL  62706
Tel:  (217) 782-5819
Fax:  (217) 524-5091
tcorrigan@atg.state.il.us
***Atty. for Lisa Madigan, Pat Quinn and Tyler Edmonds***

Joseph A. Bleyer
Bleyer & Bleyer
601 West Jackson
P.O. Box 487
Marion, IL 62959-0487
Tel: (618) 997-1331
jableyer@bleyerlaw.com
***Atty. for David Livesay***

Jonathan Lee Diesenhaus
Hogan Lovells LLP
555 13th St., NW
Washington, DC 20004
Tel:  (202) 637-5416
Fax:  (202) 637-5910
jonathan.diesenhaus@hoganlovells.com

***Atty. for Amicus Brady Center to Prevent Gun Violence***