EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
BENTON DIVISION

| | | |
|---|---|---|
| MARY E. SHEPARD and the ILLINOIS STATE RIFLE ASSOCIATION, | ) ) ) | |
| Plaintiffs, | ) ) | No. 3:11-cv-00405-WDS-PMF |
| v. | ) ) ) | Honorable Judge William D. Stiehl |
| LISA M. MADIGAN, solely in her official capacity as ATTORNEY GENERAL OF ILLINOIS, GOVERNOR PATRICK J. QUINN, solely in his official capacity as Governor of the State of Illinois, TYLER R. EDMONDS, solely in his official capacity as the State's Attorney of Union County, Illinois, and SHERIFF DAVID LIVESAY, solely in his official capacity as Sheriff of Union County, | ) ) ) ) ) ) ) ) ) ) ) | Magistrate Judge Philip M. Frazier |
| Defendants. | ) ) | |

**BRIEF OF *AMICUS CURIAE* NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Charles J. Cooper*
ccooper@cooperkirk.com
David H. Thompson
dthompson@cooperkirk.com
Peter A. Patterson
ppatterson@cooperkirk.com
COOPER & KIRK PLLC
1523 New Hampshire Ave. NW
Washington, D.C. 20036
Tel:  (202) 220-9600
Fax:  (202) 220-9601

Brian S. Koukoutchos
bkoukoutchos@gmail.com
28 Eagle Trace
Mandeville, LA 70471
Tel: (985) 626-5052

*Pro hac vice application pending*

*Counsel for Amicus Curiae National Rifle Association of America, Inc*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES............................................................................................ii

INTRODUCTION ..........................................................................................................1

INTERESTS OF THE AMICUS ....................................................................................2

ARGUMENT ..................................................................................................................2

FIREARMS CARRIAGE IN PUBLIC PLACES BY LAW-ABIDING
CITIZENS IMPROVES PUBLIC SAFETY. ................................................................2

    I.    ARMED SELF-DEFENSE IN PUBLIC IS PREVALENT IN THE 49 STATES THAT,
        UNLIKE ILLINOIS, DO NOT OUTLAW THAT CONSTITUTIONAL RIGHT. ......................2

    II.    CARRIAGE AND USE OF FIREARMS BY LAW-ABIDING CITIZENS IS AN
        EFFECTIVE MEANS OF SELF-DEFENSE. ....................................................................5

    III.    PRIVATE CITIZENS LICENSED TO CARRY WEAPONS DO NOT THREATEN
        PUBLIC SAFETY............................................................................................................8

    IV.    CONTRARY TO THE BRADY CENTER'S ASSERTION, PERMITTING
        LAW-ABIDING CITIZENS TO CARRY FIREARMS IN PUBLIC DOES NOT
        INCREASE -- BUT MAY DECREASE -- CRIME RATES................................................16

CONCLUSION..............................................................................................................19

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................................................. 1, 3

*Commonwealth v. Robinson*, 600 A.2d 957 (Pa. Super. Ct. 1991) ................................................ 16

*Commonwealth v. Romero*, 673 A.2d 374 (Pa. Super. Ct. 1996) ................................................. 16

*Jennings v. McCraw*, No. 5:10-cv-141-C (N.D. Tex. filed Sept. 8, 2010) ..................................... 2

*McDonald v. City of* Chicago, 130 S. Ct. 3020 (2010) ................................................................. 2

**Other**

A.L. Kellerman & D.T. Reay, *Protection or Peril? An Analysis of Firearm-related Deaths in the
Home,* 314 New England J. of Med. 1557-60 (1986) ........................................................... 9

A.L. Kellerman  *et al.*, *Gun Ownership as a Risk Factor for Homicide in the Home*, 329 New
England J. of Med. 1084-91 (1993) ......................................................................................... 9

A.L. Kellerman *et al.*, *Injuries and Deaths Due to Firearms in the Home*, 45 Journal of Trauma
263-67 (1998) ............................................................................................................................ 9

Charles C. Branas, et al., *Investigating the Link Between Gun Possession and Gun Assault*,
99 AMER. J. PUB. HEALTH 1 (Nov. 2009) ............................................................................... 7

Charles F. Wellford, John V. Pepper & Carol V. Petrie (eds.), FIREARMS AND VIOLENCE:
A CRITICAL REVIEW (2005) .......................................................... 4, 5, 7, 10, 16, 17

Daniel D. Polsby & Don B. Kates, Jr., *American Homicide Exceptionalism*,
69 U. Colo. L. Rev. 969 (1998) ............................................................................................. 14

David B. Mustard, *Comment*, *in* EVALUATING GUN POLICY 326 (Jens Ludwig and
Philip J. Cook eds. 2003) ......................................................................................... 13, 14, 17

David B. Mustard, *The Impact of Gun Laws on Police Deaths*,
44 J.L. & ECON. 635 (2001) .......................................................................................... 14, 15

David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive
Gun Uses: Results from a National Survey*, 15 VIOLENCE & VICTIMS 257 (2000) .............. 3, 9

David McDowall *et al., Easing Concealed Firearms Laws: Effects on Homicide in
Three States*, 86 J. CRIM. L. & CRIMINOLOGY 193 (1995) ..................................................... 18

Don B. Kates & Gary Mauser, *Would Banning Firearms Reduce Murder and Suicide?
A Review of International and Some Domestic Evidence*,
30 HARV. J. L. & PUB. POL'Y 649 (2007) ......................................................................... 5, 10

Federal Bureau of Investigation, Crime in the United States (2009)
(Available at http://www2.fbi.gov/ucr/cius2009/data/table_16.html) ................................... 10

Gary Kleck & Don B. Kates, Jr., ARMED:
NEW PERSPECTIVES ON GUN CONTROL (2001) .................................................................. 3, 4

Gary Kleck, TARGETING GUNS: FIREARMS AND THEIR CONTROL (1997) ........................... 3, 4, 5 ,6

*Guns, Crime, and the Impact of State Right-to-Carry Laws*,
73 FORDHAM L. REV. 623 (2004)........................................................................18

James D. Wright & Peter H. Rossi, ARMED AND CONSIDERED DANGEROUS (2d ed. 2008) ...........8

James Q. Wilson, *Dissent,* Appendix A to NATIONAL RESEARCH COUNCIL REVIEW.................. 17

Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State
Panel Data*, 18 INT'L REV. L. & ECON. 239 (1998) ................................................. 18

John Donohue, *The Impact of Concealed-Carry Laws, in* EVALUATING GUN POLICY 289
(Jens Ludwig & Philip J. Cook eds. 2003) ...........................................................18

John Lott, *Responding to Jack D'Aurora's piece in the Columbus Dispatch,* (available at
http://johnrlott.blogspot.com/2011/08/responding-to-jack-dauroras-piece-in.html) ...............12

John R. Lott, Jr., MORE GUNS LESS CRIME:
UNDERSTANDING CRIME AND GUN CONTROL LAWS (3d ed. 2010)................................6, 13, 18

Lawrence Messina, *Gun Permit Seekers Not the Criminal Type*,
CHARLESTON GAZETTE, P. C1 (July 28, 1997) ...................................................... 13

Lee Anderson, *North Carolina's Guns*, CHATTANOOGA FREE PRESS, P.A4 (May 31, 1997) .......14

Matt Hanley and Dave Gathman, *Local police give support to conceal carry*,
THE COURIER NEWS, Aug. 6, 2011 (available at
http://couriernews.suntimes.com/news/6899128-418/local-police-give-support-to-
conceal-carry.html) (last visited 8/10/11) ......................................................15, 16

Nick Paulson, *Police Not Fretting Over Looming Concealed Carry Law*, STEVENS POINT
JOURNAL, Aug. 6, 2011 (available at
http://www.stevenspointjournal.com/article/20110806/SPJ0101/108060501/Police-not-
fretting-over-looming-concealed-carry-law) ..........................................................15

Philip Cook, *et al., Gun Control After* Heller*: Threats and Sideshows From a Social
Welfare Perspective*, 56 U.C.L.A. L. REV. 1041 (2009)...........................................7

Samuel Francis*, Evidence shows concealed-carry laws are safe*, LAS VEGAS REVIEW-
JOURNAL  (Jan. 18, 1997)..................................................................................12

Stan Schellpeper, *Case for a Handgun-Carry Law*, OMAHA WORLD HERALD
(Feb. 6, 1997)..................................................................................................13

Terry Flynn, *Gun-toting Kentuckians Hold Their Fire*, CINCINNATI ENQUIRER
(June 16, 1997) (available at
http://www.enquirer.com/editions/1997/06/16/loc_kycarry.html) ...................................13, 15

www.vpc.org/ccwkillers.htm.................................................................................10, 11

## INTRODUCTION

In addition to its legal arguments, which are refuted in the briefing of Plaintiff Mary Shepard, *amicus* Brady Center offers a number of policy "rationales" for denying law-abiding citizens the right to carry firearms for self-defense when they leave their homes.  Brady Br.10-13.  What the Brady Center fails to understand is that the *policy debate* about the right to keep and bear arms has already been resolved by the Second Amendment to the United States Constitution.  In the words of the Supreme Court, that Amendment guarantees an individual right to "carry weapons in case of confrontation" for the "core lawful purpose of self-defense." *District of Columbia v. Heller*, 554 U.S. 570, 592, 630 (2008).  The Brady Center urges this Court to balance that constitutional right against competing interests including supposed threats to public safety.  Those threats do *not* exist, as we will explain shortly.  But the very interest-balancing that *amicus* Brady seeks, regardless of its outcome, is fundamentally illegitimate, because the Second Amendment right to armed self-defense is no longer "subject[] to a freestanding 'interest-balancing' approach.  The very enumeration of the right takes out of the hands of government … the power to decide on a case-by-case basis whether the right is *really worth* insisting upon."  *Heller*, 554 U.S. at 634-35 (emphasis in original).  The Second Amendment "necessarily takes certain policy choices off the table," *id.* at 636, and the public disarmament of law-abiding citizens is one policy choice that is no longer available to the State of Illinois.

Even if this Court were free to rebalance the scales and to judge the utility of the Second Amendment right to bear arms, the evidence mustered by the Brady Center would be insufficient to shift the balance in favor of Illinois's total ban on carrying firearms in public.

## INTERESTS OF THE AMICUS

The National Rifle Association of America, Inc. (NRA) is America's foremost and oldest defender of Second Amendment rights.  Founded in 1871, the NRA today has approximately four million members and its programs reach millions more.  The NRA is America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement. The NRA's membership includes Illinois residents, including Ms. Shepard, one of the plaintiffs in this case.  The NRA and its members have numerous interests that will be substantially affected by the outcome of this litigation.  First and foremost, the rights of Illinois NRA members are infringed by the State's ban on carrying firearms for self-defense in public.  The outcome of this case is thus critically important to the NRA and its Illinois members.  Second, the NRA and its members are often litigants in cases raising Second Amendment issues, such as *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), including the right to carry firearms in public for self-defense.  *See, e.g.*, *Jennings v. McCraw*, No. 5:10-cv-141-C (N.D. Tex. filed Sept. 8, 2010).

## ARGUMENT

### FIREARMS CARRIAGE IN PUBLIC PLACES BY LAW-ABIDING CITIZENS IMPROVES PUBLIC SAFETY.

### I.  ARMED SELF-DEFENSE IN PUBLIC IS PREVALENT IN THE 49 STATES THAT, UNLIKE ILLINOIS, DO NOT OUTLAW THAT CONSTITUTIONAL RIGHT.

The Brady Center asserts that firearms carried in public by properly licensed, law-abiding citizens "expose all members of society to great risks." Brady Br. 11.  This, and all of Brady's other policy arguments, run headlong into two insuperable hurdles.  First, the actual research on firearms refutes their facile slogans.  Second, their dire forecasts of calamity if citizens are

allowed to carry firearms cannot be squared with the experience of the states that already permit such carriage.

The right to "carry weapons in case of confrontation" that the Supreme Court described in *Heller*, 554 U.S. at 592, actually promotes public safety.  Defensive gun use  ("DGU") is a common and effective way for ordinary citizens to defend themselves from violence.  The leading study designed specifically to gauge the frequency of DGU determined that every year there are between 670,000 and 1,575,000 defensive gun uses associated with carrying firearms in public places. Gary Kleck, TARGETING GUNS: FIREARMS AND THEIR CONTROL 192 (1997) (describing results of the National Self-Defense Survey) ("NSDS"); *see also* Gary Kleck & Don B. Kates, Jr., ARMED: NEW PERSPECTIVES ON GUN CONTROL 225-26 (2001).  Thus, of the roughly 2.5 million DGUs each year, as many as 63% involve citizens carrying a firearm while away from their home. Kleck, TARGETING GUNS*, supra,* at 179, 192.

The Brady Center disputes the efficacy and frequency of defensive gun use, relying on a study by Drs. Hemenway and Azrael.  Brady Br. 11 (citing David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results from a National Survey*, 15 VIOLENCE & VICTIMS 257, 271 (2000)).  But Dr. Hemenway's study has been discredited for misrepresenting its own survey results:  his actual data indicate at least *six times* as many defensive gun uses as the estimates he reports in his article. *See* Kleck & Kates, ARMED, *supra*, at 230 & n. 27.  In contrast, Dr. Kleck's results, indicating approximately 2.5 million DGUs per year with 1.6 million of those occurring outside the home, *have been replicated and confirmed by 19 other studies*.  Many of those studies were not by firearms advocates, but by such perennial supporters of gun control as the federal Centers for Disease Control and Prevention, the Police Foundation, the U.S. Justice Department, and the WASHINGTON POST. *See* Kleck & Kates,

3

ARMED, *supra*, at 228-31.  Indeed, Dr. Hemenway himself served on the board that designed one of the principal studies that has confirmed Dr. Kleck's research about the prevalence of DGU: the Police Foundation's National Survey of the Private Ownership of Firearms.  *Id*. at 265.[1]

The debate over firearms regulation is so ridden with strife that statisticians, criminologists and public health researchers can sometimes sound less like objective social scientists than zealous advocates.  We therefore refer this Court to the principal research arm of the federal government, the National Academy of Sciences, which has conducted a review of the entire body of firearms literature.  The National Research Council of the National Academies of Science was asked by a consortium of federal and private agencies, including the Centers for Disease Control and the National Institute of Justice, "to assess the data and research on firearms." Charles F. Wellford, John V. Pepper & Carol V. Petrie (eds.), FIREARMS AND VIOLENCE: A CRITICAL REVIEW 13 (2005) ("NATIONAL RESEARCH COUNCIL REVIEW").[2]

The NRC undertook "an assessment of the strengths and limitations of the existing research and data on gun violence." NATIONAL RESEARCH COUNCIL REVIEW at 1.  Its goal was "to raise the science of firearms research so that it can begin to inform public policy." *Id*. at X. The NRC surveyed *all* the extant literature on firearms regulation – hundreds of books, journal articles, and peer-reviewed studies.  *See id*. at 22-30, 78, 130-33, 156-61, 174-77, 186-92, 242-

---

[1] This study by the Police Foundation, sponsored by the National Institute of Justice, found that "1.44% of the adult population had used a gun for protection against a person in the previous year, implying 2.73 million defensive gun users." Kleck, TARGETING GUNS, *supra* at 151-52. This figure, like Dr. Kleck's own lower estimate of 2.5 million incidents of DGU per year, "is probably a conservative estimate . . . [because] cases of [respondents] intentionally withholding reports of genuine DGUs were probably more common than cases of [respondents] falsely reporting incidents that did not occur or that were not genuinely defensive." *Id.* at 151.

[2] Another of the groups that urged the NRC to undertake this review was the Joyce Foundation, *see* NATIONAL RESEARCH COUNCIL REVIEW at 13, which finances some of Dr. Hemenway's research and that of other gun-control advocates, such as the Violence Policy Center, which is another of the Brady Center's authorities.  *See* Brady Br. 11.

68.[3]   The National Research Council noted that Dr. Kleck's estimate of defensive gun use from the NSDS was much larger than the National Crime Victimization Survey ("NCVS") estimate preferred by Dr. Hemenway.  NATIONAL RESEARCH COUNCIL REVIEW at 7.  The difference is that Dr. Kleck's results have been replicated and confirmed, whereas Dr. Hemenway's have not:  "*At least 19 other surveys* have resulted in estimated numbers of defensive gun uses that are similar (*i.e.*, statistically indistinguishable) to the results found by Kleck and Gertz.  *No other surveys have found numbers consistent with the NCVS*" figures used by Dr. Hemenway. NATIONAL RESEARCH COUNCIL REVIEW at 103 (emphasis added). *See also id.* at 113.  And the NRC noted that even the most conservative estimates of DGU indicate "hundreds of defensive uses every day." *Id*. at 102.

## II.   CARRIAGE AND USE OF FIREARMS BY LAW-ABIDING CITIZENS IS AN EFFECTIVE MEANS OF SELF-DEFENSE.

The Brady Center asserts that "the carrying of firearms in public is not a useful or effective form of self-defense."  Brady Br. 11.  On the contrary, defensive gun uses are not only common, they are also effective.  Data from the U.S. Bureau of Justice Statistics indicate that, in confrontations with criminals, 99% of victims maintain control of their firearms; even the 1% of DGUs that result in criminals taking firearms away from defenders is probably an overestimate, because it includes, *e.g.,* instances where a burglar leaving a home with a victim's weapon is confronted by the victim wielding a second firearm.  *See* Kleck, TARGETING GUNS, *supra*, at 168-69.  Furthermore, fewer than "1-in-90,000" attempts at defensive gun use result in a householder shooting a family member mistaken for a criminal.  *Id.* at 168.  Indeed, only about

---

[3] By one count, the NRC reviewed "253 journal articles, 99 books, 43 government publications, and some original empirical research."  *See* Don Kates and Gary Mauser*, Would Banning Firearms Reduce Murder and Suicide? A Review of International and Some Domestic Evidence*, 30 HARV. J. L. & PUB. POL'Y 649, 654 (2007).

30 people per year are killed by private citizens when they are mistaken for intruders; in contrast, trained police officers kill *eleven times* that many innocent individuals annually.  *See* John R. Lott, Jr., MORE GUNS LESS CRIME: UNDERSTANDING CRIME AND GUN CONTROL LAWS 2 (3d ed. 2010).  Numerous studies have found that robbery victims who resist with firearms are significantly less likely to have their property taken and are also less likely to be injured.  *See* Kleck, TARGETING GUNS, *supra*, at 170.  "Robbery and assault victims who used a gun to resist were less likely to be attacked or to suffer an injury than those who used any other methods of self-protection or those who did not resist at all."  *Id.* at 171.  "[V]ictim resistance with a gun almost never provokes the criminal into inflicting either fatal or nonfatal violence." *Id.* at 174. Similarly, "rape victims using armed resistance were less likely to have the rape attempt completed against them than victims using any other mode of resistance," and such DGU did not increase the victim's risk of "additional injury beyond the rape itself." *Id.* at 175.  Justice Department statistics reveal that the probability of serious injury from any kind of attack is 2.5 times greater for women offering no resistance than for women resisting with a gun. *See* Lott, MORE GUNS LESS CRIME, *supra*, at 4.

Indeed, to prevent completion of a crime it is usually necessary only for the intended victim to display the firearm rather than pull the trigger.  A national survey "indicates that about 95 percent of the time that people use guns defensively, they merely have to brandish a weapon to break off an attack." *See* Lott, MORE GUNS LESS CRIME, *supra*, at 3.  Fewer than one in a thousand defensive gun uses results in a criminal being killed.  *See* Kleck, TARGETING GUNS, *supra* at 178.[4]

---

[4] The Brady Center also claims that "firearms kept in the home are primarily a threat to their owners" and guests, citing studies purporting to link high rates of gun ownership with high rates

The Brady center asserts that defensive gun use does not protect victims.  Brady Br. 12 (citing Charles C. Branas, et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 AMER. J. PUB. HEALTH 1, 4 (Nov. 2009)).  That study merely found, however, that there was an *association* between victim gun possession and being shot, not that there was a *causal link*. *See* Branas, *supra*, at 15.  Regardless of the effectiveness of defensive gun use, one would expect a positive association between victim gun possession and victim injury, because those people *most at risk of victimization* (*e.g.,* because they reside in a dangerous neighborhood) are also the *most likely to arm themselves for protection*.  Going to the doctor has an extremely high positive association with being sick, but that hardly proves that going to the doctor causes illness.

The Brady Center also asserts that carrying a firearm for self-defense merely increases one's risk of injury because it initiates a sort of arms race where criminals are more motivated to carry guns by the anticipation that their victims may be armed. Brady Br. 12 (citing Philip Cook,

---

of home homicide.  Brady Br. 10-11 & n.5.  In the first place, all such evidence, however compelling, is profoundly irrelevant to the case before the court, which involves only Illinois's ban on carrying weapons in *public* places.  Illinois law permits citizens to keep firearms at home for self-defense, as the Brady Center itself points out, Brady Br. 18, so whatever risks accompany gun possession at home *already* exist and cannot possibly be affected by the outcome of this case.

Second, all of the Brady Center studies (or the predecessor studies on which they relied) were reviewed by the National Research Council and dismissed as proving nothing. *See, e.g.,* NATIONAL RESEARCH COUNCIL REVIEW at 242, 243, 247, 248, 259.  Even when statistical *associations* between gun ownership and homicide were valid, no *causal link* could be demonstrated. *Id.* at 5.  The NRC committee identified three fatal flaws in the research on which the Brady Center relies:  "[T]hese studies do not adequately address the problem of self-selection. Second, these studies must rely on proxy measures of ownership that are certain to create biases of unknown magnitude and direction. Third, because the ecological correlations are at a higher geographic level of aggregation, there is no way of knowing whether the homicides or suicides which occurred in the same areas in which the firearms are owned." *Id.* at 6.  Therefore the studies "do not credibly demonstrate a causal relationship between the ownership of firearms and the causes or prevention of criminal violence or suicide." *Id.*

*et al., Gun Control After* Heller*: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1081 (2009)).  First, as the passage quoted by the Brady Center itself reveals, the cited proposition was phrased as mere speculation based on what the survey authors had learned from interviewing criminals about their thoughts on firearms.  Second, a look at the underlying research on which the quoted passage relies subverts the Brady Center's argument. The prison inmates who were surveyed listed 14 possible reasons for carrying guns and nine of the 14 reasons were rated by a majority of the inmates as "somewhat important" or "very important." *See* James D. Wright & Peter H. Rossi, ARMED AND CONSIDERED DANGEROUS 128 (2d ed. 2008).  Thus, concerns about possible victim gun possession did not stand out as an important motivation for criminals to carry guns.  *Id.*  Far from concluding that armed victims motivated criminals to carry guns, the study actually demonstrated that criminals were *deterred* by the prospect of facing armed resistance. *See id.* at 155 (69% of the felons said they knew a crook who had been "scared off, shot at, wounded, captured or killed by an armed victim"); *id.* at 155 (40% said they had on at least one occasion decided not to commit a crime because they knew or believed the victim was carrying a gun.); *id.* at 146 (58% of felons surveyed agreed or strongly agreed that "a store owner who is known to keep a gun on the premises is not going to get robbed very often," and 56% agreed or strongly agreed that "a criminal is not going to mess around with a victim he knows is armed with a gun").  None of this should be surprising; the research merely confirms the common-sense expectation that criminals prefer their victims unarmed and defenseless – which is precisely how Illinois law leaves them.

### III.   PRIVATE CITIZENS LICENSED TO CARRY WEAPONS DO NOT THREATEN PUBLIC SAFETY.

The Brady Center would have this Court believe that law-abiding citizens who have been screened and licensed by the government to carry firearms constitute an acute threat to public

safety.  The Brady Center asserts that guns carried by private citizens for self-defense are used " 'far more often to kill and wound innocent victims than to kill and wound criminals . . . .' " Brady Br. 11 (quoting David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results From a National Survey*, 15 VIOLENCE & VICTIMS 257, 271 (2000)).  The Brady Center's use of this supposed authority is most illuminating.  First, the words for which the Brady Center substitutes ellipses in its quotation are "particularly at home." *See* 15 VIOLENCE & VICTIMS at 271 (2000).  The studies being cited in the Hemenway article focused on the use of guns for self-defense in the home.  Presumably the Brady Center omitted those inconvenient words because the present case involves a law banning the carrying of firearms in public, and therefore the risks of firearms in the home are irrelevant and unaffected by this challenge to Illinois law.

Second, the research on which Dr. Hemenway relied for the proposition quoted by the Brady Center – several articles by A. L. Kellerman – was thoroughly discredited many years ago.[5]  Indeed, these articles are so flawed that, when the National Research Council conducted its review of firearms literature, it singled out these Kellerman studies for particular censure.  The NRC opined that: (i) the studies utterly failed to establish that gun ownership increased the risk of violence to the owner, (ii) the studies were incapable of throwing light on "the impact of firearms on homicide or the utility of firearms for self-defense," and (iii) the studies' conclusions "that owning firearms for personal protection is 'counterproductive' and that 'people should be

---

[5] *See* A.L. Kellerman & D.T. Reay, *Protection or Peril? An Analysis of Firearm-related Deaths in the Home,* 314 New England J. of Med. 1557-60 (1986); A.L. Kellerman  *et al.*, *Gun Ownership as a Risk Factor for Homicide in the Home*, 329 New England J. of Med. 1084-91 (1993); A.L. Kellerman *et al.*, *Injuries and Deaths Due to Firearms in the Home*, 45 Journal of Trauma 263-67 (1998)

strongly discouraged from keeping guns in the home' " were simply "not tenable."  NATIONAL

RESEARCH COUNCIL REVIEW at 118-19.  The Brady Center thus can only support its case by

misrepresenting its own authorities and by relying on authorities that were discredited long ago.

The Brady Center next cites a webpage maintained by the Violence Policy Center

("VPC") entitled "Concealed Carry Killers," which purports to tally the number of people killed

by citizens who have permits to carry firearms in public. Brady Br. 11 (citing

www.vpc.org/ccwkillers.htm).  We shall demonstrate below that this "authority" proves nothing,

but let us assume for the moment that its figures are accurate and meaningful.   According to the

VPC's website, between May 2007 and August 15, 2011 (the date we viewed the site), 370

people were allegedly shot and killed by people with permits to carry guns.  In 2007 there were

approximately 3.5 million concealed-carry permits in the United States.  *See* Don B. Kates &

Gary Mauser, *Would Banning Firearms Reduce Murder and Suicide? A Review of International

and Some Domestic Evidence*, 30 HARV. J. L. & PUB. POL'Y 649, 671 (2007).  If we make the

conservative assumption that this number did not increase from 2007 until now, that means that a

mere one-ten-thousandth of one percent of concealed-carry permit holders committed homicide

over that approximately four-year time span.  That works out to a homicide commission rate of

about 2.5 per 100,000 per year.  This is less than half the national homicide rate for that period,

which was about 5.4 per 100,000 per year.  *See* Federal Bureau of Investigation, Crime in the

United States (2009) (Available at http://www2.fbi.gov/ucr/cius2009/data/table_16.html).

Citizens who are granted carry permits are thus far more law-abiding and less homicidal than the

public at large.  And note that this is not a fair comparison and actually overstates the homicide

rate of carry-permit holders, because the 370 deaths cited by the Brady Center include not just

10

murder, but also suicides and all types of manslaughter and even firearm accidents, whereas the FBI's figure includes only intentional acts of murder and non-negligent manslaughter.

The homicide threat presented by carry-permit holders is in fact far less than even this, as examination of the VPC's "Concealed Carry Killers" website itself reveals. Although described by the Brady Center as a "study," Brady Br. 11, the VPC's webpage does not even purport to be anything of the sort. It describes itself as a collection of "vignettes" of suicides, homicides and firearms accidents culled from news clippings, and it acknowledges that it does not have "detailed information on such killings." *See* www.vpc.org/ccwkillers.htm. If one goes to this website and clicks on the "tally" of "Total People Killed by Concealed Carry Killers: 370," one arrives at a 165-page document which collects the aforementioned "vignettes," usually with one vignette per page. (Hereafter, citations to this document will be styled "VPC Vignettes at ___"; unfortunately, the VPC did not put page numbers in its document).

Although the Brady Center is trying to argue that citizens carrying guns in public pose a threat, much of the VPC's compilation consists of incidents that took place in the home, where Illinois law, as the Brady Center itself stresses, already permits people to keep guns for self-defense. Brady Br. 18. At least 33 of the 165 pages in the VPC compilation describe firearms-related killings in the gun-owner's home. *See, e.g.,* VPC Vignettes at 17, 51, 58, 63, 99, 157. Plainly, this proves nothing about the supposed risk presented by public carriage of firearms.

The VPC list also includes a significant number of incidents that likewise prove nothing about the supposed homicide risk of allowing citizens to carry firearms in public: (i) incidents involving rifles and shotguns rather than concealable weapons that are more typically carried in public, *see e.g., id.* at 91, 94, 151, 155; (ii) at least 100 incidents that involved suicide rather than

11

the killing of another, and that do not even indicate if a firearm was the means of suicide, *see id.* at 66, 75, 79; (iii) accidental gun discharges in which nobody was charged with a crime, *see id.* at 51; (iv) homicide by strangulation, which hardly shows that guns constitute a unique threat, *see id.* at 40;  and even (v) a "vignette" in which the gun-permit owner – whom the VPC says had just been "hailed as a hero" for rescuing an abandoned baby from a trash bin – was not charged because police found that he acted lawfully in self-defense, *see id.* at 71.  The VPC's tally of "Concealed Carry Killers" is a sham and proves nothing.

Far more probative is the actual experience of the 49 states that allow at least some law-abiding citizens to carry weapons in public in some manner.  Where such carriage is allowed, few – if any – permit holders have committed offenses with their firearms.  Since they all must pass background and other checks conducted by the police, it is hardly surprising that carry-permit holders tend to be far more law-abiding than most ordinary citizens.

- In the first 10 years that Florida granted concealed-carry permits, 457,299 licenses were issued and only 85 were revoked because the permit holder committed an offense – a rate of just under .02%.  *See* Samuel Francis*, Evidence shows concealed-carry laws are safe*, LAS VEGAS REVIEW-JOURNAL at 1D  (Jan. 18, 1997).

- In Ohio, about 178,000 people had concealed-handgun permits in 2010 and "just 206 — 0.1 percent — had their permits revoked. Most revocations involved people losing their permits because they moved out of state, died or decided not to hold their license anymore." John Lott, *Responding to Jack D'Aurora's piece in the Columbus Dispatch*, (available at http://johnrlott.blogspot.com/2011/08/responding-to-jack-dauroras-piece-in.html).

12

- "In the first year following the enactment of concealed-carry legislation in Texas, more than 114,000 licenses were issued, and only 17 [were] revoked." Stan Schellpeper, *Case for a Handgun-Carry Law*, OMAHA WORLD HERALD, p. 27 (Feb. 6, 1997).

- One year after Nevada began to issue concealed carry licenses, "[l]aw enforcement officials throughout the state could not document one case of a fatality that resulted from irresponsible gun use by someone who obtained a permit under the new law." Lott, MORE GUNS LESS CRIME, *supra* at 12-13.

- In Virginia (as of the beginning of 1997), not a single permit holder had committed a violent crime.  *See* David B. Mustard, *Comment*, *in* EVALUATING GUN POLICY 331 (Jens Ludwig and Philip J. Cook eds. 2003).

-  After Kentucky's concealed carry law had been in effect for a year, numerous police officers and chiefs confirmed that there had been no cases in which a concealed-carry permit holder had committed an offense with a firearm. Terry Flynn, *Gun-toting Kentuckians Hold Their Fire*, CINCINNATI ENQUIRER (June 16, 1997) (available at http://www.enquirer.com/editions/1997/06/16/loc_kycarry.html).

-  In South Carolina, between 1989 and 1997, only one permit holder was charged with a felony (a non-firearms related crime) and the charge was dropped. *See* Mustard, *Comment*, *in* EVALUATING GUN POLICY, *supra,* at 331.  *See also* Lawrence Messina, *Gun Permit Seekers Not the Criminal Type*, CHARLESTON GAZETTE, P. C1 (July 28, 1997) ("The sort of people who ask to carry concealed

pistols legally in Kanawha County aren't the sort of people who commit felony offenses, court records show.").

- In North Carolina by 1997, over 26,000 permits had been registered and not a single one was revoked as the result of a permit holder committing a crime. *See* Lee Anderson, *North Carolina's Guns*, CHATTANOOGA FREE PRESS, P.A4 (May 31, 1997).

As a result of this nationwide experience, "even those who vehemently opposed shall-issue laws have been forced to acknowledge that license holders are extremely law abiding and pose little threat.  The President of the Dallas Police Association, who had lobbied against the Texas concealed-carry law, admitted after it was enacted that '[a]ll the horror stories I thought would come to pass didn't happen. No bogeyman. I think it's worked out well, and that says good things about the citizens who have permits.  I'm a convert.'"  David B. Mustard, *The Impact of Gun Laws on Police Deaths*, 44 J.L. & ECON. 635, 638 (2001).  Similarly, the "president and the executive director of the Florida Chiefs of Police and the head of the Florida Sheriff's Association admitted that despite their best efforts to document problems arising from the law, they were unable to do so." Mustard, *Comment*, *in* EVALUATING GUN POLICY at 331.  *See also* Daniel D. Polsby & Don B. Kates, Jr., *American Homicide Exceptionalism*, 69 U. Colo. L. Rev. 969, 1007 & n.90 (1998).  Finally, "[s]peaking on behalf of the Kentucky Chiefs of Police Association, Lt. Col. Bill Dorsey stated, 'We haven't seen any cases where a [concealed-carry] permit holder has committed an offense with a firearm.'" Mustard, *Comment*, *in* EVALUATING GUN POLICY at 331 & n.63.  A sheriff in Campbell County, Kentucky admitted that, prior to the passage of the concealed carry law, he worried that he would be uncomfortable with the type of people who were applying for concealed carry licenses, but after the law passed he discovered

that " '[t]hese are all just everyday citizens who feel they need some protection.' " Terry Flynn, *Gun-toting Kentuckians Hold Their Fire*, CINCINNATI ENQUIRER, *supra*.

Wisconsin recently passed a concealed weapons law, but law enforcement officers there do not fear that it will lead to increased crime.  A police representative stated that "[t]he majority of people carrying concealed weapons will be law-abiding people who have proper permits and pose no threat . . . Those likely to cause trouble might already have been concealing weapons." Nick Paulson, *Police Not Fretting Over Looming Concealed Carry Law*, STEVENS POINT JOURNAL, Aug. 6, 2011 (available at http://www.stevenspointjournal.com/article/20110806/SPJ0101/108060501/Police-not-fretting-over-looming-concealed-carry-law). One sheriff observed that, after the law passes, " 'It's pretty much going to be business as usual for us.' " *Id.*

The Brady Center nevertheless asserts that citizens carrying licensed firearms pose a particular threat to the police.  Brady Br. 11-12.  Yet law enforcement officers across the nation – not just the many "converts" quoted above – support the carrying of firearms by private citizens. *See, e.g.,* Mustard, *The Impact of Gun Laws on Police Deaths*, 44 J.L. & ECON. at 638 (a survey conducted by the magazine *Law Enforcement Technology* found that "76 percent of street officers and 59 percent of managerial officers agreed that all trained, responsible adults should be able to obtain handgun carry permits.").  Law enforcement officers in Illinois hold similar views.  A recent survey of law enforcement officials in Fox Valley, a suburb of Chicago, found that, "[o]f the dozen area law enforcement leaders contacted by The Courier-News, none said they opposed concealed carry." Matt Hanley and Dave Gathman, *Local police give support to conceal carry*, THE COURIER NEWS, Aug. 6, 2011 (available at http://couriernews.suntimes.com/news/6899128-418/local-police-give-support-to-conceal-

carry.html) (last visited 8/10/11).  One of the Illinois police chiefs stated that "[w]e don't have problems with legal guns owned by responsible, trained people." *Id.* Another police chief explained that "[t]he law-abiding citizens who will get the permits are probably people we never have any contact with anyway." *Id.*  These same views prevail throughout Illinois:  "The Illinois Sheriffs' Association long has been in favor of concealed carry. Last year, the Illinois Association of Chiefs of Police went from 'against' concealed carry to 'neutral' — a significant change after years of opposition." *Id.*[6]

### IV.   CONTRARY TO THE BRADY CENTER'S ASSERTION, PERMITTING LAW-ABIDING CITIZENS TO CARRY FIREARMS IN PUBLIC DOES NOT INCREASE -- BUT MAY DECREASE -- CRIME RATES.

Numerous studies indicate that the passage of more permissive carriage laws either lowers rates of violent crime or has no impact at all.  So-called "shall-issue" statutes requiring the issuance of carry permits to eligible, law-abiding citizens are strongly associated "with fewer murders, aggravated assaults and rapes." John Lott, MORE GUNS, LESS CRIME 57 (3rd ed., 2010). Although some contest this point, *see* NATIONAL RESEARCH COUNCIL REVIEW at 120-51 (reviewing the extensive body of literature supporting or contradicting Lott's research), many experts find the evidence that shall-issue laws reduce murder rates to be compelling.  Consider the views of James Q. Wilson, perhaps America's most revered and influential criminologist, who is currently Professor at Boston College and who previously held endowed chairs at

---

[6] The Brady Center also contends that the "ability of law enforcement to protect the public could be hamstrung if officers were required to effectively presume that a person carrying a firearm in public was doing so lawfully." Brady Br. 12-13.  The Brady Center's only authority for its odd argument are two Pennsylvania state court decisions concerning the standards for probable cause to "approach [an] individual and briefly detain him in order to investigate *whether the person is properly licensed.*" *Commonwealth v. Robinson*, 600 A.2d 957, 959 (Pa. Super. Ct. 1991) (emphasis added).  *See also Commonwealth v. Romero*, 673 A.2d 374, 377 (Pa. Super. Ct. 1996). Those cases did not even hint that allowing licensed firearms carriage "hamstrings" law enforcement.

Harvard, UCLA, and Pepperdine.  Professor Wilson was on the NRC committee and he summarized the research this way:  "with only a few exceptions, the studies … including those by Lott's critics, do not show that the passage of RTC [right to carry] laws drives the crime rates up (as might be the case if one supposed that newly armed people went about looking for someone to shoot)." James Q. Wilson, *Dissent,* Appendix A to NATIONAL RESEARCH COUNCIL REVIEW at 270.  Moreover, "[i]n view of the confirmation of the findings that shall-issue laws drive down the murder rate, it is hard for me to understand why these claims are called 'fragile.' "  *Id.* at 270.  *See also id.* at 269 ("some of [Lott's] results survive virtually every reanalysis done by the [NRC] committee"); *id.* at 270 ("for people interested in RTC [right to carry] laws, the best evidence we have is that they impose no costs but may confer benefits"). Professor Wilson also noted that the NRC committee's own tabulation of the research results largely confirmed the hypothesis that permissive concealed carry laws reduce murder rates. *Id.* He concluded that the evidence presented "suggests that RTC laws do in fact help drive down the murder rate, though their effect on other crimes is ambiguous." *Id.* at 271. It is important to remember that "no empirical research has made a case for shall-issue laws increasing crime. Instead, the literature has disputed the magnitude of the decrease and whether the estimated decreases are statistically significant." David B. Mustard, *Comment, in* EVALUATING GUN POLICY 326 (Jens Ludwig and Philip J. Cook eds. 2003).  *See also id.* at 326 ("Even if one uncritically accepts the most negative reviews of Lott-Mustard [research] at face value, there is still more evidence that shall-issue laws reduce, rather than raise, crime.").

The majority of the members of the NRC committee found the evidence more ambiguous than did Professor Wilson, and concluded "that with the current evidence, *it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates.*"

NATIONAL RESEARCH COUNCIL REVIEW at 150 (emphasis added).  That conclusion, without getting into the back and forth between Lott and his critics, is sufficient to dispose of the Brady Center's argument.  For it is the Brady Center's contention that allowing the carrying of firearms will *increase* crime, and it bears the burden of proof on that policy argument.[7]

* * *

Neither Plaintiff Mary Shepard nor the NRA has predicated the challenge to Illinois's law on any argument that allowing carriage in public would *reduce* crime rates.  Whichever way the debate goes on that issue, the *constitutional right* to bear arms remains the same, and it cannot be trumped by *policy* considerations – especially on the basis of evidence that the most

---

[7] In any event, none of the studies cited by the Brady Center actually supports the proposition that concealed-carry laws cause an increase in criminal violence.  The Brady Center relies on John Donohue, *The Impact of Concealed-Carry Laws, in* EVALUATING GUN POLICY 289, 320 (Jens Ludwig & Philip J. Cook eds. 2003).  Brady Br. 11.  But the passage quoted by the Brady Center out of context distorts the findings of the article.  Donohue did not conclude that concealed carry laws increase crime.  In fact, he disavowed as "implausible" the findings of the regression analysis to which the Brady Center refers, *id.* at 324, and concluded, contrary to the Brady Center, that one cannot draw conclusions regarding how concealed carry laws affect crime.  *Id.* at 324-25.

The Brady Center also cites a second Donohue article: *Guns, Crime, and the Impact of State Right-to-Carry Laws*, 73 FORDHAM L. REV. 623 (2004), and misrepresents it in precisely the same fashion. Brady Br. 12.  *See* 73 FORDHAM L. REV. at 625 (concluding only that the crime data do not support the more-guns-less-crime hypothesis, *not* that the data support the proposition that carry laws increase violent crime); *id.* at 638 ("All we can really say is that we know that there is no evidence of reduction in violent crime when RTC laws are passed"); *id.* at 639 ("A final concern is that our statistical models are simply too blunt an instrument to ascertain the likely modest impact of RTC laws on overall crime.").

The Brady Center's remaining citations likewise fail to establish a causal connection between enactment of shall-issue laws and an increase in violent crime.  *See* Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 INT'L REV. L. & ECON. 239, 248-49 (1998) (conceding that the data are so incomplete and the sample so small that any supposed increase in homicide is "not statistically significant"); David McDowall *et al.*, *Easing Concealed Firearms Laws: Effects on Homicide in Three States*, 86 J. CRIM. L. & CRIMINOLOGY 193, 203 (1995) (acknowledging that the limited data are varied and inconsistent and disavowing the conclusion "that shall issue licensing leads to more firearms murders"); *see also id.* at 204 ("our analysis does not allow a firm conclusion that shall issue licensing increases firearms homicides").

comprehensive and authoritative review of the literature, that of the National Research Council, has found to be too ambiguous and inconclusive to serve as a basis for firearms policy.

## CONCLUSION

For the reasons given above, *amicus curiae* NRA respectfully submits that Plaintiffs' motion for summary judgment should be granted.

Dated: August 29, 2011                                    Respectfully submitted,

s/ Charles J. Cooper
Charles J. Cooper*
David H. Thompson
Peter A. Patterson
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C.  20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com


Brian S. Koukoutchos
28 Eagle Trace
Mandeville, LA  70471
Tel: (985) 626-5052
Email: bskoukoutchos@gmail.com


*Pro hac vice application pending

Counsel for Amicus Curiae National Rifle Association of America, Inc.

## CERTIFICATE OF SERVICE

The undersigned attorney states that he caused a true and correct copy of Brief of *Amicus Curiae* National Rifle Association of America, Inc. in Support of Plaintiffs' Motion for Summary Judgment, to be served upon the parties of record, as shown below, via the Court's CM/ECF system on the 29th day of August, 2011.

By:   s/ Charles J. Cooper

## SERVICE LIST

Terence J. Corrigan
ILLINOIS ATTORNEY GENERAL'S OFFICE
500 S. Second St.
Springfield, IL  62706
Tel:  (217) 782-5819
Fax:  (217) 524-5091
tcorrigan@atg.state.il.us

*Counsel for Lisa Madigan, Pat Quinn and Tyler Edmonds*

Joseph A. Bleyer
BLEYER & BLEYER
601 West Jackson
P.O. Box 487
Marion, IL 62959-0487
Tel: (618) 997-1331
jableyer@bleyerlaw.com

*Counsel for David Livesay*

Jonathan Lee Diesenhaus
HOGAN LOVELLS LLP
555 13th St., NW
Washington, DC 20004
Tel:  (202) 637-5416
Fax:  (202) 637-5910
jonathan.diesenhaus@hoganlovells.com

*Counsel for Amicus Brady Center to Prevent Gun Violence*

William N. Howard
FREEBORN & PETERS LLP
311 S. Wacker Dr., Suite 3000
Chicago, Illinois   60606
Tel: (312) 360-6415
Fax: (312) 360-6996
whoward@freebornpeters.com
*Counsel for Mary E. Shepard and The Illinois State Rifle Association*

20