# United States Court of Appeals

For the Seventh Circuit
Chicago, Illinois 60604

February 22, 2013

**Before**

FRANK H. EASTERBROOK, *Chief Judge*
RICHARD A. POSNER, *Circuit Judge*
JOEL M. FLAUM, *Circuit Judge*
MICHAEL S. KANNE, *Circuit Judge*
ILANA DIAMOND ROVNER, *Circuit Judge*
DIANE P. WOOD, *Circuit Judge*
ANN CLAIRE WILLIAMS, *Circuit Judge*
DIANE S. SYKES, *Circuit Judge*
JOHN DANIEL TINDER, *Circuit Judge*
DAVID F. HAMILTON, *Circuit Judge*

Nos. 12-1269, 12-1788

MICHAEL MOORE, *et al.,* and
MARY E. SHEPARD, *et al.,*

                             *Plaintiffs-Appellants,*

                             *v.*

LISA MADIGAN, ATTORNEY GENERAL
OF ILLINOIS, *et al.,*

                             *Defendants-Appellees.*

Appeals from the United States District Courts
for the Central District of Illinois and
the Southern District of Illinois.
Nos. 3:11-cv-3134-SEM-BGC and
3:11-cv-405-WDS-PMF—**Sue E. Myerscough** and
**William D. Stiehl**, *Judges*.

## O R D E R

On January 8, 2013, defendants-appellees filed a petition for rehearing *en banc*, and on January 23, 2013, plaintiffs-appellants filed answers to the petition. A vote of the active members of the court on whether to grant rehearing *en banc* was requested and a majority of the judges have voted to deny the petition.[*] The petition is therefore DENIED.

Judge David F. Hamilton's dissent from the denial of rehearing *en banc*, joined by Judges Rovner, Wood and Williams, is appended.

---

[*] Judge Michael S. Kanne did not participate in the consideration of the petition for rehearing *en banc*.

Nos. 12-1269, 12-1788 3

HAMILTON, *Circuit Judge*, joined by ROVNER, WOOD, and WILLIAMS, *Circuit Judges*, dissenting. I respectfully dissent from the denial of rehearing en banc in these cases. The Supreme Court has not yet decided whether the post-*Heller* individual right to keep and bear arms at home under the Second Amendment extends beyond the home. The panel's split decision in these cases goes farther than the Supreme Court has gone and is the first decision by a federal court of appeals striking down legislation restricting the carrying of arms in public. Until the Supreme Court faces the issue, the state of the law affecting people in Illinois, Wisconsin, and Indiana is an important question worthy of en banc consideration to decide whether to affirm, reverse, or remand for further factual development. Without undue repetition of Judge Williams' persuasive panel dissent, three points deserve emphasis at this en banc stage of the proceedings.

First, extending the right to bear arms outside the home and into the public sphere presents issues very different from those involved in the home itself, which is all that the Supreme Court decided in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010). I will not repeat the debate in the panel opinions reviewing the historical and empirical evidence, for that debate was, in the majority's view, essentially dicta. The core of the panel majority's reasoning is that because there is a need for self-defense outside the home as well as in, *Heller* and *McDonald* should extend to public carrying of loaded firearms. *Moore v. Madigan*, 702 F.3d 933, 935-38 (7th Cir. 2012). The logic has some appeal, but its

simplicity overlooks qualitative differences between a private home and public streets and buildings that must be considered as we try to interpret *Heller* and *McDonald*. See *Kachalsky v. County of Westchester*, 701 F.3d 81, 94 (2d Cir. 2012).

In so many public settings, carrying and using firearms present lethal risks to innocent bystanders. Yet when people go about their daily lives in public places, they have no choice about whether to consent to the dangers posed by firearms in public. We can all choose whether to visit homes where firearms are present.

To illustrate the dangers posed by lawful use of firearms in public, consider a deadly confrontation on the streets of New York City in August 2012, when police confronted an armed man who had just shot and killed another man. The police officers were well trained in both *how* to shoot and *when* to shoot and not shoot. The officers fatally shot the gunman, but the officers' many shots also wounded nine bystanders.[1] I intend no criticism of the officers, who confronted an urgent, dan-

---

[1] See Michael Wilson, *After Bullets Hit Bystanders, Protocol Questions*, N.Y. Times, Aug. 25, 2012, *available at* http://www.nytimes.com/2012/08/26/nyregion/bystanders-shooting-wounds-caused-by-the-police.html? (last visited Feb. 19, 2013); Chris Francescani, *All Nine Bystanders Wounded in Empire State Shooting Hit by Police*, Reuters, Aug. 27, 2012, *available at* http://reuters.com/article/2012/08/27/us-usa-shooting-empirestate-police-idUSBRE87Q04X20120827 (last visited Feb. 19, 2013). One could go on indefinitely collecting examples of lawful firearms in public being used both to cause harm and to prevent harm.

Nos. 12-1269, 12-1788                                     5

gerous situation that few have experienced first-hand. We will always need armed police officers, and some harm will be unavoidable despite their training, skill, and experience. But consider how much worse the situation on the crowded streets of New York might have been if several civilians, without the officers' training but carrying firearms lawfully, had tried to help with their own firearms.  Unless the Supreme Court is prepared to embrace the view attributed to it by the panel majority, that the Second Amendment right to bear arms does not depend on "casualty counts," 702 F.3d at 939, we should not assume that the logic of *Heller* extends naturally and without qualification to firearms in public.

   Moreover, the panel majority makes its constitutional point about self-defense outside the home by relying on the need for weapons on the early American frontier. The reliance misses the point. See *Moore*, 702 F.3d at 936. It would have been foolish for any frontier government to prohibit carrying weapons from homestead to trading post. But we do not usually test constitutional doctrine by asking whether all foolish laws would be banned. The real constitutional question is whether there is a right to bear arms in public so rigid that it must strike down duly enacted laws that apply in the downtown streets of modern Chicago, Washington, or New York. It need not be.

   Second, despite my disagreement with the panel majority, it's important to keep in mind what the panel did not decide. The panel majority opinion is now the

6                                              Nos. 12-1269, 12-1788

law of the circuit, and Illinois has 180 days to decide how to amend its laws. Those of us in the lower federal courts are understandably reluctant to commit to a particular standard of constitutional scrutiny that should be applied to Second Amendment issues after *Heller* and *McDonald*, or even to the idea that the standard should be the same for all issues. Nevertheless, it's reasonably clear at this point that the standard is more demanding than rational-basis review and less demanding than strict scrutiny. The panel majority leaves the State a good deal of constitutional room for reasonable public safety measures concerning public carrying of firearms:

  (a) Illinois will still be able to establish reasonable limits on *who* may carry a loaded firearm in public. *Heller* itself made clear that the right to keep and bear arms may be denied based on a felony conviction or mental illness. 554 U.S. at 626; see also *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc) (upholding conviction for possession of firearm by person convicted of domestic violence misdemeanor). Reasonable requirements for firearms training and proficiency, including safe and responsible handling and use, should withstand constitutional scrutiny. The Second Circuit recently upheld New York's state law requiring "proper cause" for issuance of a permit to carry a gun. *Kachalsky*, 701 F.3d 81.

  (b) Illinois will still be able to set reasonable limits on *where* qualified persons may legally carry firearms in public. *Heller* itself endorsed restrictions in "sensitive" places, such as schools and government buildings. 554 U.S. at 626. It should not be difficult to make reasonable

arguments to support extending that reasoning to areas around schools, courthouses, other government buildings, public universities,[2] public libraries, hospitals, medical offices, public parks and forests, churches and other places of worship, banks, shopping centers, public transportation facilities and vehicles, and venues for sporting events, concerts, and other entertainment, among many possible examples.

(c) Privately owned bars, nightclubs, and restaurants also could fit into that reasoning, and surely the federal Constitution would not prevent a private owner of a business from imposing a ban on carrying firearms in or around the business. See *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264-66 (11th Cir. 2012) (upholding state law giving private property owners right to exclude firearms). Places of employment could pose similar issues, and again, it's hard to see how the federal Constitution would prohibit a private employer from banning firearms on its premises.

(d) The panel opinion also does not prevent Illinois from setting reasonable limits on *how* qualified persons may carry firearms in public places where they are not prohibited. Should loaded firearms in public be carried openly? Should they be concealed? Should the answer differ depending on place and circumstance? *Heller* noted that a majority of nineteenth-century courts upheld

---

[2] See *DiGiacinto v. Rector and Visitors of George Mason Univ.*, 704 S.E.2d 365 (Va. 2011) (upholding regulation prohibiting possession of firearms on campus of public university).

prohibitions on carrying concealed weapons in favor of carrying weapons openly, 554 U.S. at 626, but open carrying of firearms in our modern society can be intimidating and even disruptive.

(e) Finally, the panel opinion, *Heller*, and *McDonald* do not prevent Illinois from imposing reasonable limits on *which* arms may be carried in public. See *Heller*, 554 U.S. at 627. We can be reasonably confident that the Second Amendment rights are not limited to arms known to the Framers of the amendment, but also confident that the rights do not extend to all the arms that a modern militia might need.

In other words, the panel's holding that the current Illinois laws are too restrictive leaves room for many reasonable steps to protect public safety. That takes me to my third point, which concerns how future Second Amendment litigation should proceed. The panel decided to reverse dismissals under Rule 12(b)(6) and to order entry of permanent injunctions against enforcement of the state laws. That step prevented Illinois and the plaintiffs from presenting relevant evidence, both empirical and historical, in a genuinely adversarial setting subject to cross-examination.

The panel majority views the current Illinois restrictions as simply too broad to survive no matter what the empirical or historical evidence might show. The panel's reasoning on that point does not extend, as I read it, to future challenges to narrower, better-tailored restrictions such as those described above. Under some form of intermediate constitutional scrutiny, where courts

Nos. 12-1269, 12-1788 9

will need to weigh both Second Amendment rights and state interests justifying some restrictions on those rights, actual evidence on the burdens, consequences, and governmental interests will be vital for sound judgment. Courts considering even legislative facts, as distinct from adjudicative facts, can benefit from truly adversarial presentation of relevant evidence. See *Ezell v. City of Chicago*, 651 F.3d 684, 709 (7th Cir. 2011) (emphasizing need for evidence in applying intermediate scrutiny in Second Amendment challenge).

Where the law is genuinely in doubt, as it is likely to remain for some time under the Second Amendment, a trial court can do a great service by ensuring the development of a thorough and complete record that provides a reliable, accurate factual foundation for constitutional adjudication. The federal courts are likely to do a better job of constitutional adjudication if our considerations are based on reliable facts rather than hypothesized and assumed facts.