IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
BENTON DIVISION

| | | |
|---|---|---|
| MARY E. SHEPARD and the ILLINOIS STATE RIFLE ASSOCIATION, | ) ) ) | |
| Plaintiffs, | ) ) | No. 3:11-cv-00405-MJR-PMF |
| v. | ) ) ) | Honorable Judge Michael J. Reagan |
| LISA M. MADIGAN, solely in her official capacity as ATTORNEY GENERAL OF ILLINOIS, GOVERNOR PATRICK J. QUINN, solely in his official capacity as Governor of the State of Illinois, TYLER R. EDMONDS, solely in his official capacity as the State's Attorney of Union County, Illinois, and SHERIFF DAVID LIVESAY, solely in his official capacity as Sheriff of Union County, | ) ) ) ) ) ) ) ) ) ) | Magistrate Judge Philip M. Frazier |
| Defendants. | ) ) | |

**REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES,
EXPENSES, AND TAXABLE COSTS**

**INTRODUCTION**

Until Plaintiffs prevailed in the Seventh Circuit, the State of Illinois blatantly disregarded the Constitution's guarantee that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Indeed, Illinois was "the *only* state [to] maintain[] a flat ban on carrying ready-to-use guns outside the home." *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012). Because of this action, Illinois's "uniquely sweeping ban" has been constitutionally "invalidated." *Id.* at 942; *Shepard v. Madigan*, 734 F.3d 748, 749 (7th Cir. 2013).

The State now seeks to escape its responsibility to reimburse Plaintiffs' reasonable attorneys' fees. The State not only takes issue with paying certain fees requested by Plaintiffs—the State lodges objections to approximately 85% of the hours claimed by Plaintiffs—but also

says that Plaintiffs *should not receive any compensation at all*.   The State's submission lacks

merit.  As this Court has recognized, "a fee award against [Defendants] is wholly

appropriate . . . ."  Order, Doc. 110, at 2.  In light of Plaintiffs' success, that award should be

"fully compensatory."  *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983).  What is more, that

award should include fees for work done to secure a fee award.  Thus, in addition to granting

Plaintiffs' motion, the Court should direct Plaintiffs to submit supplemental materials reflecting

the additional hours their attorneys have spent seeking to secure a fee award.[1]

## I.   PLAINTIFFS ARE "PREVAILING PARTIES."

This Court's determination that Plaintiffs "received from the Seventh Circuit . . . exactly

[the relief] they sought," *Shepard v. Madigan*, 958 F. Supp. 2d 996, 1000 (S.D. Ill. 2013),

demonstrates that they are "prevailing parties."  *See Buckhannon Bd. & Care Home, Inc. v. West*

*Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 603-04 (2001) ("prevailing party" is one

"who has been awarded some relief by the court," whether "in the trial court or on appeal"

(emphasis omitted)).  The State did not deprive the "change in the legal relationship of the

parties" of the "judicial imprimatur" necessary for prevailing party status by repealing its

unconstitutional law before the district court could enjoin it.  *Id.* at 605.  *See, e.g.*, *National Rifle*

*Ass'n of America, Inc. v. City of Chicago*, 646 F.3d 992, 994 (7th Cir. 2011); *Palmetto Props.,*

*Inc. v. County of DuPage*, 375 F.3d 542, 550 (7th Cir. 2004); *see also Young v. City of Chicago*,

202 F.3d 1000, 1000 (7th Cir. 2000) ("A defendant cannot defeat a plaintiff's right to attorney's

fees by taking steps to moot the case after the plaintiff has obtained the relief he sought . . . .")

---

[1] Exceptional circumstances support the filing of this reply brief, including that the
State's response brief was over twice the length of Plaintiffs' opening brief, that the State's
response relies on discovery that was not conducted until after Plaintiffs had filed their motion,
and the importance of ensuring that the State is held to account for the constitutional violations
found in this case.  Furthermore, this Court's orders have consistently contemplated that
Plaintiffs may file a reply.  *See* Doc. 110 at 2; Doc. 118.

(Contrary to the State's suggestion, *see* Defs.' Objections to Pls.' Mot. for Att'y Fees, Doc. 119, at 6, *Young* was not premised on the catalyst theory).

The State takes issue with Plaintiffs' citation of *Hanrahan v. Hampton*, 446 U.S. 754, 757 (1980), for the proposition that final remedial orders are not required for prevailing party status.  Doc. 119 at 4-5.  But *Hanrahan* indicates that the key inquiry for "prevailing party" status is not whether "remedial orders ha[ve] . . . been entered" but rather whether the plaintiff has "established the liability of the opposing party" or, in other words, "established his entitlement to some relief on the merits of his claims."  446 U.S. at 757.  *Buckhannon* reinforces this conclusion.  *See, e.g.*, 532 U.S. at 604 (citing *Hanrahan*, 446 U.S. at 757).  And *Hewitt v. Helms*, 482 U.S. 755 (1987), is not inconsistent with it, for the plaintiff in that case had not established entitlement to relief on the merits.  Rather, he secured an appellate decision that prison officials had violated his constitutional rights, but lost on his damages claim—the only claim he pursued on remand in district court—because the constitutional violation was not clearly established.  *Id.* at 758-59.  In other words, "[t]he most that he obtained was an interlocutory ruling that his complaint should not have been dismissed for failure to state a constitutional claim.  That is not the stuff of which legal victories are made."  *Id.* at 760.  Here, by contrast, Plaintiffs secured a ruling on the merits from the Seventh Circuit that they were entitled to the relief sought in their complaint.

The State also claims that Plaintiffs "misstate the holding" of *Southworth v. Board of Regents of University of Wisconsin System*, 376 F.3d 757 (7th Cir. 2004).  Doc. 119 at 10.  But that case indicates that one of the ways in which the plaintiffs prevailed was by securing a court ruling that the defendants violated the constitution and in response to which the defendants adopted new policies.  *See Southworth*, 376 F.3d at 768.

3

In the end, the State acknowledges that prevailing party status does not require the entry of a final injunction, *see, e.g.*, Doc. 119 at 11, but it seeks to escape the application of that principle here on grounds that are either immaterial or illusory.

A.      First, the State observes that it still had time to file a petition for certiorari when the case was mooted, suggesting that its option to appeal deprived the Seventh Circuit's mandate "declaring the old law unconstitutional and enjoining it," *Shepard*, 734 F.3d at 750, of its finality.  But a final judgment on the merits that becomes moot before the time for appeal runs is a "judgment on the merits" for purposes of conferring prevailing party status.  *See Young*, 202 F.3d at 1000-01.  "Many a defendant gives up after a district court's final decision and does not appeal," but such "cessation of hostilities . . . does not deprive the victor of prevailing-party status." *NRA*, 646 F.3d at 994.

B.      Second, the State insists that Plaintiffs were not prevailing parties because "the form of any relief to be granted by this court had never been decided."  Doc. 119 at 12.  But the Seventh Circuit remanded the case with instructions to the district court to enter a declaratory judgment that Illinois's carry ban was unconstitutional and an injunction against its enforcement. *Moore*, 702 F.3d at 942.  The State's successful plea to extend the stay of the Seventh Circuit's mandate demonstrates that the State understood the import of this order:  "This additional time will avoid a circumstance in which *there is no state law in place* governing the carrying of firearms in public places, a circumstance that this Court's original, 180-day stay *anticipated* and set out to avoid."  Mot. to Stay Mandate for Additional 30 Days at 3, *Moore*, No. 12-1269 (7th Cir.), ECF No. 73 (emphases added); *see also id.* (failing to extend stay could lead to "a gap in state firearm regulation").  The State should be judicially estopped from now changing course to say that the consequences of the Seventh Circuit's remand order were unclear.  See Br. in

4

Support of Pls.' Mot. For Att'y Fees, Doc. 107, at 10 (discussing judicial estoppel).

The State's argument also is at odds with the very federalism principles the State invokes. Tailoring an injunction after liability has been established may be necessary when the government neglects to carry out an affirmative duty and merely enjoining enforcement of the offending provision fails to remedy the constitutional violation.  Such was the case in every case the State cites for the proposition that work remains to be done following a judgment that the government has violated the constitution.  *See* Doc. 119 at 12 (collecting cases).  In those cases, there was no less intrusive alternative to crafting a detailed injunction to correct the constitutional deficiency. [2]  But here, the least intrusive course on "the operation of local and state governmental entities" would have been to enjoin the offending law, curing the constitutional violation complained of, and leaving the State completely free to do what it did here: to attempt to enact new legislation within the bounds of the Constitution.  *See Shepard*, 734 F.3d at 752 (noting that *Moore v. Madigan* left the substance of replacement legislation "to the State of Illinois in the first instance").  For any federal court to have done what the State claims it would have requested of this Court on remand—that is, to "ask the parties for proposed remedial plans," and to craft a detailed injunction regulating the carriage of firearms in Illinois, Doc. 119 at 13—would have been utterly inappropriate.

_____

[2] In *Zessar v. Keith*, 536 F.3d 788 (7th Cir. 2008), the court held that Illinois's absentee ballot law afforded voters whose ballots were denied inadequate notice and opportunity to be heard, thereby identifying a constitutional violation that could be remedied only by the creation of constitutionally adequate procedures.  In *Lewis v. Casey*, 518 U.S. 343 (1996), and *Al-Alamin v. Gramley*, 926 F.2d 680 (7th Cir. 1991), state prison officials had violated prisoners' rights to access the courts and to practice their religion, respectively, by failing to provide adequate facilities and accommodations—violations that could only be remedied by affirmative acts by the prison officials.  Finally, by the time *Dayton Board of Education v. Brinkman*, 433 U.S. 406 (1977), had been decided, it was clear that merely enjoining states from segregating was not fulfilling the constitutional guarantee of equal protection.

At any rate, the government's argument suffers from a fundamental misunderstanding of "prevailing party" status.  Prevailing party status requires a "material alteration of the legal relationship of the parties."  *Buckhannon*, 532 U.S. at 604.   That alteration may be accomplished in a number of ways, including a final judgment on the merits and a settlement agreement enforced through a consent decree.  *Id.*  But it may also occur when the defendant changes his conduct in a way that gives the plaintiff the relief he seeks and that change in conduct is marked with the necessary judicial imprimatur—that is, it is *in*voluntary.  *See id.* at 605; *Federation of Advert. Indus. Representatives, Inc. v. Chicago*, 189 F.3d 633, 639-40 (7th Cir. 1999).

In *Palmetto Properties* and *Zessar*, the plaintiffs had "a hurdle to overcome" to establish their entitlement to fees because two primary markers of "prevailing party status"—that is, a final judgment on the merits or a settlement agreement enforced through a consent decree—were lacking.  *See Zessar*, 536 F.3d at 796.  In the absence of these "normative judicial acts," the Seventh Circuit had to decide whether the defendants' conduct that mooted the case bore the necessary "judicial imprimatur"—that is, whether it could be considered involuntary.  *Id.*  That is why it mattered whether the summary judgment decisions in those cases contained "succinct and easily enforceable" holdings.  *Id.* at 797.

The State's conduct in this case was involuntary because, as explained above, the Seventh Circuit's decision left it no choice but to eliminate the carry ban.  *See Shepard*, 734 F.3d at 752 (describing *Moore v. Madigan* as invalidating the ban).  True enough, the State had some choice about the restrictions on carriage it enacted in place of the ban, *id.* at 751, but the relief on which Plaintiffs premise their prevailing party status is *not* the creation of new restrictions, but instead the elimination of the ban, *id.* at 752 (noting that the Seventh Circuit's mandate required the elimination of the ban and said nothing about the content of the replacement statute).  The

State had no choice but to eliminate the ban, so its conduct in that regard was involuntary and marked with the necessary judicial imprimatur.

But while they can clear the *Zessar* hurdle, Plaintiffs have no such hurdle to overcome to establish their prevailing party status because, unlike the plaintiffs in *Palmetto Properties* and *Zessar*, they procured a final judgment on the merits. For that reason, *NRA* is the most relevant precedent. In that case, the cities, like the State in this case, relied heavily on *Zessar*. The Seventh Circuit rejected their argument, *not* because the case more closely resembled *Palmetto Properties*, which the *NRA* Court does not even cite, but because the plaintiffs had actually procured a final judgment on the merits. *See NRA*, 646 F.3d at 993 ("The district court was right to observe that plaintiffs did not receive a favorable judgment from it. But they did better: They won in the Supreme Court, which entered a judgment in their favor."). Whereas the mooting of the case forestalled the entry of a final judgment in *Zessar* (and in *Palmetto Properties*), and therefore required the court to determine whether defendants' action was voluntary, no such analysis is required when the judgment issues before the case becomes moot. *See id.* at 994. And there is no question that the Seventh Circuit's decision was final before this case became moot, because the Seventh Circuit's mandate issued before the State enacted its new carry law. As the Supreme Court's judgment did in *NRA*, the Seventh Circuit's judgment "changed the relationship between the parties" because it "established conclusively, and not just by a district court's opinion that never led to a valid judgment (as in *Zessar*), that the second amendment" precludes a complete ban of carriage. *See id.*

## II.   PLAINTIFFS' FEE CALCULATION IS REASONABLE AND JUSTIFIED BY THE "EXCELLENT RESULTS" THEY ACHIEVED IN THIS LITIGATION.

Having established that Plaintiffs are prevailing parties, the first step in determining the

amount of a "reasonable fee" is to calculate the lodestar—that is, "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433.  After it calculates the lodestar, the Court must decide whether to award the full lodestar or to adjust it upward or downward, considering, among other things, "the important factor of results obtained." *Id.* at 434 (internal quotation marks omitted).

The "excellent results" Plaintiffs obtained in this case justify the award of a fully compensatory fee. *Hensley*, 461 U.S. at 435; Doc. 107 at 8-11.  Plaintiffs note that the City of Chicago and the Village of Oak Park were ordered to pay over $1.3 million in attorneys' fees— over double of what Plaintiffs are requesting here—in the successful challenge to those jurisdictions' handgun bans. *See* Order, *NRA v. City of Chicago*, No. 08-3697 (N.D. Ill. Aug. 14, 2012), ECF No. 139.  While that litigation reached the United States Supreme Court, it further illustrates that the amount Plaintiffs seek here is reasonable.

At any rate, the State does not dispute that if Plaintiffs are prevailing they are entitled to the full lodestar.  Instead, the State disputes Plaintiffs' calculation of that lodestar.  With very minor exceptions noted herein, the State's objections are unavailing.[3]

### A. Plaintiffs' Claimed Rates Are Reasonable.

Plaintiffs have met their burden of "producing satisfactory evidence" that their requested rates reflect "the market rate for the services rendered." *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 640 (7th Cir. 2011) (internal quotation marks omitted).  The burden therefore shifts to the State "to offer evidence that sets forth a good reason why a lower rate is essential." *Id.* (internal quotation marks omitted).  The State has made no such showing, so the Court should award Plaintiffs fees at their requested rates.

---

[3] Exhibit C-5 sets out fees Plaintiffs have agreed to deduct.

*1. Reasonable Rates for Cooper & Kirk, PLLC*

The State asserts that the "reasonable rates" for this litigation are the market rates for East St. Louis, Illinois, which it argues are lower than the rates Cooper & Kirk attorneys charge.  Doc. 119 at 21.[4]  This argument lacks merit.   The average rate charged by other attorneys in this geographic area fails to account for Cooper & Kirk's opportunity cost, its extensive experience and expertise in Second Amendment litigation, and the complex nature of Plaintiffs' claims.  In recognition that a "reasonable rate" varies based on these factors, the Seventh Circuit has held that "[t]he market rate is the rate that lawyers *of similar ability and experience* in the community normally charge their paying clients *for the type of work in question*."  *Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399, 407 (7th Cir. 1999) (internal quotation marks omitted) (emphasis added).  When "the litigation is one where the attorneys practicing it are highly specialized and the market for legal services in that area is a national market," the "relevant community" may refer to a "community of practitioners," rather than to any particular local market.  *Jeffboat, LLC v. Director, Office of Workers' Comp. Programs*, 553 F.3d 487, 490 (7th Cir. 2009).

Plaintiffs have provided ample evidence that the market rate, so defined, is equal to or higher than the rates Cooper & Kirk actually charged, and Plaintiffs claim, in the fee petition.[5]

---

[4] The State also argues, without explanation, that Cooper & Kirk partners and of counsel should be awarded rates that St. Louis firms pay their eighth-year associates.  (Partner rates for the firms the State identifies are in the record.  *See* Thompson Decl., Doc. 106-1, Ex. H.)  The State does not even attempt to justify reimbursing the services of attorneys, including a former Assistant Attorney General for the Office of Legal Counsel, who boast anywhere from one to nearly four decades of legal experience, as associates. *See id.* ¶¶ 10a-d (describing attorneys' experience).

[5] Plaintiffs are giving the State a discount by seeking to collect at the historical rate paid to Cooper & Kirk.  In determining how to best compensate an attorney for the delay associated with collecting a fee award, courts may base the award on *current* rates or use historical rates *while adjusting the fee to reflect its present value.  See Perdue v. Kenny A ex. rel. Winn*, 559 U.S.

As a starting point, Plaintiffs provided evidence of the rates actually charged in this litigation, which reflect "typical arm's-length, market-rate transactions."  Thompson Decl., Doc. 106-1, ¶ 9 & Ex. A.  Second, Plaintiffs provided evidence of Cooper & Kirk's actual billing rate for similar litigation, *id.* ¶ 16 & Ex. D, which is presumptively the market rate, *see Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 640 (7th Cir. 2011).  In that litigation, the City of Chicago and the Village of Oak Park did not even challenge Cooper & Kirk's market rates.  *See NRA v. Oak Park*, 871 F. Supp. 2d 781 (N.D. Ill. 2012).  And in response to the State's interrogatories, Plaintiffs identified more than a dozen additional cases involving the Second Amendment in which Cooper & Kirk charged rates equal to the rates it has charged in this case.  See Exhibit A at 6.  Finally, although the above evidence would suffice, Plaintiffs also provide "the next best evidence," *Uphoff*, 176 F.3d at 407: the rate other attorneys charge for similar work, Thompson Decl., Doc. 106-1, ¶¶ 17a-c.  These rates match or exceed the rates claimed by Plaintiffs.  *Id.*

The State also insists that "if a party can attain competent counsel at a lower fee in a civil rights case, it [is] unreasonable for a lawyer who charged a higher rate to be awarded attorney's fees by the Court at his hourly rate."  Doc. 119 at 24.  But the case the State cites for this proposition offers no such rule, but instead reinforces the principle that the lodestar rate must reflect the attorney's experience in the relevant practice area.  *See Cooper v. Casey*, 97 F.3d 914, 920 (7th Cir. 1996) (suggesting that an experienced antitrust attorney may not be able to recover his full antitrust rate in a civil rights case to which his specialized skills are not transferable).  As Cooper & Kirk has a specialty in civil rights litigation concerning the Second Amendment, its rates are easily justified.

---

542, 556 (2010).  The Seventh Circuit has approved of both approaches.  *See Smith v. Village of Maywood*, 17 F.3d 219, 221 (7th Cir. 1994).

The State argues in the alternative that Cooper & Kirk's services should be reimbursed at a "blended rate" of $375, as that is the blended rate Cooper & Kirk charges the State of Tennessee in unrelated litigation that does not involve the Second Amendment.  The State makes no effort to explain why that rate is a more reasonable measure of the market rate than the rates it actually charged in this case and many other Second Amendment cases.  (In addition, the State neglects to mention that Tennessee's blended rate has since increased to $425 per hour.  *See* Exhibit B.  It also omits any reference to the other blended rate agreement Plaintiffs provided during discovery, pursuant to which Cooper & Kirk charged the State of Louisiana a blended rate of $495.  *See* Exhibit A at 11.)

In short, Plaintiffs have demonstrated with "satisfactory evidence" that Cooper & Kirk's rates reflect "the market rate for the services rendered," and the State has fallen far short of meeting its own burden to show that a lower rate is "essential."  *See Pickett*, 664 F.3d at 640 (internal quotation marks omitted).

### 2. Reasonable Rates for Stephen P. Halbrook

While the State criticizes the $540 rate requested for Mr. Halbrook, it is not clear that the State challenges it.  At any rate, it is reasonable.  As an initial matter, because the Seventh Circuit has approved using an attorney's current market rate as opposed to his historical rate when calculating a fee award, *see supra* note 5, it is of no moment that a sample invoice produced by Mr. Halbrook in discovery was dated December 2013.  *See* Doc. 119 at 29 n.13.

Furthermore, additional evidence demonstrates that the rate Plaintiffs seek for Mr. Halbrook's work is reasonable.  The fees Mr. Halbrook charges to clients are below market rate because he "believe[s] that legal services required to support Second Amendment rights should be affordable."  Halbrook Decl., Doc. 106-3, at 4.  In addition, the Court can look to "evidence

of rates similarly experienced attorneys" receive in similar litigation.  *Pickett*, 664 F.3d at 640

(internal quotation marks omitted); *see also Halderman v. Pennhurst State Sch. & Hosp.*, 899 F.

Supp. 209, 215 (E.D. Pa. 1995).  Plaintiffs have established that $540 is an eminently reasonable

rate in the relevant market for an attorney of Mr. Halbrook's impressive experience and

expertise.  *See* Doc. 107 at 14-15; Halbrook Decl., Doc. 106-3, at 4.

### B.  Plaintiffs' Claimed Hours Are Reasonable.

In preparing their fee requests, Plaintiffs exercised billing judgment to eliminate "hours

that [were] excessive, redundant, or otherwise unnecessary."  *Hensley*, 461 U.S. at 434.  *See,*

*e.g.*, Thompson Decl., Doc. 106-1, ¶ 7; Halbrook Decl., Doc. 106-3 at 2.  Despite this good faith

effort, in Exhibits 5, 7, 10, and 11, the State offers objections to all but 201.7 of Plaintiffs' nearly

1,400 claimed hours.  In Exhibit C, Plaintiffs respond individually to these line-by-line

objections.  But the vast majority of these objections are premised on legal theories that find no

support in the case law.  Plaintiffs address these general errors here.

### 1.  *Work Performed in the Absence of a Written Contract*

The State complains that Plaintiffs' responses to the State's document requests did not

include written contracts covering the entirety of this litigation.  *See* Doc. 119 at 17-20, 24, 29

n.13, 31.  It seeks to exclude *all work* performed in the absence of a written contract.  *See id.*

As an initial matter, Plaintiffs note that the State's request for documents exceeded the

scope of this Court's discovery order, which limited the State to interrogatories.  Doc. 110 at 2.

Indeed, the State did not even ask for leave to issue document requests.  *See* Doc. 108 at 2

("Defendants request that they be allowed to conduct some discovery *limited to interrogatories*,

and, if necessary, depositions of plaintiffs' counsel . . . .") (emphasis added).  While Plaintiffs

produced documents to avoid bringing the issue to the Court, any alleged shortcomings in the

12

documentary evidence cannot undermine Plaintiffs' fee requests in light of the fact that the Court contemplated that *there would be no such discovery at all*.

At any rate, the law does not require Plaintiffs to support their fee requests with copies of fee agreements.  As explained above, the law expressly contemplates that Plaintiffs may meet their burden to show a "reasonable fee" with other forms of evidence of the prevailing market rate.  Similarly, Plaintiffs may meet their burden to prove the reasonableness of the hours expended with other forms of evidence that the hours were expended in furtherance of the litigation and on behalf of Plaintiffs.  *See, e.g.*, *Shadis v. Beal*, 692 F.2d 924, 926-27 (3d Cir. 1982) (rejecting formalism in identifying attorney-client relationships); *Berkley Trace, LLC v. Food Lion, LLC*, No. 11-3207, 2013 WL 5718867, at *8 n.11 (D. Md. Oct. 18, 2013).  Plaintiffs amply meet that burden.

Attorney William N. Howard, who led teams at Freeborn & Peters LLP, and Locke Lord LLP, over the course of the litigation, entered an appearance on behalf of Plaintiffs, Doc. 4, and is listed in this Court's docket as Plaintiffs' "lead attorney."  There can be no question that he was working on behalf of Plaintiffs throughout this litigation.

As explained in Plaintiffs' responses to the State's interrogatories, from the beginning "Plaintiffs understood that Mr. Howard would enlist the assistance of additional attorneys to work on their behalf . . . ," and Cooper & Kirk was engaged pursuant to this arrangement. Exhibit A at 3.  As Mr. Thompson explains in his declaration, "[a]lthough Cooper & Kirk did not appear for Plaintiffs until the initial appeal in this matter, attorneys from the Firm represented and performed work for Plaintiffs during all stages of this litigation, as demonstrated by the billing records . . . ."  Doc. 106-1, ¶ 8.  *See Smith v. Atlanta Postal Credit Union*, 350 Fed. App'x 347, 350 (11th Cir. 2009) (rejecting argument that fees incurred before entry of

appearance were non-compensable); *see also Augustine v. Department of Veterans Affairs*, 503 F.3d 1362, 1366 (Fed. Cir. 2007).  It is true that Cooper & Kirk *also* represented the NRA as an amicus in this Court, but as Mr. Thompson explains, he sought to exclude all hours expended pursuant to that representation from the records.  Thompson Decl., Doc. 106-1, ¶ 7.

Mr. Howard also enlisted attorney Stephen P. Halbrook to assist in the litigation.  Exhibit A at 3.  Mr. Halbrook's billing records reveal that his work was performed on behalf of Plaintiffs.  Halbrook Decl., Doc. 106-3, at 2 & Ex. B.  These hours were reasonably expended in the course of the litigation, even though Mr. Halbrook never entered an appearance on behalf of Plaintiffs.  *See Priestley v. Astrue*, 651 F.3d 410, 416 (4th Cir. 2011).

### 2.  *Vague Entries*

The State criticizes various entries as being overly vague.  *See, e.g.*, Doc. 119 at 30.  The Seventh Circuit has recognized that a court may look to surrounding entries to clarify the meaning of entries that may appear vague when viewed in isolation.  *See Berberena v. Coler*, 753 F.2d 629, 634 (7th Cir. 1985).  The State makes no serious effort to examine the entries in context.  Indeed, in the exhibits attached to its opposition, the State removes many of the details from the attorneys' detailed time entries and then misleadingly labels them as vague.  In the attached Exhibit C, Plaintiffs show that almost all of the entries the State has singled out are adequately descriptive, either in isolation or "when viewed in the context of the surrounding documentation."  *Id.*

### 3.  *Excessive Hours*

The State also identifies hours it considers to be excessive.  The Seventh Circuit has cautioned that a finding of excessive hours must rest on more than "a gestalt reaction that there [i]s too much."  *Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 570 (7th Cir. 1992).  For this

reason, courts have been unsympathetic to bare assertions that the total amount of time dedicated to a given task is excessive when the objecting attorney fails to provide evidence of how much time attorneys would reasonably dedicate to the task. *See, e.g.*, *Gibson v. City of Chicago*, 873 F. Supp. 2d 975, 992 (N.D. Ill. 2012); *Delgado v. Mak*, No. 06-3757, 2009 WL 211862, at *7 (N.D. Ill. Jan. 29, 2009). Courts have also recognized that the amount of time to be dedicated to a given task will vary widely based on the complexity and importance of the issues involved. *See, e.g.*, *Martin v. City of Indianapolis*, 28 F. Supp. 2d 1098, 1104 (S.D. Ind. 1998).

The State appears to have tallied the amount of time it would take a person read or type the words in the relevant documents and objects to any amount of time Plaintiffs expended above and beyond that total. *See, e.g.*, Doc. 119 at 27 (objecting to seven hours spent writing a filing that is capped at 350 words; *id.* at 31 (objecting to twelve minutes spent reviewing a document and reading two motions); *id.* at 31-32 (objecting to two twelve minute increments spent on two emails); *id.* at 32 (objecting to twelve minutes spent writing two sentences). Such a mechanical approach does not account for the time required to analyze and carefully craft legal arguments— especially legal arguments pertaining to novel issues of constitutional law. *See Martin*, 28 F. Supp. 2d at 1104. For example, in objecting to the total number of hours dedicated to drafting the complaint (58.1 hours), the State emphasizes the fact that it contained only one count. Doc. 119 at 30. But the State makes no allowance for the fact that that one count sat at the frontier of Second Amendment litigation, seeking to secure judicial protection of a right whose contours at the time were judicially undefined in the wake of *District of Columbia v. Heller*, 554 U.S. 570 (2008). Neither does the State's approach account for the relative importance of different tasks. Attorneys can reasonably spend more time drafting two sentences in a pleading than they spend drafting a two sentence intra-office email. *See, e.g.*, *Sypniewski v. Warren Hills Reg'l Bd. of*

15

*Educ.*, No. 01-3061, 2006 WL 1675066, at *11 (D.N.J. June 14, 2006) (emphasizing importance of complaint).  Finally, the State's analysis does not account for the allocation of hours.  For example, accepting as true the State's tallies, over two-thirds of the attorney hours spent reviewing, researching, and drafting the various appellate briefs were expended by associates. *See* Doc. 119 at 25-26 nn.7, 8, 10.

The primary target of the State's "excessive time" objections is the work attorneys at Cooper & Kirk performed on the Seventh Circuit appellate briefs and oral argument.  *See* Doc. 119 at 25-27.  But that time was reasonable, particularly in light of the excellent results Plaintiffs achieved in the Seventh Circuit.  Indeed, according to the State's calculations Plaintiffs' are requesting reimbursement for approximately 140 hours spent by Cooper & Kirk attorneys drafting opening and reply briefs in the Seventh Circuit—about 1.5 hours per page, hardly an unreasonable amount.  *See* Doc. 119 at 25-26; *See* Brief of Plaintiffs-Appellants, *Shepard*, No. 12-1788 (7th Cir.), ECF No. 12 (64 pages); Reply Brief of Plaintiffs-Appellants, *Shepard*, No. 12-1788 (7th Cir.), ECF No. 36 (31 pages).  And Plaintiffs' appellate briefs plainly were not mere reproductions of their briefs in this Court.  Plaintiffs' response to the State's motion to dismiss, for example, was 20 pages.  *See* Doc. 40.  The time Mr. Cooper and his colleagues spent preparing for the argument also was reasonable, particularly in light of the excellent results accomplished on appeal and the magnitude and importance of this case.  Furthermore, Plaintiffs should not be punished for the fact that the *Moore* plaintiffs' attorneys took the "risky path" of spending less time preparing for oral argument.  *NRA*, 871 F. Supp. 2d at 786.

The State also complains about conferencing and time spent on the fee petition. Although the State lists a number of conferences it finds excessive, it offers no explanation of why they were excessive.  Doc. 119 at 22-23.  Courts routinely recognize that reasonably staffed

conferences promote efficiency and quality in litigation.  *See, e.g.*, *Berberena*, 753 F.2d at 633.

With respect to the fee petition, Doc. 119 at 33-34, the attached Exhibit C shows that the time

reported for the fee petition thus far was reasonable.

### 4.  *Unnecessary or Uncompensable Activities*

The State identifies several categories of hours that it believes should be excluded.  None

of its arguments in favor of exclusion withstands scrutiny.

a.  <u>Lobbying</u>: The State argues that the Court must exclude hours expended on legislative

and public relations.  *See* Doc. 119 at 20, 28.  The cases on which it relies support no such

categorical exclusion, but instead merely stand for the proposition that work performed by the

same attorney for the same client, but unrelated to the litigation, cannot be claimed.  *See Webb v.*

*Board of Educ. of Dyer Cnty.*, 471 U.S. 234, 242 (1985).  Indeed, courts permit the collection of

fees for legislative or media efforts that meaningfully contribute to the litigation.  *See Davis v.*

*San Francisco*, 976 F.2d 1536, 1545 (9th Cir. 1992), *reh'g denied*, *vacated in part*, *and*

*remanded*, 984 F.2d 345 (1993); *Jenkins by Agyei v. Missouri*, 862 F.2d 677, 678 (8th Cir.

1988); *Dupuy v. McEwen*, 648 F. Supp. 2d 1007, 1021 (N.D. Ill. 2009).  An award of fees for

legislative or public relations work is particularly appropriate for a controversy that "lend[s]

itself to resolution in the political arena."  *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169,

176 (4th Cir. 1994).  In their haste to exclude all public relations-related work, the State fails to

consider the fact that, by seeking an extension of the stay of the Seventh Circuit's mandate while

it developed replacement carriage legislation, the State brought this litigation into the political

arena and justified any legislative and public relations work claimed by Plaintiffs.

As it happens, though, Plaintiffs seek almost no fees for legislative or public relations

work.  Most of the work the State identifies as "legislative" in nature is work performed tracking

the development of the replacement carriage law in the Illinois legislature after the Seventh Circuit invalidated the flat ban. *See, e.g.*, Doc. 119-1, Ex.7, at 76 (objecting to "[r]esearch re consequences of amendatory veto of carry bill" on grounds that it is "[l]egislative, not litigation related"). A lawyer's ethical duty requires him to track legal developments that affect the claim he is litigating. That work is not the sort of lobbying or media campaign work that is non-compensable when it does not further the litigation.

The State does identify a few entries that are genuinely media-related, as set forth in Exhibit C. Although Plaintiffs maintain that such work is compensable in this case, in the interest of compromise, Plaintiffs consent to the exclusion of those hours.

b. Researching Trial Judge: The State next objects to an alleged total of 10.1 hours spent researching judges in the Southern District of Illinois. As the more detailed billing records attached to Mr. Howard's declaration reveal, that time was spent not only researching judges but also "analyz[ing] the relevant Illinois statutes for further limitations on the possession of firearms that could impact the complaint, including any restrictions on carrying firearms in churches[,] research[ing] and analyz[ing] equal protection issues and pleading standards and elements[, and] further editing . . . the draft complaint." Howard Decl., Doc. 106-2, Ex. B, at 17.

At any rate, the State's objection finds no support in the case law. Indeed, researching judges is part of the "careful pre-filing investigation of the facts and the law . . . required by the Federal Rules of Civil Procedure and [is] compensable pursuant to section 1988." *Globe Glass & Mirror Co. v. Brown*, No. 94-4033, 1996 WL 325602, at *3 (E.D. La. June 12, 1996); *see also Community House, Inc. v. City of Boise*, No. 05-0283, 2014 WL 1247758, at *10 n.10 (D. Idaho Mar. 25, 2014); *Florez v. Delbovo*, No. 94-4475, 1996 WL 543314, at *4 (N.D. Ill. Sept. 23, 1996). Plaintiffs are therefore entitled to compensation for the reasonable number of hours their

attorneys spent investigating the law of the forum before filing the complaint.

c. <u>Clerical and Paralegal Work</u>. The State objects to clerical or paralegal work "for which attorneys' fees should not be charged." *See, e.g.*, Doc. 119 at 25, 26 n.9, Ex. 7. Plaintiffs do not contend that these tasks can be compensated at an attorney's billing rate, as they were performed by "staff, including legal assistants, law clerks, and summer associates." Thompson Decl., Doc. 106-1, ¶ 11; *see also* Howard Decl., Doc. 106-2, ¶ 3. Instead, as Plaintiffs noted in their opening brief, they included these hours in their lodestar at "hourly rates charged for legal assistants, law clerks, and other non-attorney staff." Doc. 107 at 12. The case law permits this approach. *See Missouri v. Jenkins by Agyei*, 491 U.S. 274, 284-85 (1989).

### 5.  *Work After Seventh Circuit Decision on the Merits*

Finally, the State argues that Plaintiffs should not be able to claim hours expended after the Seventh Circuit issued its decision on the merits because "the case was over and all that was remaining was a final order." Doc. 119 at 27. It is true that Plaintiffs won a final judgment on the merits and therefore became prevailing parties when the Seventh Circuit issued its decision, but surely the State cannot pretend that an attorney's work on a case ends with the issuance of an opinion on appeal. *See, e.g.*, *Bond v. Stanton*, 630 F.2d 1231, 1235 (7th Cir. 1980).

Plaintiffs have omitted from their fee request work relating to the dismissal of the case as moot and the subsequent appeal, but Plaintiffs are entitled to compensation for the work they did to defend the relief they secured from the Seventh Circuit on their first appeal. This included tracking and analyzing the State's new legislation to determine whether it complied with the Seventh Circuit's mandate, litigating the stay of the mandate, and preparing their fee petition.

### III.   **PLAINTIFFS ARE ENTITLED TO FULL COMPENSATION FOR EXPENSES.**

The State objects to Plaintiffs' itemized expenses on the ground that they are not

supported by adequate documentation.  Yet Plaintiffs detailed the time and nature of every

individual expense they incurred.  As with attorney time entries, and as set forth in Exhibit D, the

context of these billing entries provides further detail on the purpose of the expenses, so that the

Court may assess their reasonableness.  A $12,441.65 bill of expenses for litigation that is going

on its fourth year is hardly extravagant, and the records support Plaintiffs' request.  Plaintiffs

nevertheless agree to reduce their request by approximately $900, as set forth in Exhibit D-4,

resulting in a total request of $11,517.30.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be granted, and this Court should

award Plaintiffs $606,298.00 in fees, $11,517.30 in expenses, and $791.00 in taxable costs.


Dated:  May 27, 2014                        Respectfully submitted,

William N. Howard                       s/ Charles J. Cooper
LOCKE LORD LLP                          Charles J. Cooper*
111 S. Wacker Dr.                       David H. Thompson*
Chicago, Illinois 60606                 COOPER & KIRK, PLLC
Tel: (312) 443-0333                     1523 New Hampshire Avenue, N.W.
Fax: (312) 896-6433                     Washington, D.C. 20036
whoward@lockelord.com                   Tel: (202) 220-9600
                                        Fax: (202) 220-9601
                                        ccooper@cooperkirk.com
                                        *Admitted *pro hac vice*.

*Attorneys for Plaintiffs*

20

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney states that he caused a true and correct copy of **Reply Brief in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Taxable Costs** to be served upon the parties of record, as shown below, via the Court's CM/ECF system on the **27th** day of **May, 2014**.

By:   s/ Charles J. Cooper

### <u>SERVICE LIST</u>

Terence J. Corrigan
Illinois Attorney General's Office
500 South Second Street
Springfield, IL 62706
Tel: (217) 782-5819
Fax: (217) 524-5091
tcorrigan@atg.state.il.us

Joseph A. Bleyer
K. Rockne Bleyer
BLEYER & BLEYER
601 West Jackson
P.O. Box 487
Marion, IL 62959
Tel: (618) 997-1331
jableyer@bleyerlaw.com

Jonathan Lee Diesenhaus
HOGAN LOVELLS LLP
555 13th Street, N.W.
Washington, D.C. 20004
Tel: (202) 637-5416
Fax: (202) 637-5910
jonathan.diesenhaus@hoganlovells.com

Karl Triebel
Illinois Attorney General's Office -
Chicago 2
100 West Randolph Street
12th Floor
Chicago, IL 60601
Tel (312) 814-2391
Fax: (312) 814-2253
ktriebel@atg.state.il.us

Karen L. McNaught
Illinois Attorney General's Office -
Springfield
500 South Second Street
Springfield, IL 62706
Tel: (217) 782-1841
Fax: (217) 524-5091
kmcnaught@atg.state.il.us